UNITED STATES of America, Plaintiff,

v.

Angela JOHNSON, Defendant.

Nos. CR 00–3034–MWB, CR 01–3046–MWB.

United States District Court, N.D. Iowa, Central Division.

April 23, 2002.

Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Dean A. Stowers, Rosenberg Law Firm, Des Moines, IA, Thomas P. Frerichs, Frerichs LAw Office, Waterloo, IA, PAtrick J. Berrigan, Watson & Dameron, LLP, Kansas City, MO, Philip A. MacTaggart, Federal Public Defender, Davenport, IA, Robert R. Rigg, Drake University Legal Clinic, Des Moines, IA, for Defendant.

Patrick J. Reinert, Charles J. Williams, U.S. Atty's Office, Northern District of Iowa, Cedar Rapids, IA, for U.S.

## MEMORANDUM OPINION AND ORDER REGARDING GOVERNMENT'S NOTICE OF INTENT TO USE EVIDENCE AND DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. BACKGROUND ........................................................800

II. FINDINGS OF FACT ................................................802
 A. The Informant's "Résumé" of Cooperation in Federal Investigations.....802
 1. Cooperation with Pennsylvania authorities .........................803
 2. The Scotter Clark investigation .....................................803
 3. The Stefani information .............................................803
 4. The Daniel Dice investigation ......................................803
 5. Scotter Clark revisited and the Garrett investigation ................804
 6. The Dr. Shultice investigation ......................................804
 7. McNeese's motivations .............................................805
 8. Effects of McNeese's prior cooperation .............................805
 B. Acquisition Of Incriminating Statements ...............................806
 1. Johnson's placement in the Benton County Jail ....................806
 a. The decision-maker .............................................806
 b. Benton vs. Linn .................................................808
 c. The rationale for Johnson's placement .........................809
 2. "First contact" and reaction .......................................811
 a. Johnson's cell assignments .....................................811
 b. First contact between McNeese and Johnson ....................812
 c. First notice of contact and reactions............................813
 i. The August 13th notice to a jailer ........................813
 ii. The August 14th meetings .................................814
 iii. Johnson's removal to a different cell .......................814
 3. Continued contacts ...............................................814
 a. Frequency and manner of contacts ............................814
 b. The August 30th incidents .....................................816
 c. The September 3rd note-passing report .........................816
 d. September 6th meeting .........................................817
 e. Incidents from September 6th to September 11th ................820
 4. The September 11th instructions and aftermath .....................821
 5. Termination of the contacts .......................................824
 6. McNeese's admissions to another inmate ...........................824
 7. Summary of findings ..............................................825

III. SUBSEQUENT PROCEEDINGS.........................................827
 A. The Second Indictment ................................................827
 B. Framing Of The Admissibility Dispute .................................827

 1. The government's "Notice Of Intent To Use Evidence" ................ 827
 2. The defendant's response ........................................... 828
 C. Hearings And Other Proceedings ....................................... 828
 1. The first evidentiary hearing ...................................... 828
 2. Post–hearing submissions ........................................... 828
 3. The second evidentiary hearing ..................................... 829
 4. Oral arguments ..................................................... 829

IV. LEGAL ANALYSIS ......................................................... 829
 A. The "Deliberate Elicitation" Rule In Supreme Court Precedent ......... 829
 1. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d
 246 (1964) ......................................................... 829
 a. Facts of the case .............................................. 829
 b. The Supreme Court's analysis .................................. 830
 2. Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424
 (1977) ............................................................. 830
 a. Facts of the case .............................................. 830
 b. The Supreme Court's analysis .................................. 831
 3. United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115
 (1980) ............................................................. 832
 a. Facts of the case .............................................. 832
 b. The Supreme Court's analysis .................................. 832
 4. Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) .... 834
 a. Facts of the case .............................................. 834
 b. The Supreme Court's analysis .................................. 835
 5. Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364
 (1986) ............................................................. 837
 a. Facts of the case .............................................. 837
 b. The Supreme Court's analysis .................................. 838
 B. Application Of The Rule .............................................. 840
 1. Preliminary considerations ......................................... 840
 a. Burden of proof ............................................... 840
 b. "Elements" of the claim ....................................... 841
 2. Attachment of the right to counsel ................................. 843
 a. Attachment of the right ....................................... 843
 b. To what charges the right had attached ........................ 844
 3. Agency of the informant ............................................ 846
 a. "Luck," "happenstance," "entrepreneurs," and "volunteers" ..... 846
 b. Indicia of agency ............................................. 847
 i. The Moore decision ....................................... 847
 ii. "Control," "roving agency," and "symbiotic relation-
 ships." .................................................. 849
 iii. Other indicia of agency .................................. 854
 iv. The Moore decision revisited ............................. 856
 v. The governing rule ...................................... 862
 c. When was McNeese a government agent? ........................... 863
 4. "Deliberate elicitation" ........................................... 871
 a. Conduct of the government ..................................... 873
 i. "Intentional creation" of the opportunity ............... 875
 ii. "Knowing exploitation" of the opportunity ............... 876
 iii. "Legitimate purposes" of the surveillance .............. 877
 iv. Did the constable just blunder? ......................... 885
 b. Conduct of the informant ...................................... 885
 i. "Passive listening" vs. "deliberate elicitation" ....... 886
 ii. Was McNeese only a "passive listener"? .................. 888
 iii. Impact of McNeese's "ultra vires" actions ............... 891
 iv. Impact of the voluntariness of Johnson's disclosures ... 892
 5. Scope of the preclusion ............................................ 895
 a. Extent of the "taint" ......................................... 896

i. *What statements were obtained in violation of Massiah?* . . . . . 896
ii. *What evidence, besides statements, is "tainted"?* . . . . . . . . . . . . 898
b. *Does the government's "good faith" remove the "taint"?* . . . . . . . . . 901
c. *Can the evidence be used for impeachment?* . . . . . . . . . . . . . . . . . . . . . . 902

V. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 902

Was there a *"Massiah* violation" of a defendant's Sixth Amendment right to counsel when a singularly adept and seasoned federal jailhouse informant obtained self-incriminating statements from the defendant shortly after her indictment and arrest on charges that carry the federal death penalty? The government contends that the informant initially procured incriminating statements as an "entrepreneur," but thereafter followed instructions to act merely as a "listening post" while the defendant volunteered more incriminating statements, including the location of the bodies of murdered witnesses. The government also contends that its continuing investigation of the defendant, including use of the informant, was appropriate to discover evidence of other potential, but uncharged or inchoate, crimes. The defendant, however, asserts that the informant was ever and always a "government agent" who "deliberately elicited" incriminating statements from her as part of a carefully orchestrated effort by the government to obtain such statements in violation of her Sixth Amendment right to counsel.

While the consequences of admitting or suppressing the evidence obtained by the jailhouse informant may be particularly dire here, either for the government's case or the defendant's, in light of the nature of the evidence and the gravity of the charges involved, that is not a consideration under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and its progeny, which are controlling on the issue presented. Rather, the question is whether the defendant will be denied the basic protections of the Sixth Amendment guarantee of the right to counsel if evidence of her own incriminating words is used at trial, because federal agents deliberately elicited that evidence from her after she had been indicted and in the absence of her counsel. *See, e.g., Massiah,* 377 U.S. at 206, 84 S.Ct. 1199. That issue, surely, is a weighty one, whatever the charges against the defendant, and whatever the nature of the incriminating evidence obtained from her. As Justice Stewart explained in *Massiah,* what is at issue here is

> a constitutional principle established as long ago as *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 [ (1932) ], where the Court noted that ' * * * during perhaps the most critical period of the proceedings * * * that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation (are) vitally important, the defendants * * * (are) as much entitled to such aid (of counsel) during that period as at the trial itself.' *Id.,* 287 U.S., at 57, 53 S.Ct., at 59, 77 L.Ed. 158.

*Massiah,* 377 U.S. at 205, 84 S.Ct. 1199; *accord United States v. Red Bird,* 287 F.3d 709, —— (8th Cir.2002). The court will give that issue all due consideration here, in its disposition of the government's "notice of intent to use evidence" from the jailhouse informant, and the defendant's responsive motion to suppress that evidence.

## I. BACKGROUND

Federal prosecutions against defendant Angela Johnson began on July 26, 2000, with the filing, in Case No. CR 00–3034–MWB, of the first of two indictments against her involving charges that grew

out of a continuing investigation of the criminal conduct, including drug trafficking, of Johnson's sometime boyfriend, Dustin Honken, and his associates. This first seven-count indictment against Johnson charges her with five counts of aiding and abetting the murder of witnesses, one count of aiding and abetting the solicitation of the murder of witnesses, and one count of conspiracy to interfere with witnesses.[1]

1. More specifically, **Count 1** of this first federal indictment is the first of the counts charging what was described above, for shorthand purposes, as "aiding and abetting the murder of a witness." It charges that, on or about July 25, 1993, Johnson aided and abetted another individual to willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill Gregory Nicholson with the intent to prevent Gregory Nicholson from attending or providing testimony at an official proceeding in the Northern District of Iowa—specifically, a criminal prosecution of Dustin Honken on a charge of conspiracy to distribute methamphetamine or to possess methamphetamine with intent to distribute it—and to prevent Gregory Nicholson from communicating to a law enforcement officer of the United States information relating to the commission or possible commission of federal offenses, specifically, distribution of methamphetamine and conspiracy to distribute methamphetamine, which killing is a first-degree murder, as defined by 18 U.S.C. § 1111, all in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2)(A), 1111, and 2.

**Count 2** of the indictment is the second charge of "aiding and abetting the murder of a witness." It charges that, on or about July 25, 1993, Angela Johnson aided and abetted another individual to willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill Lori Duncan (who was Gregory Nicholson's girlfriend) with the intent to prevent Lori Duncan from communicating to a law enforcement officer of the United States information relating to the commission or possible commission of federal offenses—specifically, tampering with Gregory Nicholson, a federal witness, and unlawful contact with Gregory Nicholson in contempt of court by violation of conditions of pretrial release by Dustin Honken—which killing was a first-degree murder, as defined by 18 U.S.C. § 1111, all in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2)(A), 1111, and 2.

**Counts 3** and **4** of the indictment are the third and fourth charges of "aiding and abetting the murder of a witness." They charge that, on or about July 25, 1993, Angela Johnson aided and abetted another individual to willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill Kandi Duncan and Amber Duncan (Lori Duncan's daughters), respectively, with the intent to prevent them from communicating to a law enforcement officer of the United States information relating to the commission or possible commission of federal offenses—specifically, tampering with Gregory Nicholson, a federal witness, and unlawful contact with Gregory Nicholson in contempt of court by violation of conditions of pretrial release by Dustin Honken—which killings were first-degree murders, as defined by 18 U.S.C. § 1111, all in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), 1512(a)(2)(A), 1111, and 2.

**Count 5** of the indictment is the last of the five charges of "aiding and abetting the murder of a witness." It charges that, on or about November 5, 1993, Angela Johnson aided and abetted another individual to willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill Terry DeGeus with the intent to prevent Terry DeGeus from communicating to a law enforcement officer of the United States information relating to the commission or possible commission of federal offenses—specifically, the distribution of methamphetamine and conspiracy to distribute methamphetamine—which killing was a first-degree murder, as defined by 18 U.S.C. § 1111, all in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A), 1111, and 2.

**Count 6** of the indictment was described above, in shorthand terms, as the charge of "aiding and abetting the solicitation of the murder of witnesses." It charges that, between about June 10, 1996, and February 24, 1998, Angela Johnson aided and abetted another individual to solicit, command, induce, and endeavor to persuade Dean Donaldson and Anthony Altimus to engage in conduct constituting a felony that has as an element the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States—

A warrant issued for Johnson's arrest on these charges on July 26, 2000, the same day the indictment was filed. Johnson was arrested on this federal warrant by officers with the Iowa Department of Criminal Investigation (DCI) on July 30, 2000, the following Sunday, and was then brought to the Benton County Jail. Johnson was arraigned before a magistrate judge in Cedar Rapids, Iowa, which is in Linn County, on Monday, July 31, 2000, at which time, while represented by court-appointed counsel, she entered a plea of not guilty to all of the charges against her. At the arraignment on July 31, 2000, a further detention hearing was set for August 2, 2000, and the Clerk of Court was directed to appoint other counsel to represent Johnson in further proceedings. Johnson was returned to the Benton County Jail where she remained incarcerated, except when she appeared in court, until October 3, 2000, when she was transferred to the Black Hawk County Jail in Waterloo, Iowa.

Johnson contends that, while she was incarcerated in the Benton County Jail, a jailhouse informant named Robert McNeese, acting as a government agent, deliberately elicited incriminating statements from her.

## II. FINDINGS OF FACT

### A. The Informant's "Résumé" of Cooperation in Federal Investigations

Robert McNeese, the jailhouse informant in this case, already had a long history of cooperation with the government, including the United States Attorney's Office in the Northern District of Iowa, in the form of obtaining incriminating statements from fellow inmates and other targets of criminal investigations, before he ever had contact with Angela Johnson in the Benton County Jail in the late summer of 2000. McNeese had been convicted of a bank robbery charge in the Northern District of Iowa in 1988, and since that time had been incarcerated in various federal penitentiaries. He is currently serving a life sentence on federal charges of importation of heroin in the Middle District of Florida, a crime he committed while incarcerated in a federal correctional facility,

specifically, the murders of Timothy Cutkomp and Daniel Cobeen, with the intent to prevent these witnesses' attendance or testimony at a federal drug trial, a second case against Dustin Honken—with the intent that Dean Donaldson and Anthony Altimus engage in such conduct and under circumstances strongly corroborative of that intent, all in violation of 18 U.S.C. §§ 373(a)(1) and 2.

Finally, **Count 7** of the July 26, 2000, indictment charges Johnson with a "conspiracy" offense, described above, in understated terms, as "conspiracy to interfere with witnesses." It actually charges that, between about July 1, 1993, and continuing thereafter until about February 24, 1998, Angela Johnson knowingly and willfully combined, conspired, confederated, and agreed with other persons known and unknown to the grand jury to commit offenses against the United States, which were identified as (1) killing or attempting to kill another person with the intent to prevent that person's attendance or testimony at an official proceeding; (2) preventing communication by that person to a law enforcement officer of information relating to the commission or possible commission of a federal offense or violations of conditions of release pending judicial proceedings; (3) knowingly using intimidation, physical force, threats, or otherwise corruptly to persuade another person with intent to influence, delay, or prevent testimony of that person at an official proceeding; (4) hindering, delaying, or preventing communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings; and (5) soliciting, commanding, inducing, and endeavoring to persuade a person to commit a violent felony with intent that such person engage in such conduct under circumstances strongly corroborative of that intent.

and in the course of which he conspired with members of organized crime also incarcerated in federal prisons. He was recently sentenced on a money-laundering charge in this district stemming from the Scotter Clark drug-trafficking investigation discussed below. Conviction on the money-laundering charge is pursuant to a plea agreement, which reduced the charge from conspiracy to distribute more than 50 kilograms of marijuana to conspiracy to commit money laundering, in part because of McNeese's cooperation in this case. McNeese testified, and the court finds, that he hopes that his cooperation in this and other cases will lead to reductions in his life sentence on the importation conviction in Florida. It has already led to reduction of his sentence on the money-laundering charge in this district.

### 1. Cooperation with Pennsylvania authorities

McNeese cooperated with Pennsylvania authorities and the FBI in investigations of organized crime in 1998 by obtaining information on criminal activities of incarcerated persons. McNeese accomplished this, in part, by allowing investigators to record telephone conversations and what he described as "active" collection of information. *See* Suppression Hearing Transcript, Vol. II (Testimony of Robert McNeese), at p. 395, *ll.* 9–19.

### 2. The Scotter Clark investigation

McNeese's potential for cooperation in criminal investigations involving Iowa defendants first came to the attention of law enforcement officers in Iowa in the second half of 1997. At that time, members of a DEA task force, including officers from the Cedar Rapids Police Department, were contacted by officials at the federal penitentiary in Atlanta, Georgia, where McNeese was then incarcerated, about telephone calls between McNeese and others that they had intercepted, which they

believed suggested criminal activity in the Cedar Rapids area. Agents learned that McNeese was involved with a New York "crime family" with connections to a drug trafficking operation in Cedar Rapids involving Scotter Clark and McNeese's brother, Floyd McNeese. Robert McNeese was interviewed by task force agents and, in mid–1998, agreed to cooperate with law enforcement officials. He was, therefore, brought back to the Linn County Jail in September of 1998. Once in Cedar Rapids, McNeese testified before a Grand Jury concerning drug trafficking by Scotter Clark's organization in February of 1999.

### 3. The Stefani information

Also, while in the Linn County Jail, McNeese began to provide the authorities, particularly Cedar Rapids Police Detective and DEA task force member Mark Fischer, with information about Steve Stefani, a local attorney serving time for a probation violation arising from drug charges. Although Scotter Clark was not then in custody, both McNeese and Stefani were. In March of 1999, McNeese was returned to a federal penitentiary, this time in Terre Haute, Indiana.

### 4. The Daniel Dice investigation

Before leaving Cedar Rapids, Iowa, however, McNeese provided information to Detective Fischer concerning criminal activity of a childhood friend, Daniel Dice, who was, according to McNeese, then involved in large-scale importation of controlled substances across the border from Mexico into the San Diego, California, area. Detective Fischer and an agent from the San Diego area eventually met with McNeese in Terre Haute, and McNeese agreed to cooperate in an investigation of Mr. Dice. Consequently, in November of 1999, McNeese was taken to

California, where he participated in recorded telephone calls with Mr. Dice that produced incriminating evidence about Mr. Dice's drug-trafficking operations.

### 5. Scotter Clark revisited and the Garrett investigation

McNeese returned to the Cedar Rapids area in mid-March of 2000 to provide additional cooperation in the Scotter Clark trial. At that time, McNeese was housed in the Linn County Jail. However, about a week later, on March 22, 2000, McNeese was moved to the Benton County Jail, possibly because he had been disruptive in the Linn County Jail. In September of 2000, McNeese entered into a plea agreement regarding charges stemming from his involvement in the Scotter Clark drug-trafficking operations.

However, well before that, while he was incarcerated in the Benton County Jail, McNeese began to provide authorities with information that a private investigator named Jeff Garrett, who had purportedly been hired by the New York "crime family" to assist Mr. McNeese, had burgled the office of a Cedar Rapids attorney—indeed, one of the attorneys now representing Angela Johnson—and had obtained documents from the investigation of Scotter Clark. McNeese agreed to allow authorities to record a one-on-one conversation between himself and Mr. Garrett in a visitor's room at the Benton County Jail, which led to the issuance of a search warrant for Mr. Garrett's office.

### 6. The Dr. Shultice investigation

In early April of 2000, McNeese again contacted Detective Fischer, this time with information that his cellmate, a Dr. Shultice, had confided to him that he was attempting to have at least two persons testify falsely for him at his sentencing on federal charges. Dr. Shultice, a Cedar Rapids physician, was the principal defendant in a high-profile drug distribution case in the Cedar Rapids area, which involved, among other things, charges that Dr. Shultice had dispensed prescriptions outside of the usual course of medical practice and without legitimate medical purpose, and those prescriptions had resulted in the death of a patient. After McNeese contacted Detective Fischer about Dr. Shultice, Detective Fischer contacted the United States Attorney's Office. On April 11, 2000, McNeese signed a "Memorandum of Instruction" from the United States Attorney's Office providing him with what the parties have referred to as "listening post instructions" concerning what he could and could not do to obtain incriminating information from Dr. Shultice. *See* Government's Exhibit 3. McNeese signed those "listening post instructions" after going through it "line-by-line" with Detective Fischer. *See* Suppression Hearing Transcript, Vol. I (Testimony of Detective Fischer), at p. 23, *l.* 23, to p. 24, *l.* 6. This set of "listening post instructions" was limited to authorization to obtain information from Dr. Shultice. *Id.* at p. 24, *ll.* 8–20.

At this point, another investigator, FBI Special Agent Scott French, became involved in the investigation of Dr. Shultice. McNeese agreed with Agent French and Detective Fischer to wear a "wire" to record a conversation with Dr. Shultice. In that recorded conversation, Dr. Shultice made incriminating statements about plans to hire a "hit man" to kill some witnesses and to hire "a couple of women" to lie at his sentencing. Dr. Shultice made similar statements in a recorded interview with a DEA agent who posed as a prospective "hit man." Also, a female police officer posed as a woman willing to lie at Dr. Shultice's sentencing, and authorities thereby obtained incriminating statements in another recorded meeting with Dr. Shultice at the Benton County Jail.

### 7. McNeese's motivations

The court finds that it was readily apparent that McNeese had two specific goals in mind when providing to the government incriminating statements made by other inmates: (1) he wanted assistance with his efforts to reduce his life sentence in Florida, as no other reductions on other sentences could lead to his earlier release; and (2) he wanted assistance with getting himself and his brother into the federal witness security program (WITSEC). As to McNeese's interest in assistance with his efforts to get into the WITSEC program, Detective Fischer testified that there were two significant problems: (1) McNeese's habit of making contact with the media; and (2) his demonstrated lack of self-control and inability to abide by terms and instructions given to him.

### 8. Effects of McNeese's prior cooperation

Detective Fischer testified that the situations involving Dice, Stefani, and Shultice involved persons or incidents of which law enforcement officers were simply unaware until McNeese brought them to their attention. Similarly, there is no evidence that any law enforcement officers ever expressly asked McNeese to obtain information from Angela Johnson before McNeese informed them that he had had contact with Angela Johnson in the Benton County Jail. However, the court finds that, prior to Angela Johnson's arrival at the Benton County Jail, McNeese was well-known to federal prosecutors in the Cedar Rapids office of the U.S. Attorney for the Northern District of Iowa and to federal and state law enforcement officers working with them as a cooperative "jailhouse informant"—and indeed, an "entrepreneur"—who would obtain and then volunteer information when it suited him, whether or not he had been given instructions from authorities to obtain information about any specific inmates, and that

he had been led to believe by experience with government agents that he would thereby obtain some assistance with his efforts to reduce his life sentence and/or to get himself and his brother into the witness security program.

The court also finds that it was clear to government agents that McNeese, even when given detailed instructions by the government, could be something of a "loose canon" who played the game for himself. Indeed, at his sentencing hearing on the money-laundering charges in this district, the prosecuting AUSA, who is also prosecuting the charges against Angela Johnson, remarked that his request for a reduction in McNeese's sentence was somewhat tempered by "some starts and stops in the cooperation and—some rocky roads on whether the defendant was complying with all the instructions given and other difficulties that certainly were presented, and that certainly was factored in on the nature and extent of his cooperation." McNeese Sentencing Transcript, Case No. Cr. 00–52 (Sept. 18, 2001), at 14–15. On the other hand, the sentencing judge, Judge Michael Melloy, who has since been elevated to the Eighth Circuit Court of Appeals, found that McNeese's cooperation in this and other prior and concurrent investigations in this district had been unprecedented:

> [A]s I say, it's hard to imagine—and certainly I can't think of anybody in my nine plus years of experience who's done more by way of cooperation. The cooperation, in so far as the drug conspiracy itself, was substantial. Then you add to that the Shultice/Angela Johnson/Dustin Honken matters and I believe the defendant clearly qualifies as the most important and valuable cooperator that this district has probably ever seen.

*Id.* at 28–29. The court, therefore, imposed a sixty percent reduction in McNeese's sentence based on his coopera-

tion, even though the prosecuting attorney had only recommended a departure of thirty-five to forty percent off his sentence. *Id.* at 13 & 30.[2] These specific observations about McNeese's value as an informant are, admittedly, after the fact of his cooperation in this case. Nevertheless, the court finds that it was clear to government agents, based on McNeese's "résumé" of cooperation even before Johnson was placed in the Benton County Jail with McNeese, that it was likely that, given any sort of opportunity, McNeese would attempt to obtain incriminating information from Angela Johnson, where Johnson's case was an especially high-profile one in the Northern District of Iowa, involving a great deal of press coverage, which included the fact that the bodies of the alleged murder victims had never been found. It was also clear to government agents that McNeese's attempts to obtain such information would not necessarily be in compliance with the letter of any "listening post instructions." Finally, it was clear to government agents that McNeese would then attempt to trade any incriminating information he obtained, *quid pro quo*, for assistance with his personal agenda to reduce his sentence or to get into the witness security program.

## B. Acquisition Of Incriminating Statements

### 1. Johnson's placement in the Benton County Jail

Johnson contends that her initial placement in the Benton County Jail, rather than the Linn County Jail, was part of the government's plan to elicit information from her, in the absence of counsel, through McNeese, a known and accomplished jailhouse informant, already incarcerated there. Thus, the circumstances under which Johnson was placed at the Benton County Jail may be significant to Johnson's claim of a "*Massiah* violation."

### a. The decision-maker

On July 28, 2000, after Johnson's indictment, but prior to her arrest, Assistant United States Attorney (AUSA) Patrick Reinert, the prosecutor in this case, telephoned Roger Arechiga, the Chief Deputy U.S. Marshal for the Northern District of Iowa, concerning Johnson's possible arrest and incarceration. Chief Deputy Arechiga's duties include entering into contracts with the sheriff's departments in various counties of this state, the State of Iowa itself, and a private corporation in Minnesota for bed space for federal inmates pending trial. There is no federal holding facility in the State of Iowa for inmates pending trial in federal court. The county jails in Linn County, Benton County, and Black Hawk County, among others, have contracts with the Marshal's Office to hold federal inmates prior to trial and/or sentencing.

Chief Deputy Arechiga is also involved in the placement of individual federal inmates following their arrest. However, the record evidence is, and the court finds, that the state DCI officers who arrested

---

**2.** The sentencing judge also held out the possibility of a further reduction, upon a Rule 35 motion, and directed that McNeese's sentence for money-laundering in this district run concurrently with his life sentence in the Middle District of Florida, so that the sentence imposed in this district would not delay any opportunity for McNeese's early release on the Florida charge. The sentencing judge also took note of the beneficial impact his sentencing determinations might have on McNeese's chances of obtaining a reduction in sentence on the Florida charges and was informed of the prosecuting attorney's undertaking to make authorities in Florida fully aware of the extent and value of McNeese's cooperation in this district in the hope of enhancing McNeese's chances of a reduction of his life sentence in Florida to a term of years. *Id.* at 5–6, 13–14, 16–18, & 31–32, 84 S.Ct. 1199.

Johnson could have taken her to any jail under federal contract. Chief Deputy Arechiga testified, and no party disputed, that, if state officers arrest a person on a federal warrant, the state officers can take that prisoner to any convenient jail under federal contract, although they ordinarily check with the U.S. Marshal's Office to determine what jail under a federal contract has space available. Chief Deputy Arechiga also testified, and the court also finds, that the arresting officers, not the Marshal's Office, are responsible for transporting the prisoner to an initial appearance before a federal magistrate judge. The U.S. Marshal's Office is not responsible for placement or transportation of a prisoner until the magistrate judge directs the Marshals to take custody of the prisoner at an initial appearance or arraignment. Even when prisoners have been placed in the custody of the Marshals, they are in fact incarcerated in the contract facilities identified above in the keeping of local jailers.

Arrestees were sometimes placed in one jail or another with which the U.S. Marshal's Office had a contract based on matters including requests from defense counsel, opportunities for visitation with family members, concerns about isolation of a detainee from other inmates who might pose a danger to the detainee, threats by detainees to staff members or other inmates at a particular jail, or ease of transportation to the pertinent judicial proceedings. However, it is, in Chief Deputy Arechiga's words, "fairly unusual" for a federal prosecutor to request placement of an arrestee in a particular jail—although less unusual for a prosecutor to request relocation of an inmate who has decided to cooperate after his or her arrest. *See* Suppression Hearing Transcript, Vol. II, p. 377, *l.* 20, to p. 378, *l.* 19. On the other hand, Chief Deputy Arechiga testified, and the court agrees, that "[Mr.] Reinert is a very aggressive prosecutor" who "gets involved in a lot more details." *Id.* at p. 378, *ll.* 18–21. While it is still "not very common," Mr. Reinert has occasionally requested a particular placement for a person upon arrest where that person "could be a possible informant," *id.* at 378, *l.* 25 to p. 379, *l.* 3; however, that is not the reason that AUSA Reinert gave for requesting a particular placement for Angela Johnson upon her arrest.

In his telephone call on July 28, 2000, prior to Johnson's arrest, AUSA Reinert advised Chief Deputy Arechiga that Johnson might be arrested that weekend by DCI officers on a federal warrant, " 'and if she was, could they put her in the Benton County Jail.' " *Id.* at p. 355, *ll.* 4–5 (Testimony of Chief Deputy Arechiga). Chief Deputy Arechiga responded with what the defense contends is one of the burning questions in this case: "What's wrong with Linn County?" *Id.* at *ll.* 5–6. According to Chief Deputy Arechiga, AUSA Reinert explained, " 'Well, Linn County doesn't tape their telephone conversations but Benton County does, and so I prefer that she would be out there.' " *Id.* at *ll.* 6–9. Chief Deputy Arechiga testified that AUSA Reinert indicated that the government's interest in taping Johnson's telephone calls "was something to do with the possibility that she may try to arrange an escape." *Id.* at p. 356, *ll.* 5–6. Chief Deputy Arechiga also confirmed that it was his understanding that the Linn County Jail did not routinely tape inmates' telephone conversations, although jail staff could apparently listen to inmates' calls in that jail. Chief Deputy Arechiga agreed to place Johnson in the Benton County Jail, and asked to be paged if any difficulties were encountered in booking her in there, but he never received such a page.

Chief Deputy Arechiga assumed that AUSA Reinert would direct the DCI officers to take Johnson to the Benton County Jail; he testified, that it was not his re-

sponsibility to direct them to do so. Chief Deputy Arechiga also testified that he asked to be kept up to date on any information about a planned escape attempt by Johnson, but that he never communicated concerns about an escape threat to staff at the Benton County Jail. Rather, he thought that passing on such information was the responsibility of the DCI officers who brought Johnson in after her arrest, although he admitted that he did not know whether AUSA Reinert had advised the DCI officers of his concerns about an escape attempt.

After her arrest on July 30, 2000, Johnson was, in fact, placed in the Benton County Jail. The court finds that, in this case, the decision to place Johnson in the Benton County Jail, rather than the Linn County Jail, was made by AUSA Reinert,[3] not Chief Deputy Arechiga, or the DCI officers who actually arrested Johnson. Agent Basler of the DCI testified that he did not make the decision to place Johnson in the Benton County Jail, but instead, he had had a conversation with AUSA Reinert before Johnson was arrested about her placement, in which AUSA Reinert indicated certain security concerns and a desire to monitor her telephone calls, and that Agent Basler "knew when I arrested Angela that we were going to be taking her to Benton County to be held." Suppression Hearing Transcript, Vol. III (Testimony of Agent Basler), p. 672, l. 20 to p. 673, l. 20. Although AUSA Reinert denied that he had the authority to direct Johnson's placement in the Benton County Jail, he acknowledged that he was "sure" he told Agent Basler that Johnson was going to go to the Benton County Jail "after I talked to the marshal's service about where she would be housed when she was arrested." *Id.* (Testimony of AUSA Reinert) at 765, *ll.* 11–19.

### b. Benton vs. Linn

The court turns next to a comparison of the Benton County Jail, where Johnson was placed after her arrest, and the Linn County Jail, which, for reasons indicated below, seems like the more logical place for arresting agents to have taken her. As reflected in Chief Deputy Arechiga's testimony, the Linn County Jail is located a very short distance from the federal courthouse in Cedar Rapids, and thus makes transportation of federal prisoners to and from court proceedings considerably easier for the Marshal's Office than placement of prisoners elsewhere. Several of the witnesses—like Chief Deputy Arechiga—stated that it was their understanding that AUSA Reinert nevertheless wanted Johnson placed in the Benton County Jail and that his primary concern was that Johnson might attempt to escape. Although various government witnesses expressed a subjective belief that the Benton County Jail "might be" more secure than the Linn County Jail, because it is a smaller facility that purportedly permits greater scrutiny of the activities of the various inmates, there is no objective evidence in the record upon which the court could base a finding that the Benton County Jail was either more or less secure than the Linn County Jail.[4]

---

3. Chief Deputy Arechiga testified that, even though he was not responsible for Johnson's initial placement, he believed that AUSA Reinert had contacted him about Johnson's initial placement in the Benton County Jail, because he had "chewed out" the U.S. Attorney's Office in the past for putting people in jail and not advising him.

4. Indeed, Chief Deputy Arechiga testified, and the court finds, that another reason, besides ease of transportation to court proceedings, that the Benton County Jail was a less than ideal facility for placement of federal pretrial detainees was that it lacked a full-time nursing staff. At the same time, there is nothing in the record to indicate that Angela Johnson had any medical condition that would make it

In the circumstances of this case, a more critical distinction between the Benton County Jail and the Linn County Jail is that, while male and female prisoners were detained in separate cellblocks (called "pods") in the Linn County Jail, there was no such separation of male and female prisoners into separate cellblocks in the much smaller Benton County Jail. Rather, the Benton County Jail had only a single cellblock and, as this case demonstrates, male and female prisoners could be placed in adjacent cells. Moreover, the small inmate population—jail capacity was only about thirty inmates—and configuration of the single cellblock at the Benton County Jail, *see* Government's Exhibit 2 (Benton County Jail Floor Plan), reproduced on page 23, made it likely that every prisoner in the Benton County Jail would be aware of the gender and location, and likely the name and face, of every other prisoner in the jail. Although there is little record evidence on this point concerning the Linn County Jail, in light of that jail's larger population and separation of male and female prisoners into separate cell blocks, it seems unlikely that prisoners would be as fully aware of the name, face, or gender of all other inmates in that jail.

As the record in this case also demonstrates, it was possible for any prisoner in the Benton County Jail, male or female, to find a way to have extensive communication—oral, written, or both—with any other prisoner, male or female, in the Jail, even though contact between male and female prisoners and the passing of notes were supposedly prohibited by jail rules. The uncontradicted testimony of witnesses who had been inmates of the Benton County Jail, including Robert McNeese and Sara Bramow, was that inmates routinely shouted through walls of adjacent cells, largely unimpeded by jail staff, making the Benton County Jail a "loud" place, and

more appropriate for her to be placed in a

inmates routinely spoke to other inmates in the exercise yard, which was used by all of the inmates, through cell windows overlooking the yard. Benton County Jail officials recognized that communications between inmates occurred, for example, through the windows of the cells overlooking the exercise yard and via notes, which were passed among inmates in books and magazines or tossed through the food slots or bars of cells, even though such contact was also supposedly prohibited. However, jailers at the Benton County Jail did not always impose written citations for rules violations or punishment on occasions when they observed prohibited communications between inmates. Indeed, as shall be discussed more fully below, jailers actually facilitated such communications by passing books and magazines between inmates, while turning a blind eye to the possibility that notes were concealed in those items, by actually passing sealed notes between inmates, and upon occasion, by permitting face-to-face contact of inmates in transit to or from the exercise yard with other inmates allowed out of their cells.

#### c. The rationale for Johnson's placement

Turning to the reasons expressly advanced for Johnson's placement in the Benton County Jail, although several witnesses testified that it was their understanding that AUSA Reinert wanted Johnson placed there out of concern that Johnson might attempt to escape, that was not the reason AUSA Reinert himself first gave at the suppression hearing. Instead, on direct examination by defense counsel, he testified as follows:

Q. There's already been testimony, Mr. Reinert, that you wanted her taken to the Benton County Jail, correct?

A. Yes, sir.

facility with a full-time nursing staff.

Q. And the explanation that has been given so far in the record, one of the explanations, is that you wanted her monitored, correct?

A. I wanted the opportunity to limit her ability to tamper with witnesses, and in the Benton County facility, since it's a small jail, it's much easier to monitor mail and monitor outgoing phon[e] calls. And if we can monitor those two things and make sure that the prisoners know that they're being monitored, then that cuts down on her ability to tamper with a witness by having face-to-face contact with someone in the visiting room, so I thought it was—it was very protective of our witnesses to try to make sure that we were able to ensure we knew what was going on, or if there was a threat that we picked up on phone monitoring, we could take steps to protect our witness.

Q. Your concern was witness tampering?

A. Yes, sir.

Q. That was your only concern?

A. Yes, sir.

Suppression Hearing Transcript, Vol. III (Testimony of AUSA Reinert), at p. 764, l. 8, to p. 765, l. 7. Only on cross-examination by the government did AUSA Reinert suggest that "[w]e were always concerned about escape, and I know there have been some references that we have looked at very closely about whether there was any plan for an escape attempt." *Id.* at p. 774, *ll.* 17–20. On examination by the court, AUSA Reinert stated that his concerns were *both* witness tampering and escape, when he discussed Johnson's placement with Chief Deputy Marshal Arechiga. *Id.* at 777, *ll.* 3–8. While such evolving explanations of the reasons for Johnson's placement in the Benton County Jail might simply be the result of gradual recollection of past events, the court also recognizes that they provide an inference of post hoc justification and pretext that cannot be ignored. That inference may or may not be reinforced by other evidence in the case, upon further examination below.

The government's witnesses all staunchly deny that Johnson was placed in the Benton County Jail just because a known "superstar" federal jailhouse informant, Robert McNeese, was already detained there. Agent Basler, one of the officers who arrested Angela Johnson and transported her to the Benton County Jail, professed no knowledge of Robert McNeese prior to Johnson's arrest, and so was apparently unaware that Mr. McNeese was already at the Benton County Jail. *Id.* at p. 676, *ll.* 10–21. However, AUSA Reinert was aware of Robert McNeese's past cooperation with the government, because he had been the prosecutor in the Scotter Clark and Stefani cases. *See* Suppression Hearing Transcript, Vol. III, at 734, *ll.* 7–9.[5] AUSA Reinert was also aware that McNeese was already incarcerated in the Benton County Jail, and that, as of March 2000, well before Johnson's placement in the same jail, McNeese was "familiar with the mechanics of talking to someone and capturing the conversations on tape." *See id.* at p. 753, *l.* 16, to p. 754, *l.* 1. Although AUSA Reinert knew that McNeese was in the Benton County Jail, he professed himself to be "surprised" upon learning that McNeese and Johnson had been in contact with each other at the Benton County Jail, *id.* at p. 773, *ll.* 13–16, and that he would not have wanted to deal with McNeese or to bring him into any more of his cases. *Id.* at p. 777, *l.* 11, to p. 778, *l.* 4. This court

---

**5.** Although AUSA Reinert specifically acknowledged during the suppression hearing that he was the prosecutor in the Scotter Clark investigation, at the cited point in the transcript, court records also show that AUSA Reinert was the prosecutor in the case against Steve Stefani and the cases against both Robert and Floyd McNeese.

finds the latter comment surprising, given Judge Melloy's view of the extraordinary impact of McNeese's assistance in the Dr. Shultice investigation. Even if McNeese was difficult to work with, it was clear that he was capable of obtaining extremely useful information. AUSA Reinert stated that McNeese had been placed in the Benton County Jail—admittedly, long before Angela Johnson was also placed there— "so we could keep track of him too, because of—his involvement in Linn County showed he wanted to engage in potentially future criminal conduct, so we needed to—keep that from happening as well." *Id.* at 767, *ll.* 1–5.

### 2. *"First contact" and reaction*

### a. *Johnson's cell assignments*

The floor plan of the Benton County Jail, from Government Exhibit 2, is shown below.

**BENTON COUNTY JAIL FLOOR PLAN**

Upon her arrival at the Benton County Jail, Johnson was placed in cell # 2, a two-person cell directly adjacent to the cell occupied only by Robert McNeese, which was cell # 1. Benton County Jail officials testified that no one instructed them to place Johnson in that cell; rather, her placement there was attributable solely to the happenstance that cell # 2 was the only cell, other than the temporary holding cell, then occupied by a female inmate, and no other cells were completely vacant. Although the court finds it suspicious that Johnson was placed in a cell adjacent to a known jailhouse informant, the court must, perforce, agree with the government's assertion, in response to what the government described as the defendant's "conspiracy theory," that the government "just isn't that good."

Nevertheless, the court finds that Johnson's initial placement was in proximity to McNeese and that she remained incarcerated in close proximity to him for the

remainder of the time they were both in the Benton County Jail. Based on commissary records, Johnson remained in the cell adjacent to McNeese from Johnson's admission to the Benton County Jail on July 30, 2000, until at least August 15, 2000, and she was joined in that cell by Sara Bramow, who testified that she reported to the Benton County Jail to do a sixty day sentence on August 6, 2000. Bramow remained Johnson's cellmate throughout much of Johnson's stay at the Benton County Jail. From August 19 to August 29, the commissary records indicate that Johnson was in cell # 6, one of the cells overlooking the exercise yard. *See* Government's Exhibit 2. Sara Bramow testified that she was moved with Johnson to cell # 6. The commissary records indicate, further, that from September 7 until she was transferred to the Black Hawk County Jail, Johnson was in cell # 7, which also overlooks the exercise yard, and Ms. Bramow testified that she again was transferred to that cell with Johnson. Thus, for all but the last week of her stay at the Benton County Jail—when McNeese was in isolation—Johnson's placement was such that oral communication with McNeese was possible, either through the wall of their adjacent cells, by yelling directly across the hall, or by talking through the window of Johnson's cell into the exercise yard, which McNeese was allowed to visit regularly. Also, during almost the entire time that Johnson and McNeese were both at the Benton County Jail, they passed notes back and forth almost daily, and Johnson and McNeese's relative cell placements had no impact on their ability to pursue communications in that way. As explained more fully below, the court finds that each of these kinds of contacts between Johnson and McNeese, as well as others, occurred frequently during Johnson's stay at the Benton County Jail.

The court finds, further, that some contact between McNeese and Johnson was likely simply by virtue of the fact that they were both incarcerated in a jail of the size and nature of the Benton County Jail. That likelihood of contact approached inevitability when a jail of the size and nature of the Benton County Jail was combined with the presence in that jail of a highly motivated jailhouse informant and a defendant in a high-profile case in which press coverage disclosed that key evidence, the bodies of the alleged murder victims, had never been found. The record makes clear that McNeese received the Cedar Rapids newspaper while he was in the Benton County Jail, for example, from evidence that McNeese sent Johnson clippings of newspaper stories about himself and that he commented to investigators on the effect of a newspaper story about himself upon Johnson. It is but a small step to infer that McNeese soon learned enough about Johnson after her arrival at the Benton County Jail, either from the press or from her own explanation of the charges against her, to find her as interesting as any of the prior targets of his skills as an informant.

### b. First contact between McNeese and Johnson

McNeese testified that Johnson had been at the Benton County Jail for about a week before he first had contact with her, which he said consisted of yelling through the wall of their adjacent cells, which he had initiated. *See* Suppression Hearing Transcript, Vol. II, at p. 421, *ll.* 3–6. Sara Bramow also testified that McNeese first made contact with Johnson and Bramow about the second day that Bramow was in the Benton County Jail, that is, on or about August 7, 2000, by beating on and yelling through the wall between their cells, and by sending a letter over in a crossword puzzle book with newspaper ar-

ticles on who he was, with requests for information about who the two women were. *See* Suppression Hearing Transcript, Vol. IV, at p. 796, *ll.* 9–21 (Testimony of Sara Bramow). Bramow testified that the crossword puzzle book was passed to the women by a jailer, Andy Rich. *Id.* at p. 797, *ll.* 10–25. The timing of "first contact" as identified in McNeese's testimony at the suppression hearing differs somewhat from what he told Agent Basler in an interview on September 6, 2000, at which time McNeese told Basler "that on the first day that Johnson was in the Benton County Jail, [he] talked to Johnson, and Johnson told him what she had been charged with." Defendant's Exhibit F, p. 1. Although it is not clear whether it was a week or a day after Johnson arrived at the Benton County Jail that she had first contact with McNeese, the court finds that disposition of the admissibility of McNeese's evidence in this case does not turn on this uncertainty about the timing of that first contact.

Quite soon after their first contact, Johnson told McNeese about the charges against her, but McNeese testified that he did not ask Johnson any questions about her case "at that time." *Id.* at Vol. II (Testimony of Robert McNeese), p. 421, *l.* 24, to p. 422, *l.* 15. Sara Bramow testified that "a lot of letters" between McNeese and Johnson followed, which were passed directly between Johnson and McNeese through the food slot in his cell door, which was always left open, and by Officer Rich, one of the jailers, passing notes between them. *See id.* at Vol. IV, p. 798, *l.* 17, to p. 800, *l.* 15. Bramow testified that Officer Rich passed notes almost daily, sometimes twice a day, "[j]ust like a mail run." *Id.* at 800, *ll.* 16–21. Moreover, Bramow testified that the notes were not always concealed in books, magazines, or newspapers, but were sometimes simply in sealed envelopes that Officer Rich placed in the bars of Johnson's and Bramow's cell

door. *Id.* at 800, *l.* 22, to p. 801, *l.* 4. Officer Rich denied that he ever knowingly passed notes between inmates, but admitted that he passed magazines or newspapers between inmates "all the time," even though he knew that inmates sometimes hid notes in such items. Rich testified that he only searched the items passed from one inmate to another before delivering them "[i]f we think about searching through the games sometimes or books or whatever it may be." *Id.* at p. 881, *l.* 23, to p. 882, *l.* 17. The court finds that Officer Rich had either actual or constructive knowledge that he was passing notes between Johnson and McNeese, based on this and other testimony discussed below.

### c. *First notice of contact and reactions*

#### i. *The August 13th notice to a jailer.*
On or about August 13, 2000, during the time that Johnson was still in cell #2, McNeese first informed a jailer—that is, a jailer other than Officer Rich—that he was having contacts with Johnson. On that date, McNeese informed Officer Merino that Johnson was talking to him through the wall between their cells. Merino testified that he had not been aware of McNeese talking to other females housed in cell #2 prior to that time. At about this same time, a dispatcher, who had a view down the cellblock hallway from her office, reported that she had seen a note being passed between McNeese and Johnson (although she wasn't sure which way) through the food slot in the door of McNeese's cell. The dispatcher reported the note-passing incident to Detective Pete Wright of the Benton County Sheriff's Department, and a member of the DEA Drug Task Force in Cedar Rapids, Iowa, after a jailer, Bill Reese, refused to do anything about it. *See* Defendant's Exhibit E (Memorandum of August 14, 2000, from

Detective Wright to AUSA Reinert), p. 1, ¶ 1.

***ii. The August 14th meetings.*** After receiving the dispatcher's report of a note passing between McNeese and Johnson, Detective Wright, whose responsibilities included investigation of incidents at the Benton County Jail, had a meeting with McNeese and jailer Les Wood. At that point, Detective Wright understood that there was to be no contact between male and female · inmates, including McNeese and Johnson, but that McNeese had reported that Johnson talked to him and "everyone" by yelling or talking through the wall between their cells. ·Detective Wright testified that he told McNeese during the August 14, 2000, meeting to stop talking or sending notes to the women in cell # 2. Detective Wright then e-mailed the jail administrator about stopping such contacts.

After that meeting, McNeese again contacted Officer Merino to tell him that he had in his possession some notes that he had received from Angela Johnson, which he had not mentioned at the meeting with Deputy Wright and Officer Wood, apparently because he did not trust Officer Wood. Again on August 14, 2000, after receiving copies of the notes McNeese had given Merino, *see* Government's Exhibit 10, Wright had a second meeting with McNeese and the jail administrator. McNeese then clarified that the note the dispatcher had seen being passed had actually been from McNeese to Johnson and indicated that he was quite fully informed by Johnson about the circumstances of her case, including the fact that no bodies had been found. Indeed, Detective Wright's memorandum on the meeting states the following:

> McNeese had asked Johnson about the murder charges and no bodies. Johnson had made some sort of statement to McNeese that there was no need to

worry, no one would be able to find the bodies, or words to that effect. McNeese had other information from Johnson.

Defendant's Exhibit E, pp. 2–3, ¶ 5. Detective Wright instructed McNeese not to have any more contact with Johnson, *see* Suppression Hearing Transcript (Testimony of Detective Wright) at 271, *ll.* 21–25 ("I simply, I guess, didn't want to become more involved in this than that, and so I said, 'Okay, don't talk to her any more. I'll talk to the United States Attorney's Office,' and try to get out of it."), at least "until this matter was resolved." Defendant's Exhibit E (Memorandum of August 14, 2000, from Detective Wright to AUSA Reinert), p. 3, ¶ 5. Wright then wrote a memorandum to AUSA Reinert, to which he attached his previous e-mail to the jail administrator, and asked AUSA Reinert for further guidance.

***iii. Johnson's removal to a different cell.*** It was about this time, or shortly thereafter, that Johnson and her cellmate were moved to another cell, on the basis of instructions that Detective Wright had received from AUSA Reinert. Johnson was moved to cell # 6, which was across from, instead of adjacent to, McNeese's cell, but which overlooked the exercise yard. Sara Bramow testified that she and Johnson were · told that they were being moved because they were "too loud." Suppression Hearing Transcript, Vol. IV, at p. 802, *l.* 18, to p. 803, *l.* 1. Far from stopping contacts between McNeese and Johnson, the move had no real impact on the possibility or frequency of their contacts, and instead opened up new means for them to communicate.

### 3. Continued contacts

#### a. Frequency and manner of contacts

McNeese testified that he had contact with Johnson shortly after she was moved

when she knocked on her cell window overlooking the exercise yard while he was in the yard, and they were able to talk. Opportunity for this kind of contact, of course, had not existed when McNeese and Johnson were in adjacent cells, neither of which overlooked the exercise yard. As before, McNeese also passed notes to Johnson and received notes from her through the food slot in his cell door, which was kept open, ostensibly to allow air to circulate in his cell, because he has asthma. On the other hand, an apparently new channel of communication between McNeese and Johnson after she was moved was the exchange of notes by leaving them in a book in a particular place on a book shelf in the jail library, having made such arrangements through Johnson's cell window into the exercise yard. Finally, McNeese testified that he and Johnson exchanged notes or letters by placing them in magazines and asking one of the jailers if they would pass the magazine for them, but without telling the jailer that there was a note inside, which, again, was nothing new. *See* Transcript, Vol. II, p. 456, *ll.* 7–16.

Also, after Johnson was moved, McNeese began to take notes on their contacts and conversations, *see* Government's Exhibit 5, which, he testified, was on his own initiative and contrary to Detective Wright's instructions. McNeese testified that he did this, because Johnson began to tell him "things concerning her

crimes." Transcript, Vol. II, p. 430, *ll.* 7–12. Thus, the date on which McNeese testified that he began to learn "things concerning [Johnson's] crimes" is actually after several jail officials not actively involved in passing notes between McNeese and Johnson had been notified by McNeese that he and Johnson were in communication.

Sara Bramow's testimony largely corroborates McNeese's testimony concerning the frequency and manner of McNeese's contacts with Johnson, including Officer Rich's facilitation of note-passing. Even Officer Rich admits that, if every magazine or newspaper he passed between McNeese and Johnson, and vice versa, contained a note, he would have passed upwards of twenty notes between them. *See* Transcript, Vol. IV, at 887–92.[6]

There are some differences, however, in Bramow's testimony about who initiated and pushed contacts between McNeese and Johnson. Bramow testified that Johnson seemed uninterested in sharing information with McNeese, and had been cautioned by her attorney and relatives not to share information about her alleged crimes with anyone, but that McNeese kept "bugging her" until she gave him information, in response to his offers to help her with her case. *See id.* at 813–14. Bramow testified that McNeese, not Johnson, initiated contacts through the women's cell window after the women were moved by

---

**6.** The parties dispute the precise import of Officer Rich's testimony about how many notes he may have passed between Johnson and McNeese as opposed to how many magazines, etc., he may have passed. The court also engaged in questioning of Officer Rich to determine the meaning of his testimony on this point. The most definitive statement on this point appears to be the following, during questioning of Officer Rich by defense counsel:

Q. How many notes do you think you passed between the two of them?

A. I have no idea.

Q. How many do you remember passing between the two of them?

A. If there was a note in every book and game that I passed, there was probably more than 20.

Q. How many notes do you remember passing that way?

A. I didn't have any knowledge of passing notes that way.

Suppression Hearing Transcript, Vol. IV, p. 892, *l.* 19, to p. 893, *l.* 4.

banging on their cell window when he was in the exercise yard. Bramow testified that McNeese might bang on their cell window as often as three times a day, although other inmates did not get out to exercise more than once a day, and were entitled to only three outings a week under jail rules. Bramow also testified that McNeese would be very annoyed and persistent if Johnson did not come to the window to talk to him, and that their conversations through the window were usually several minutes, not just several seconds. *See id.* at Vol. IV, pp. 804–07.

Sara Bramow also testified that on two occasions, Officer Rich allowed McNeese and Johnson to have face-to-face contact in the jail corridor or yard, for several minutes, not just seconds, when Johnson and Bramow were being brought in from the exercise yard and McNeese was out of his cell, another privilege Bramow testified that McNeese enjoyed to a degree other inmates did not. Bramow testified that, on the two occasions of direct contact in the jail corridor, Officer Rich simply continued on his way with Bramow, after McNeese stopped Johnson, returning Bramow to her cell and only later bringing in Johnson. *See id.* 807–08 & 809; *and compare id.* at 819–22 (cross-examination by the government). Officer Rich denies allowing incidents of direct contact to occur—a denial the court does not find credible—but acknowledged that there may have been "accidental" face-to-face contact in the jail corridor, although he doesn't remember any specific incidents. *See id.* at 882–83.

### b. *The August 30th incidents*

On August 30, 2000, following a verbal confrontation between a dispatcher and Angela Johnson regarding Johnson's violation of jail rules by sitting on a table in her cell, Johnson made threats to the dispatcher. Detective Wright then apparently learned through McNeese that Johnson was trying to learn the dispatcher's name and what kind of car she drove, and also was planning an escape from the jail. Consequently, with McNeese's agreement, Detective Wright arranged a meeting between McNeese and DCI Agent Bill Basler, which took place on September 6, 2000.

### c. *The September 3rd note-passing report*

Backtracking briefly, on September 3, 2000, one of the jailers, Officer Rich, normally a courier between McNeese and Johnson, confiscated a note from McNeese to Johnson, which a dispatcher had seen McNeese pass to Johnson through his cell door. Officer Rich confiscated the note, *see* Government's Exhibit 8, and placed Johnson in her lock-down cell. Rich testified that he was unaware of any notes passing between the two prior to that time, which the court does not find credible, although Rich acknowledged that note-passing happens with some regularity in the Benton County Jail, which the court readily accepts is both true and that Rich knew it. Also, the note itself indicates that "It sucks only getting to hear from you once a week," *see id.* at p. 2, and provides other indications of frequent and extensive communications between McNeese and Johnson. McNeese also testified, and the court finds, that there had been several contacts, oral and written, between McNeese and Johnson between August 14 and September 3. *See* Government's Exhibit 5 (McNeese Notes 8/13/00–9/10/00) & Exhibit 11 (Letters from Johnson to McNeese given to Agent Basler on 9/6/00).

In the note intercepted on September 3, however, McNeese seems to characterize his side of things as "mere listening," or at least, as having been instigated by Johnson:

For real Angie you don't really even know me and hell I could be a[sic] informant and testify against you and just tell the jury every thing you've told me and trust me you would probably be convicted. I know you told me you've never been in jail but hell wise up I mean you just started rattling things off to me without me even asking so hell I know the whole picture. I'd hate to hear what you would tell me if I started asking questions. All I'm saying is you need to use caution that's all. Since you don't know the law you need to just take the advice of your attorney. . . .

I don't know how you talked me into writing a letter to you anyway. I don't wanna get into trouble and I don't wan't [sic] you to get into trouble either. Don't get me wrong it's great to hear from you but hell you need to concentrate on your case and not piss these people off.

Government's Exhibit 8 at pp. 3–4. The court simply cannot accept McNeese's characterization of having been "talked into writing a letter to [Johnson]," when it is clear from both Sara Bramow's testimony and McNeese's later statements to Agent Basler, which the court finds more credible, that McNeese initiated and pushed for continued contacts with Johnson. Moreover, in light of his record as an informant for government agents, McNeese was shrewd enough to know that he shouldn't suggest in a note that he was pumping Johnson for information.

### d. September 6th meeting

At the meeting between Agent Basler and McNeese, on September 6, 2000, which Detective Wright had arranged, prompted by concerns about threats to jail personnel and a possible plan for Johnson to escape, McNeese told Agent Basler that he had obtained more information from Johnson, including Johnson's statement that the missing witnesses were dead.

McNeese testified at the suppression hearing as to the manner in which he had obtained that information, as follows:

I believe she said that—I think I said something like, "if they don't have any bodies, you're not going to get found guilty" or—and said something about if they were alive or something, and she said that they were dead, and I told [Agent Basler] that.

Transcript, Vol. II, p. 434, *ll.* 11–15. Thus, McNeese's own characterization of the conversation is that he was involved in and forwarded a conversation about Johnson's crimes by commenting on the effect of the absence of the alleged murder victims' bodies; McNeese was not simply "listening."

Also during the meeting on September 6, 2000, Agent Basler learned from McNeese that Johnson wanted McNeese's help with having a girl named "Christi" killed, that Johnson had disclosed to McNeese extensive information about the murders of witnesses with which Johnson is presently charged, as well as information about Johnson's plans for an escape and Dustin Honken's plan to have an inmate in a federal prison in Colorado admit to killing the five witnesses. Transcript, Vol. III, pp. 679–681. Agent Basler characterized McNeese's further revelations concerning plans to suborn a perjured confession to the murder of witnesses as follows:

Q. What did McNeese relate concerning how that discussion developed then beyond that point?

A. Mr. McNeese told me that he then fabricated a story, which he told Angela Johnson, and that fabricated story involved a[n] individual by the name of Greg Long, that apparently was from Iowa and had been incarcerated in the federal prison at Leavenworth on a methamphetamine charge. Mr.

McNeese further explained that this story that he told Angela involved the fact that this Mr. Long, while at Leavenworth, had committed a murder and had been sentenced to an additional life sentence because of that killing. Mr. McNeese said that he thought that if he could convince Greg Long to admit to killing the five people, once that happened, why, Angela Johnson would obviously be released from jail and would also be in a position to sue the Government for false arrest.

Suppression Hearing Transcript, Vol. III, p. 681, *l.* 20, to p. 682, *l.* 11; *see also id.* at p. 708, *ll.* 9–25 (reiterating that McNeese fabricated the story about Greg Long). McNeese further related that he and Johnson planned to share the proceeds of a successful civil suit against the federal government. *Id.* at p. 682, *ll.* 12–25. Agent Basler indicated that McNeese told him he had had this conversation with Johnson about August 21, 2000. *Id.* at pp. 683–84. Agent Basler instructed McNeese "not to do anything, anything, until he heard from an investigator as to specifically how to proceed." *Id.* at p. 684, *ll.* 17–25. Finally, during the September 6, 2000, meeting, McNeese turned over to Agent Basler letters he had received from Johnson prior to that time. *See* Government's Exhibit 11.

The testimony of McNeese and Agent Basler at the suppression hearing concerning this meeting is consistent with Agent Basler's contemporaneous interview notes. *See* Defendant's Exhibit F. However, Agent Basler's interview notes reveal considerably more detail about the information McNeese had obtained from Johnson and how he had obtained it. The interview notes indicate that Johnson wanted to kill "Christi," because she had revealed details of the murder of the witnesses to Christi while Johnson "was on a 'drug binge' one evening, and was feeling bad, in addition to being high on methamphetamine," that the "police had been leaning on Christi for

years, and that Christi had finally 'broke weak' and 'ratted her off.' " *Id.* at p. 1. In order to assess what information was obtained by McNeese at what time, and how he obtained it, the court deems it appropriate to quote *verbatim* the remainder of Agent Basler's interview notes from September 6, 2000:

> McNeese stated that he has portrayed himself to Johnson as being a mob member, who is still well connected to various individuals on the outside of the prison system.

> McNeese stated that Angie Johnson mentioned that Dustin Honken had someone in the federal prison in Florence, Colorado, who was going to admit to committing the murders of the five missing individuals in Iowa. McNeese stated that Johnson did not mention who this person was. *McNeese stated that he then fabricated a story which he told Johnson, indicating that McNeese knew a person from north Iowa by the name of Greg Long, who was doing a prison sentence at the federal prison in Leavenworth for methamphetamine trafficking. McNeese further stated that he went on to tell Johnson that after Greg Long was sent to prison, Long had killed an informant inside the prison, and had been sentenced to a life prison term. McNeese further stated that he told Johnson that McNeese could possibly convince Greg Long to admit to the killings of the five individuals missing in north Iowa, but would need additional details regarding the crime, so that when Long made these admissions [they] could be substantiated. McNeese further stated that he told Johnson that after these admissions by Greg Long, Angie Johnson would be released from her charges, and then would be in a position to sue the government for false arrest. McNeese again stated that all*

*of the information regarding Greg Long had been fabricated by McNeese.*

McNeese then stated that he needed to return to his cell, in order to retrieve some paperwork. When McNeese returned, McNeese provided a letter that McNeese received from Angela Johnson, [*see* Government's Exhibit 11] with [sic] McNeese stated that the information in the letter refers to McNeese and Johnson's discussion of the situation with Greg Long.

I then took the original of the aforementioned letter from McNeese, as well as the originals of handwritten notes made by McNeese regarding Angela Johnson. Copies of this letter and its [sic] will accompany this interview as Exhibit 23–1A. I have the original of the letter and the notes at the Mason City Division of Criminal Investigation office.

McNeese stated that Angela Johnson learned about Dustin Honken's plans at the prison in Florence through Johnson's sister during a visit at the Benton County Jail. McNeese stated that he was told by Angela Johnson that the woman and the two girls were shot to death, and that Johnson did not mention how the other two individuals died. McNeese stated that this information in regard to the people being shot was shared with McNeese a couple of weeks ago when Angela Johnson was mad, due to the fact that Johnson's daughter, Alyssa, had been refused a visit.

McNeese stated that Angela Johnson told McNeese that after the two little girls were shot, Johnson had wrapped the girls in garbage bags, with Johnson stating that this was the worst things [sic] she's ever done.

McNeese stated that Johnson never mentioned what happed [sic] to the bodies after the people were shot.

McNeese stated that Angela Johnson did mention that the people were killed due to the fact that they were "rats", with McNeese further stating that Johnson did not mention who these individuals had informed on.

McNeese stated that he has other letters written by Angela Johnson, which McNeese has turned over to one of McNeese's attorneys. I asked McNeese what the importance of these letters was, and McNeese stated that in the letters, Johnson admits her guilt. *McNeese again stated that he had told Johnson that in order for Greg Long to admit to these crimes, Long would need all of the details of the crimes, so that Long could make a full admission.* McNeese stated that Johnson is willing to provide these details to McNeese, and that McNeese is willing to wear a "wire" in order to document these details. I told McNeese that he should take nor [sic] further action in regard to this, until he is given specific instructions by the investigators.

McNeese stated that Angela Johnson mentioned that she had once been employed as a stripper.

McNeese stated that Angela Johnson also made reference to a third person being involved in these killings.

McNeese stated that Angela Johnson has told McNeese that Johnson has a desire to break out of the Benton County Jail, and wants McNeese to help her, with Johnson stating that her boyfriend, who owns some type of a company, would be willing to help.

*McNeese stated that Angela Johnson mentioned that Johnson's attorney has told Johnson not to trust McNeese with the attorney describing McNeese as being an informant.*

McNeese stated that on one occasion, McNeese was allowed by a Benton County jailer to meet with Angela Johnson face to face, so that they could talk.

I asked McNeese the name of this jailer, and McNeese refused to identify this person, due to a fear of this jailer getting in trouble.

Having nothing further to add, the interview was concluded.

Defendant's Exhibit F, 3–7 (original in all capital letters; emphasis in italics added).

In light of these interview notes, any suggestion that McNeese was "just listening" to Johnson's incriminating statements is untenable. Rather, McNeese was clearly actively and deliberately eliciting information from Johnson, not just about potential or uncharged crimes, but about the charged crimes, by initiating conversations and putting forward a fabricated plan to have someone else confess to the murders, preempting a similar plan first suggested by Dustin Honken. By suggesting such an alternative plan, McNeese put himself in a position to get more information about Johnson's crimes, under the guise of needing information to make a perjured confession credible. Moreover, McNeese was so persuasive that he was able to convince Johnson to go along with this fabricated plan and reveal incriminating information to him notwithstanding that her attorney—who had also represented Dr. Shultice, on whom McNeese had previously informed—had warned her not to trust McNeese and had described McNeese as an informant. Under these circumstances, it is impossible to imagine, or find, that McNeese was "just listening."

### e. Incidents from September 6th to September 11th

A second meeting between McNeese and government agents was arranged for September 11, 2000. McNeese testified that, at some point prior to the September 11, 2000, meeting, he thought that Detective Fischer had told him to remember the "listening post instructions" regarding Dr. Shultice, and that he had been "going to

inform" prior to the September 11, 2000, meeting. On the other hand, McNeese also testified that Agent Basler told him at the conclusion of the September 6, 2000, meeting that he should not have any contact with Johnson until their next meeting. *See id.* at p. 435, *l.* 14 to p. 436, *l.* 3. Notwithstanding Agent Basler's "no contact" instructions, McNeese is sure that he talked to Johnson in the interim and that he "could have" obtained additional information from her. *Id.* at p. 436, *ll.* 4–11.

Up to September 11, 2000, McNeese testified that no jailer or law enforcement officer assisted or facilitated note passing or face-to-face contacts with Johnson, although the two did meet face-to-face fortuitously once, for about ten or twenty seconds, in the hall outside his cell, when Johnson was coming off a visit and he was coming in from recreation, or vice versa, and Johnson would sometimes talk through his food slot on her way past his cell. *Id.* at p. 436, *l.* 17 to p. 438, *l.* 7. The court does not find McNeese's assertions that no government agent facilitated his contacts with Johnson to be credible, in light of contrary and credible evidence that Officer Rich frequently passed notes between McNeese and Johnson with at least constructive knowledge that he was doing so, and the improbability that jailers were unaware of McNeese's frequent contacts with Johnson through the cell window on to the exercise yard. Moreover, Agent Basler's interview notes reflect that McNeese himself told Basler that a jailer at the Benton County Jail had allowed him to meet face-to-face with Johnson on one occasion "so that they could talk." *See* Defendant's Exhibit F; Transcript, Vol. III, p. 709, *ll.* 1–16. Also, as noted above, Sara Bramow testified that, on two occasions, Officer Rich permitted Johnson and McNeese to have direct contact in the jail corridor. *See id.,* Vol. IV, 807–08 & 809;

*and compare id.* at 819–22 (cross-examination by the government).

### 4. The September 11th instructions and aftermath

At the meeting on September 11, 2000, which involved McNeese, Wright, Basler, and AUSA Reinert, McNeese was presented with "listening post instructions" regarding Angela Johnson prepared by AUSA Reinert. *See* Government's Exhibit 4. McNeese asked several questions about the "listening post instructions," and, apparently after all of his questions were answered, McNeese and two witnesses, Agent Basler and another agent, signed the instructions.

The instructions recounted known contacts between McNeese and Johnson, including note-passing on August 14 or 15, and September 3, and that Detective Wright had instructed McNeese on or about August 15, 2000, to have no further contact with Johnson about her pending case. The instructions then stated the following:

> This memorandum clarifies your relationship with the United States while you are incarcerated.
>
> Although in the past you have acted as an informant and have actively cooperated, you are *not* a government agent. You are not to initiate conversation with any individual regarding that individual's past criminal conduct in an attempt to elicit or obtain information about that past criminal conduct. If someone comes to you and begins a conversation regarding their conduct, whether charged or uncharged, you may listen and respond to the statements but you should not begin to question that individual or elicit further information. In the event you begin to hear or receive information which is privileged, you must immediately take action to remove

yourself from the conversation and/or change the topic of conversation.

> You may not obtain any information concerning a recognized legal privilege. The general categories of privileged communications are as follows: attorney-client, clergyman-parishioner, and husband-wife.

Government's Exhibit 4, p. 1 (underlining in the original).

The "listening post instructions" continue with instructions about various privileged and unprivileged relationships. *Id.* at 2. They conclude as follows:

> Below is a line for your signature. This signature before the witness ensures that you understand your duties and obligations regarding your cooperation you have decided to undertake while incarcerated.
>
> *Exceptions to this memorandum may be made by the United States Attorney's Office in the event we initiate an investigation of an inmate for crimes not yet committed.* In the event such an investigation is initiated by the United States Attorney's Office, your role and activities in that investigation may differ from the guidance in this memorandum. If such an investigation is initiated, you will be given additional guidance.

*Id.* (emphasis added).

Following the September 11, 2000, meeting, a "taint team" was established to insulate prosecutors and investigators assigned to Angela Johnson's case from direct contact with McNeese. The "taint team" consisted of other investigators and AUSAs who would receive documents and information from McNeese to screen that information for privileged or otherwise inappropriate material.

On September 11, 2000, Detective Wright turned over to Agent Basler several letters and notes exchanged between

McNeese and Johnson prior to that time. *See* Government's Exhibit 12. Also around this time, McNeese turned over to Agent Basler notes that he had made concerning his contacts with Johnson between August 13 and September 10. *See* Government's Exhibit 5. The local federal authorities also made requests at this time to the Department of Justice for permission to use McNeese more extensively, for example, by asking him to wear a wire. No response on that application was received before September 26, 2000.

After McNeese signed the "listening post instructions" regarding Johnson on September 11, 2000, Officer Merino, one of the jailers, testified that he was told by Detective Wright that, if there were further communications between McNeese and Johnson, Officer Merino was to "let them pass." *See* Transcript, Vol. I (Testimony of Officer Merino), at p. 9, *ll.* 2–6. These instructions, the court finds, did little more than give formal approval to what had already been happening as a matter of fact.

Also, after September 11, 2000, Officer Merino said that he observed some of the communication between McNeese and Johnson through the window in the exercise yard and that McNeese informed him almost daily of his contacts with Johnson, but that he did not observe any note-passing between them. For example, on September 18, 2000, McNeese disclosed to Officer Merino that he had information from Johnson, including a map of the location of the bodies of the witnesses Johnson is charged with having helped to kill, an explanation of how they had been killed, and an explanation of her involvement in disposing of their bodies.

Officer Merino testified that only one other jailer, Officer Rich, was "in the loop," that is, that he had been advised that McNeese was cooperating in an investigation of Angela Johnson. On the other hand, Officer Rich testified that he was not aware that McNeese was cooperating in an investigation of Angela Johnson until after McNeese was removed to isolation in the last week of September after McNeese refused to turn over to government authorities the maps that he had obtained from Angela Johnson. Nevertheless, another jailer, Officer Reese, who was not "in the loop," asked Officer Merino if something was going on between McNeese and Johnson. Indeed, Reese testified that McNeese was trying to make contact with Johnson several times. Plainly, jail staff, whether in or out of "the loop," became aware that communications were occurring between McNeese and Johnson, and at least some jail staff had been specifically instructed to permit those communications to continue.

In addition to the "listening post instructions" McNeese signed on September 11, 2000, on September 12, 2000, McNeese signed a plea agreement drafted by AUSA Reinert on September 7, 2000, concerning his involvement in the Scotter Clark drug-trafficking crimes. *See* Government's Exhibit 14. That agreement provided for "cooperation" beyond the Scotter Clark investigation as follows:

> 4. Defendant agrees to fully and completely cooperate with the United States Attorney's Office and other law enforcement agencies in the investigation of criminal activity within the Northern District of Iowa and elsewhere.
>
> 5. Full and complete cooperation with the United States Attorney's Office and law enforcement agencies shall include but is not limited to the following:
>
> A. providing intelligence information;
>
> B. arranging for the purchases of controlled substances by defendant and/or undercover agents;

C. providing the introduction of undercover agents to controlled substance traffickers;

D. providing information to secure search warrants, if feasible;

E. providing testimony before the federal grand jury and, if necessary, testimony before any court as a witness in any prosecutions growing out of this or any related investigation;

F. providing any documents or other items in the defendant's custody, possession or under the defendant's control that are relevant to this or any related investigation;

G. making defendant available for interview and debriefing sessions by government attorneys and law enforcement agents upon request;

H. recording conversations related to any investigation as requested; and

I. engaging in and conducting other activities as directed by the law enforcement agents in charge of the investigation.

Government's Exhibit 14 (McNeese plea agreement), at 2–3.

McNeese maintains that he never intentionally questioned Johnson about her case. *See* Transcript, Vol. II, at p. 445, *ll.* 18–25. The court does not find this contention at all credible in light of evidence including McNeese's own characterization of the manner in which he obtained information from Johnson in his interview with Agent Basler. However, McNeese testified, and the court finds, that McNeese continuously received information from Johnson. McNeese continued to take notes on his contacts with Johnson between September 11 and September 24. *See* Government's Exhibit 6. After September 11, 2000, McNeese had frequent telephone contacts with Agent Basler in which he revealed information obtained from Johnson concerning the murder of Terry DeGeus, information that Johnson believed that Dustin Honken was planning to kill her, a conversation Johnson had with McNeese about whether he knew anybody who could kill Honken, more information concerning how the bodies of the murdered witnesses were buried that would be useful to a person making a perjured confession to their murders, and plans to use a gun during a jail break attempt from the Benton County Jail. Agent Basler told McNeese he would need to get more guidance on how to respond to Johnson's questions about procuring someone to make a perjured confession. Agent Basler eventually passed on to McNeese instructions from AUSA Reinert that McNeese should act as "a listening post," that is, he should respond if Johnson talked about the original charges, but should not direct the conversation and should not interrogate Johnson. It was Agent Basler's understanding that McNeese was allowed to leave his cell to make calls to him from a private area.

On September 26, 2000, McNeese repeated to Officer Merino that he had a map showing the locations of the bodies of the witnesses. Officer Merino passed that information on to Deputy Wright and two AUSAs, members of the "taint team," who had arrived at the Benton County Jail. Detective Wright turned over to the "taint team" members items he had received from McNeese since September 11, 2000. *See* Government's Exhibit 13. A meeting then took place involving Wright, Merino, McNeese, and the two AUSAs. McNeese denied that he had a map from Johnson and refused a request to let officers search his cell. Instead, McNeese requested that the meeting be terminated and he was returned to cell # 1.

Later that day, McNeese's cell was searched, although McNeese's legal mail

was not, but the search turned up nothing illegal or improper. Later in the day, McNeese became irate and had to be removed from his cell by a cell extraction team, which involved officers, dressed in full protective gear, entering McNeese's cell, strapping McNeese to a restraint board, and taking him to the isolation cell. Thereafter, Officer Merino was instructed not to permit any contact between McNeese and Johnson and, so far as he knew, there was none. However, Detective Wright testified that he had learned that there had been more communications between McNeese and Johnson and that McNeese had more documents to turn over to authorities. Indeed, McNeese testified that he obtained one or more maps after September 26, 2000, "from the books" in the jail library where he and Johnson left notes for each other. *See* Transcript, Vol. II, at p. 453, *l.* 10, to p. 454, *l.* 16. Sara Bramow also testified that she and Johnson received a note from McNeese while he was in isolation. McNeese also made notes contemporaneously with a conversation he had with Johnson concerning the bodies, which he said took place approximately September 29 or 30. *Id.* at p. 457, *ll.* 1–21.

On October 2, 2000, McNeese contacted Detective Fischer, with whom he had recently had little contact, in response to a request from Detective Fischer, through Detective Wright, that McNeese contact him. Detective Fischer was aware that McNeese claimed to have obtained from Angela Johnson, and to have in his possession, the maps showing where the bodies of the murdered witnesses could be found. During the conversation with Detective Fischer, McNeese offered to turn the maps over to Detective Fischer, although it wasn't clear whether McNeese was serious or joking about wanting to be let out of solitary confinement in exchange. Nevertheless, Detective Fischer had the impression that McNeese would destroy the maps

if anyone else attempted to take them from him.

After contacting the United States Attorney's Office, Detective Fischer met with McNeese face-to-face at the Benton County Jail and McNeese turned over the maps to Detective Fischer and explained various things on them. Detective Wright was "very adamant" about the fact that McNeese was not turning over the documents "just to get out of the hole, and McNeese agreed with that." *See* Transcript, Vol. I (Testimony of Detective Fischer), p. 35, *ll.* 18–24. Officers also obtained a warrant to search McNeese's legal mail, his cell, and his person, which was executed on October 3, 2000. Several documents were seized during that search.

### 5. Termination of the contacts

On October 3, 2000, Johnson and McNeese were both removed from the Benton County Jail. Johnson was placed in the Black Hawk County Jail in Waterloo, Iowa, and McNeese was initially transferred to the Linn County Jail, then to the Scott County Jail in Davenport, Iowa. There do not appear to have been any contacts between them since.

### 6. McNeese's admissions to another inmate

In June of 2001, Robert McNeese was again incarcerated in the Linn County Jail on the fifth floor in one of two adjacent "solitary confinement" cells. The other cell was occupied by Anthony Curtis Flowers from June 1 to June 25, 2001. Flowers testified that, during that time, he and McNeese would converse, usually in the late evening after visiting hours ended and the jail was less noisy. Flowers, who had seen newspaper articles about Angela Johnson, testified that he asked McNeese how it was that he was celled next to Johnson at the Benton County Jail. He

testified that McNeese responded, "So that I could work her." Suppression Hearing Transcript, Vol. IV, at 864, *l.* 7, to 866, *l.* 16. Mr. Flowers then brought this information to the attention of one of Angela Johnson's defense attorneys.

### 7. Summary of findings

Before turning briefly to the procedural background to the present *Massiah* issue, the court believes that it would be useful to summarize—and occasionally amplify— what the court finds to be its most pertinent findings of fact on the basis of the evidence as a whole. Such a summary is intended to serve as a frame of reference and factual foundation for the legal analysis to follow, although that legal analysis also includes some additional necessary findings of fact, because of the complexity and number of issues presented by the question of the admissibility of incriminating evidence obtained by McNeese.

First, as to Robert McNeese himself, the court finds that McNeese was a long-time, thoroughly seasoned informant, known to government officials to have a track record of obtaining incriminating evidence from associates and, more specifically, from fellow inmates, even where government officials were ignorant of the persons or incidents involved prior to McNeese's revelations. It was also readily apparent to government officials prior to any contact between McNeese and Johnson that McNeese had two specific goals in mind when passing on incriminating statements made by other inmates: (1) he wanted assistance with his efforts to reduce his life sentence on a federal drug conviction in Florida, as no other reductions on other sentences could lead to his earlier release; and (2) he wanted assistance with getting himself and his brother into the federal witness security program (WITSEC). Moreover, McNeese had also been led to believe by his experience with government agents that he would obtain

some assistance with this personal agenda in return for providing incriminating information about others. Finally, even before Johnson was placed in the Benton County Jail with McNeese, it was or should have been apparent to government officials, based on McNeese's "résumé" of cooperation, that it was likely that, given any sort of opportunity, McNeese would attempt to obtain incriminating information from Angela Johnson, not necessarily in compliance with the letter of any "listening post instructions," which he would then attempt to trade, *quid pro quo,* for assistance with his personal agenda to reduce his sentence or to get into the witness security program.

Next, the court finds that AUSA Reinert, who had previously been involved in investigations in which McNeese had acted as an informant, was not only the prime mover, but the ultimate decision-maker regarding Johnson's placement in the Benton County Jail upon her arrest, even though, under ordinary circumstances, it is more likely that Johnson would have been placed in the Linn County Jail. The two jails differed in critical respects, not the least of which was that the person who decided where to place Johnson upon her arrest knew that McNeese was already in the Benton County Jail. The Benton County Jail is a much smaller facility, consisting of a single cellblock in which male and female prisoners could—and were—placed in adjacent cells, and the configuration of that jail was such that it was likely that every prisoner in the Benton County Jail would be aware of the gender and location, and likely the name and face, of every other prisoner in the jail. Certainly, as the floor plan of the Benton County Jail on page 23 shows, because McNeese was housed in cell # 1, he was even more likely to know the faces, placement, and comings and goings of all or almost all of the other inmates, because nearly all inmate traffic

through the jail—from cells to the exercise yard, booking area and library, medical room, and attorney or visitor areas—had to pass the door of the cell he occupied. McNeese also enjoyed unprecedented liberty within the jail, including more frequent trips to the exercise yard than were afforded to other prisoners, and unusual cooperation of jailers in passing his communications to other inmates. Moreover, not only was it possible for all inmates in the Benton County Jail to have extensive oral or written communications with any other prisoner, male or female, but government officials either knew or should have known that such communications occurred regularly and were facilitated, either consciously or through "willful blindness," by jail staff who, for example, actually passed materials between cells with little attempt to ascertain whether they contained contraband, and permitted communications through cell windows into the exercise yard, as well as other talking or note-passing among inmates.

Because of the potent combination of (1) a jailhouse informant that government officials knew or should have known was highly-motivated, experienced, and already on site; (2) a jail that government officials knew or should have known had only a small population and held male and female prisoners in a single cellblock, which was configured in such a way that communications among inmates were relatively easy, and which had a staff that was at best tolerant of such communications and at worst actively facilitating them; and (3) the placement in that jail of a female prisoner facing unusual charges of a particularly grim nature, government officials, including AUSA Reinert and possibly other law enforcement officers or government officials, either knew or should have known that McNeese's eventual contact with Johnson and acquisition of incriminating statements from her were likely—indeed, all but inevitable. The court also finds

that AUSA Reinert, and possibly other government officials, were aware that once such contact had been established, McNeese was almost certain to pass on to the government any incriminating information he acquired from Johnson. Moreover, the court finds that government officials were poised to exploit those circumstances when (not just if) they occurred, or moved with alacrity to do so once advised by McNeese that contact had been established.

The court finds that the likely contacts between McNeese not only actually materialized, but occurred shortly after Johnson arrived at the jail and was placed—"suspiciously," but nevertheless probably through lucky happenstance—in the cell immediately adjacent to McNeese. Moreover, the evidence is undisputed that McNeese, not Johnson, initiated "first contact" and that he was the party who made the more concerted effort to pursue contacts once initiated. Communications, written and oral, between McNeese and Johnson then occurred with great frequency, often facilitated by Officer Rich passing notes between them, either simply in envelopes, or hidden in other materials, such as newspapers, which Officer Rich made no effort to examine for contraband before passing them on. Officer Rich himself conceded that he passed materials between McNeese and Johnson and that it was likely that such materials often contained notes.

Once jailers and other government officials—that is, government officials other than Officer Rich—were notified by McNeese that he was having contact with Johnson, those officials took at best "cosmetic" efforts to stop contact between them. Those efforts consisted of "no contact" instructions to McNeese, which government officials either knew or should have known, based on past experience with

McNeese, would be ignored, and moving Johnson from an adjacent cell to one across the corridor. The change in cells did little or nothing to stop communications, but actually provided new opportunities for communications, including face-to-face contact at the window of Johnson's cell, which looked into the exercise yard where McNeese was permitted unusually frequent visits, and passing of materials via a "drop" in the jail library, arranged during conversations at the cell window, all of which government officials either knew or should have known could, would, and did occur, based on the nature and configuration of the jail.

Perhaps most critically, during the communications between McNeese and Johnson, McNeese was not simply "listening," but was actively engaged in conversations and questioning about Johnson's charges. McNeese even went so far as to fabricate a plan to suborn a perjured confession to the murders with which Johnson was charged as a very useful ploy to obtain detailed information from Johnson about her charged crimes while appearing to act in her interest.

Nearly a month elapsed after government officials became aware that McNeese was having contacts with Johnson, and thereby obtaining incriminating information from her, before government officials finally gave McNeese "listening post instructions" concerning permissible ways to obtain information from Johnson. Some jailers were then given explicit instructions to let communications between McNeese and Johnson pass, although even jailers "not in the loop" were aware that something was going on with regard to such communications. McNeese's "listening post instructions" and the "let them pass" instructions to jailers, the court finds, did little more than give formal approval to what had already been happening, and government officials knew or should have known was happening, as a matter of fact. Only when McNeese ceased to be cooperative did government officials pull the plug and send Johnson and McNeese to separate jails.

## III. SUBSEQUENT PROCEEDINGS

### A. The Second Indictment

On August 30, 2001, based in part on evidence provided by McNeese or obtained as a result of information he provided, a grand jury returned a second indictment against Angela Johnson, the indictment in Case No. CR 01–3046–MWB. That indictment charges five counts of killing witnesses while engaging in a drug-trafficking conspiracy, and five counts of killing witnesses in furtherance of a continuing criminal enterprise.[7]

### B. Framing Of The Admissibility Dispute

#### 1. The government's "Notice Of Intent To Use Evidence"

On November 14, 2000, the government filed a Notice of Intent to Use Evidence in

---

7. More specifically, **Counts 1** through **5** of the second indictment charge that, on or about July 25, 1993, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A) and 846, relating to a conspiracy to manufacture and distribute more than 100 grams of methamphetamine between 1992 and 2000, Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry De-Geus, respectively, and that such killings resulted. **Counts 6** through **10** charge that, on or about July 25, 1993, Angela Johnson, while working in furtherance of a continuing criminal enterprise between 1992 and 2000 in violation of 21 U.S.C. § 848(c) intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted.

Case No. CR 00–3034–MWB. The Notice was filed and prosecuted by AUSA Williams, a member of the "taint team," rather than AUSA Reinert, the prosecutor in this case. In that Notice, the government notified the court and the defendant that it seeks to introduce at trial evidence of incriminating statements Angela Johnson made to Robert McNeese, along with evidence derived from those statements, including the bodies of five murder victims. The government requested an order finding that the evidence obtained from McNeese is admissible at Angela Johnson's trial on the charges pending in Case No. CR 00–3034–MWB, that is, the first seven-count indictment against Johnson.[8] The government submitted a brief in support of its motion in which it contended, generally, that the information provided by McNeese had not been obtained in violation of Johnson's Sixth Amendment right to counsel. Johnson filed an initial resistance to use of McNeese's jailhouse informant evidence on November 27, 2001.

Before the "*Massiah* issue" raised by the parties could be resolved, issues concerning conflicts of interest of counsel intervened. The court resolved those issues, at least conditionally, by order dated February 9, 2001, which allowed the parties and the court to turn their attention back to the "*Massiah* issue."

### 2. The defendant's response

Johnson filed a brief in response to the government's Notice of Intent to Use Evidence on April 6, 2001, in which she asserted that McNeese's acquisition of incriminating statements from her violated her Sixth Amendment right to counsel within the meaning of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246

(1964), and its progeny. Johnson, therefore, requested that the statements and evidence flowing from those statements be suppressed. At this point, the court and the parties agree that the issue of the admissibility of McNeese's evidence had "morphed" into Johnson's motion to suppress evidence based on a "*Massiah* violation."

### C. Hearings And Other Proceedings

### 1. The first evidentiary hearing

On April 11, 12, and 13, 2001, the court held an evidentiary hearing on the alleged "*Massiah* violation." In the course of that hearing, the court heard evidence from Cedar Rapids Police Detective and DEA task force member Mark Fischer, Benton County Jail Officers Michael Merino, Andrew Rich, and William Reese, FBI Special Agent Scott French, Detective Pete Wright of the Benton County Sheriff's Department, Chief Deputy U.S. Marshal Roger Arechiga, Robert McNeese, the alleged jailhouse informant, Geoffrey Garret, a private investigator, Agent William Basler of the Iowa Department of Criminal Investigation (DCI), FBI Special Agent Randy VanGent, and AUSA Patrick Reinert.

### 2. Post-hearing submissions

By order dated April 23, 2001, the court directed the parties to file simultaneous post-hearing briefs on various issues on or before May 21, 2001. Both parties complied with that order, filing timely briefs in further support of their contentions regarding the admissibility of McNeese's evidence of Johnson's incriminating statements. Those submissions, however, did not complete the record on the "*Massiah* issue" now before the court. Rather, on

---

**8.** Again, the first indictment charges Johnson with five counts of aiding and abetting the murder of witnesses, one count of aiding and abetting the solicitation of the murder of witnesses, and one count of conspiracy to interfere with witnesses. These charges are described more fully *supra* at n. 1.

May 25, 2001, Johnson moved to submit additional evidence in support of her contentions that McNeese obtained information in violation of her Sixth Amendment right to counsel in the form of evidence from her cellmate at the Benton County Jail, Sara Bramow.

### 3. The second evidentiary hearing

The court held another evidentiary hearing on July 27, 2001, at which it heard testimony from Sara Bramow, who had been Johnson's cellmate at the Benton County Jail in the late summer of 2000, and Anthony Curtis Flowers, who had been celled next to McNeese in the Linn County Jail in June of 2001, and additional rebuttal testimony from Officer Andrew Rich offered by the government. That hearing closed the evidentiary submissions on the "Massiah issue."

### 4. Oral arguments

On January 15, 2002, the court heard oral arguments on the "Massiah issue," via video teleconferencing on the ICN network, with the court and an Assistant United States Attorney from the "taint team" assigned to the "Massiah issue," present in Sioux City, Iowa, and defense counsel and defendant Angela Johnson present in Cedar Rapids, Iowa. At that point, the episodic submissions of the parties on the "Massiah issue" were completed, and the court turned at last to the uncharacteristically extended process of preparation of its disposition of the weighty question of whether Johnson's Sixth Amendment rights were violated when McNeese obtained her incriminating statements, and thus McNeese's evidence

should be suppressed, or whether McNeese's evidence of Johnson's incriminating statements is instead admissible in her trial in Case No. CR 00–3034–MWB on the charges in the first indictment.

### IV. LEGAL ANALYSIS

### (Including some additional findings of fact)

Defendant Johnson seeks to suppress evidence provided by Robert McNeese on the ground that, through McNeese, the government "deliberately elicited" incriminating statements from her in violation of her Sixth Amendment right to counsel. The Supreme Court's rule against "deliberate elicitation" of evidence from a defendant in the absence of counsel has its genesis in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[9] Thus, the court's legal analysis of the questions presented here begins with examination of *Massiah* and the evolution of the "deliberate elicitation" rule through Supreme Court precedent.

### A. The "Deliberate Elicitation" Rule In Supreme Court Precedent

### 1. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)

### a. Facts of the case

In *Massiah,* the defendant was free on bail following charges of violating federal narcotics laws. *See Massiah,* 377 U.S. at 201, 84 S.Ct. 1199. A co-defendant, Colson, who unbeknownst to Massiah had decided to cooperate with government investigators, permitted an agent to install a

---

9. Although the Supreme Court itself saw its decision in *Massiah* as a logical extension of its prior precedent—in particular *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), and *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)—for present purposes, the decision in

*Massiah* is the source of the doctrine that the government cannot "deliberately elicit" information from a defendant concerning charged offenses outside of the presence of his or her counsel without violating the defendant's Sixth Amendment right to counsel.

radio transmitter in his automobile, which allowed an investigator to overhear conversations between Colson and Massiah carried on in Colson's car. *Id.* at 202–03, 84 S.Ct. 1199. During one such conversation, Massiah made incriminating statements. *Id.* at 203, 84 S.Ct. 1199. At trial, those statements were used against Massiah over the objections of his counsel that the statements had been obtained in violation of Massiah's Sixth Amendment right to counsel. *Id.* at 203, 84 S.Ct. 1199.

#### b. The Supreme Court's analysis

Justice Stewart, writing for a 6–3 majority,[10] established the "deliberate elicitation" standard thereafter applicable to claims that a defendant's Sixth Amendment right to counsel had been violated by use of incriminating statements made to a federal agent or informant in the absence of counsel:

> We hold that the petitioner was denied the basic protections of that [Sixth Amendment] guarantee [of a right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the *Spano* case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, *'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah*

*was more seriously imposed upon * * * because he did not even know that he was under interrogation by a government agent.'* 307 F.2d at 72–73.

*Massiah,* 377 U.S. at 206, 84 S.Ct. 1199 (emphasis added). Thus, in *Massiah,* the Supreme Court reversed Massiah's conviction on the ground that his Sixth Amendment right to counsel had been violated by the surreptitious monitoring of his incriminating statements, which had been "deliberately elicited" from him in the absence of counsel. In subsequent decisions, with remarkable, shifting coalitions among the justices, the Supreme Court has attempted to define and refine what constitutes "deliberately eliciting" incriminating statements from a criminal defendant in violation of his or her Sixth Amendment right to counsel.

#### 2. Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)

The next Supreme Court decision to address a *"Massiah* issue," *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), involved contact between the defendant and a known government agent, not an undercover informant or co-defendant. Nevertheless, the Court found that *Massiah* was controlling, clarifying what constitutes "deliberate elicitation" that is "constitutionally indistinguishable" from impermissible "interrogation" as defined in *Massiah.*[11]

#### a. Facts of the case

In *Williams,* a young girl was abducted from the YMCA in Des Moines, Iowa, and a warrant was issued for a recently-escaped mental patient, Williams, who was a

---

**10.** Justice White wrote a dissent, which was joined by Justices Clark and Harlan.

**11.** The majority decision in *Williams* was again by Justice Stewart, with concurring opinions by Justices Marshall, Powell, and

Stevens, a dissent by Chief Justice Burger, a dissent by Justice White, in which Justices Blackmun and Rehnquist joined, and a dissent by Justice Blackmun in which Justices White and Rehnquist joined.

resident of the YMCA. *Williams,* 430 U.S. at 390, 97 S.Ct. 1232. Williams telephoned a Des Moines attorney, Mr. McKnight, from Davenport asking for assistance, and McKnight advised Williams to turn himself in to Davenport police, which Williams did. *Id.* at 390, 97 S.Ct. 1232. McKnight then arranged with Des Moines police that police officers, including a Detective Leaming, would pick up Williams in Davenport, but would not interrogate him or mistreat him. *Id.* at 391, 97 S.Ct. 1232. McKnight also instructed Williams that he was not to talk to the officers about the missing girl until after consulting with McKnight upon his return to Des Moines. *Id.* These conditions were reiterated to Detective Leaming by the attorney who had represented Williams at his initial appearance in Davenport. *Id.* at 391–92, 97 S.Ct. 1232. "At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney." *Id.* at 392, 97 S.Ct. 1232. Notwithstanding the "no questions" agreement, during the drive back to Des Moines, Detective Leaming gave Williams what he called the "Christian burial speech," encouraging Williams to reveal where he had left the girl's body, so that she could get a "Christian burial," before an in-coming snowstorm made it too difficult to find her body ever again. *Id.* at 392–93, 97 S.Ct. 1232. Thereafter, during the course of the trip, Williams revealed where he said he had left the child's shoes at one location and a blanket in which she had been wrapped at another—although these items were not discovered during stops at the specified locations—and, ultimately, where the girl's body could be—and was in fact—found. *Id.*

### b. *The Supreme Court's analysis*

Although the Iowa Supreme Court affirmed Williams's conviction on the ground that he had waived his right to counsel, on a petition for a writ of *habeas corpus,* the Supreme Court affirmed the conclusions of the lower federal courts that Williams had been denied his Sixth Amendment right to counsel. The Court concluded that (1) "[t]here can be no doubt in the present case that judicial proceedings had been initiated against Williams before the start of the automobile ride from Davenport to Des Moines"; (2) "[t]here can be no serious doubt, either, that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as and perhaps more effectively than if he had formally interrogated him"; and (3) that Leaming had purposely done so "during Williams' isolation from his lawyers." *Id.* at 399, 97 S.Ct. 1232. Under these circumstances, the Court concluded that "Detective Leaming's 'Christian burial speech' had been tantamount to interrogation," making the circumstances of the case "constitutionally indistinguishable from those presented in *Massiah v. United States.*" *Id.* at 400, 97 S.Ct. 1232. The Court concluded further,

> That the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant. Rather, the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.

*Williams,* 430 U.S. at 400–401, 97 S.Ct. 1232 (footnotes and citations omitted). Thus, in *Williams,* the Court once again granted relief from "deliberate elicitation" of incriminating statements in the absence of counsel, finding that the constitutionally significant fact was not whether or not the monitoring of the statements had been "surreptitious," or even whether or not the statements had been obtained by means of "formal interrogation," but whether the government agent had "purposely sought during [the defendant's] isolation from his lawyers to obtain as much incriminating

information as possible," such that the circumstances were "tantamount to an interrogation." [12]

### 3. United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)

Although *Williams* involved "deliberate elicitation" of incriminating statements by a known government agent, the next case in the Supreme Court's line of decisions, *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), like *Massiah* and the case presently before this court, involved surreptitious acquisition of a defendant's incriminating statements by a confidential informant.[13] Thus, the *Henry* decision may provide insights particularly applicable here.

#### a. Facts of the case

*Henry* involved a bank robbery, for which Henry was eventually arrested and held in the Norfolk, Virginia, city jail, following indictment and appointment of counsel. *Henry*, 447 U.S. at 265–66, 100 S.Ct. 2183. Shortly after Henry was incarcerated, government agents investigating the robbery contacted Nichols, an inmate of the jail, who had been acting as a paid informant for the FBI, although "[t]he record d[id] not disclose whether the agent contacted Nichols specifically to acquire information about Henry or the Janaf robbery" with which Henry was charged. *Id.* at 266, 100 S.Ct. 2183. After Nichols was released, he told investigating officers that Henry had told him about the robbery, and he was paid for providing that information. *Id.* At Henry's trial, Nichols testified that Henry had explained various details of the planning and execution of the robbery. *Id.* at 267, 100 S.Ct. 2183. The jury, which was not told that Nichols was a paid informant, convicted Henry on the basis of Nichols's testimony. *Id.*

#### b. The Supreme Court's analysis

On petition for writ of *certiorari* in Henry's subsequent proceedings to vacate his sentence pursuant to 28 U.S.C. § 2255, the Court laid out the question before it and the essential aspects of its analysis as follows:

> The question here is whether under the facts of this case a Government agent "deliberately elicited" incriminating statements from Henry within the meaning of *Massiah*. *Three factors are important. First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.*

*Henry*, 447 U.S. at 270, 100 S.Ct. 2183. In light of these factors, the Supreme Court found that the Court of Appeals had correctly analyzed the case:

> The Court of Appeals viewed the record as showing that Nichols deliberately

---

12. Although *Williams* also discusses the issue of waiver of the right to assistance of counsel, that issue is not presented here. Indeed, the Supreme Court itself later appeared to foreclose any argument that a defendant waives his or her Sixth Amendment right to counsel when he or she makes incriminating statements to an *undisclosed* government agent, which is the circumstance presented here. *See United States v. Henry*, 447 U.S. 264, 273, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *see also infra*, p. 159.

13. As an example of the shifting coalitions producing decisions in the *Massiah* line of cases, the majority opinion in *Henry* was by Chief Justice Burger, a dissenter in *Williams*. Justice Powell, who concurred in *Williams*, also filed a concurring opinion in *Henry*. Justice Blackmun dissented in an opinion joined by Justice White. Justice Rehnquist dissented in a separate opinion. Thus, three of the dissenters in *Williams* again dissented in *Henry*, but one of the dissenters in *Williams* was the author of the majority opinion in *Henry*.

used his position to secure incriminating information from Henry when counsel was not present and held that conduct attributable to the Government. Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information. *This combination of circumstances is sufficient to support the Court of Appeals' determination. Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.* *Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183 (footnote omitted; emphasis added).

The Court rejected various arguments of the government. First, the Court rejected the government's argument "that the federal agents instructed Nichols not to question Henry about the robbery," because "according to his own testimony, Nichols was not a passive listener; rather he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminating statements were 'the product of this conversation.'" *Id.* at 271, 100 S.Ct. 2183. The Court also found that "affirmative interrogation, absent waiver would certainly satisfy *Massiah*," and rejected the government's argument that *Williams* modified *Massiah's* "deliberately elicited test," because "[i]n *Massiah*, no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Id.* at 271–72, 100 S.Ct. 2183. In so holding, the Court noted that "we are [not] called upon to pass on the situation where an informant is placed in close proximity but makes no effort to

stimulate conversation about the crime charged," *id.* at 271 n. 9, 100 S.Ct. 2183, and also rejected a purported distinction between the case before it and *Massiah* on the ground that "the additional fact in *Massiah* that the agent was monitoring the conversation is hardly determinative," because "[i]n both *Massiah* and this case, the informant was charged with the task of obtaining information from an accused." *Id.* at 272 n. 10, 100 S.Ct. 2183. As to the latter point, the Court explained further,

> Whether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it was a matter of no concern to the *Massiah* Court. Moreover, we deem it irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused.

*Henry,* 447 U.S. at 272 n. 10, 100 S.Ct. 2183. The Court then distinguished the circumstances presented from those arising where the government uses undercover agents to obtain incriminating statements from persons not in custody, but suspected of criminal activity, prior to the time charges are filed, which the Court noted might implicate Fourth and Fifth Amendment concerns, but not the Sixth Amendment issue identified in *Massiah*. *Id.* at 272–74, 100 S.Ct. 2183.

> In *Henry,* the Court held as follows:
> Under the strictures of the Court's holdings on the exclusion of evidence, we conclude that the Court of Appeals did not err in holding that Henry's statements to Nichols should not have been admitted at trial. *By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Gov-*

ernment violated *Henry's* Sixth Amendment *right to counsel.* This is not a case where, in Justice Cardozo's words, "the constable ... blundered," *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926); rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.

*Henry,* 447 U.S. at 272–75, 100 S.Ct. 2183 (footnotes omitted; emphasis added). Thus, the Court in *Henry* defined "deliberate elicitation" as "intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *Id.* at 275, 100 S.Ct. 2183, *and compare Williams,* 430 U.S. at 399, 97 S.Ct. 1232 (finding that the Sixth Amendment was violated under the standards stated in *Massiah* where a known government agent "purposely sought during [the defendant's] isolation from his lawyers to obtain as much incriminating information as possible").

### 4. Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)

The next decision in the Supreme Court's string of *"Massiah* cases," *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), like *Massiah* and *Henry,* involved an undercover informant.[14] However, it did not merely reaffirm the principles stated in those cases, but expanded upon them.

### a. Facts of the case

In *Moulton,* in the course of investigating a fire call involving a burning Chevrolet dump truck in the vicinity of the Belfast Dodge automobile dealership, police officers searched a building located on the Belfast Dodge property, but not part of the dealership, and found evidence of several recent automobile and automobile-related thefts. *Moulton,* 474 U.S. at 161–62, 106 S.Ct. 477. Moulton and a co-defendant, Colson, leased the building in question to restore and sell old Ford Mustangs. *Id.* at 162, 106 S.Ct. 477. Moulton and Colson were indicted on charges of theft by receiving stolen automobiles and automobile parts, but both were released on bail pending trial. *Id.* Colson, who had been receiving anonymous threatening telephone calls regarding the charges, eventually made a full confession of his participation with Moulton in committing the crimes with which they were then charged as well as a number of other crimes. *Id.* at 162–63, 106 S.Ct. 477. "The officers offered Colson a deal: no further charges would be brought against him if he would testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges. Colson agreed to cooperate." *Id.*

Colson also discussed the anonymous threats he had received and "Moulton's inchoate plan to kill [a witness]." *Id.* In response, the police chief suggested that a recording device be placed on Colson's

**14.** In *Moulton,* Justice Brennan wrote for the majority (joined by Justices Marshall, Blackmun, Powell, and Stevens). Chief Justice Burger, the author of *Williams* and a dissenter in *Henry,* again dissented, and was joined in his dissent by Justices White and Rehnquist, and in part by Justice O'Connor. In its briefs, the government mistakenly describes this 5–4 decision as a "plurality decision" that "has limited application." *See* Government's Memorandum in Support of the Government's Notice of Intent to Use Evidence at 13; *id.* at 14 n. 2; *see also* Government's Supplemental Memorandum in Response to Defendant's Motion to Dismiss at 4 (also describing *Moulton* as a decision by "a plurality of the Supreme Court"). However, at the oral arguments on January 16, 2002, on the alleged *"Massiah* violation" in this case, the government acknowledged that characterization of *Moulton* as a "plurality decision" was an error, which the government represented, and the court finds, was inadvertent.

telephone, and he agreed. *Id.* In this way, the police recorded three telephone calls from Moulton to Colson, but those calls revealed little more of interest than a plan for a meeting between the two men on December 26, 1981. *Id.* at 163–64, 106 S.Ct. 477. The police then obtained Colson's agreement to wear a body wire transmitter to record his meeting with Moulton, but "Colson was instructed 'not to attempt to question Perley Moulton, just be himself in his conversation....'" *Id.* at 164–65, 106 S.Ct. 477. Thus, Colson, like the informant in 100 S.Ct. 2183*Henry*, received a "no questions" instruction. *See Henry*, 447 U.S. at 270–71, 100 S.Ct. 2183. During the December 26 meeting, picked up by Colson's "wire," Colson obtained several incriminating statements from Moulton by professing to have a poor memory and asking Moulton to remind him of the circumstances of the crimes and by "reminiscing" about events surrounding the various thefts. *Moulton*, 474 U.S. at 165–66, 106 S.Ct. 477. These statements were later admitted into evidence against Moulton at a bench trial, following denial of defense counsel's motion to suppress, leading to Moulton's conviction on several of the charges against him. *Id.* at 166–67, 106 S.Ct. 477.

Moulton appealed on the ground that admission into evidence of his statements to Colson violated his Sixth Amendment right to the assistance of counsel, and the Supreme Judicial Court of Maine granted his appeal and remanded for a new trial. *Id.* at 167–68, 106 S.Ct. 477. However, the Supreme Court granted the State's petition for certiorari. *Id.* at 168, 106 S.Ct. 477.

### b. The Supreme Court's analysis

The Supreme Court affirmed the Maine high court's order for a new trial. The Court forecast the essential aspects of its analysis of the Sixth Amendment issue as follows:

Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. *The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance.* We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, *at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.*

*Moulton*, 474 U.S. at 170–71, 106 S.Ct. 477 (emphasis added). Thus, *Moulton* expressly elevates the Sixth Amendment concerns first formulated in *Massiah* into an "affirmative obligation" of the government "not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Id.* at 171, 106 S.Ct. 477. In *Moulton*, the Court held that the government had violated that affirmative obligation.

The Court continued its analysis with a survey of its prior decisions in *Spano, Massiah,* and *Henry.* The Court noted that,

[In *Henry*,] [t]he Government argued that it should not be held responsible for [the informant's] conduct because its agent had instructed [the informant] not to question [the defendant] and had not intended that [the informant] take affirmative steps to obtain incriminating statements. We rejected this argument, finding that, under the circumstances, the agent "must have known" that [the informant] would take affirmative steps to secure incriminating information. [*Henry*, 447 U.S.] at 271, 100 S.Ct., at

2187. *Consequently, the Court held, "[b]y intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel, the Government violated [the defendant's] Sixth Amendment right to counsel." Id.,* at 274, 100 S.Ct., at 2189.

*Moulton,* 474 U.S. at 173–74, 106 S.Ct. 477 (emphasis added). The Court then articulated what it believed to be the guiding principles to be drawn from *Massiah* and *Henry:*

The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, *the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. See Henry,* 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring). *However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.*

*Moulton,* 474 U.S. at 176, 106 S.Ct. 477 (emphasis added).

As the Court in *Moulton* then explained, "Applying this principle to the case at hand, it is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant, Colson." *Id.* Specifically,

*It was the police who suggested to Colson that he record his telephone conversations with Moulton.* Having learned from these recordings that Moulton and Colson were going to meet, *the police asked Colson to let them put a body wire transmitter on him to record what was said.* Police Chief Keating admitted that, when they made this request, the police knew—as they must have known from the recorded telephone conversations—that Moulton and Colson were meeting for the express purpose of discussing the pending charges and planning a defense for the trial. *The police thus knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. As in Henry,* the fact that the police were "fortunate enough to have an undercover informant already in close proximity to the accused" does not excuse their conduct under these circumstances. 447 U.S., at 272, n. 10, 100 S.Ct., at 2187, n. 10. *By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.*

*Moulton,* 474 U.S. at 176–77, 106 S.Ct. 477 (footnotes omitted; emphasis added). Thus, in *Moulton,* "deliberate elicitation" was defined to include both "intentional creation" of an opportunity to confront the defendant in the absence of counsel, *id.; and compare Henry,* 447 U.S. at 275, 100 S.Ct. 2183 (defining "deliberate elicitation" as "intentionally creating a situation likely

to induce [the defendant] to make incriminating statements without the assistance of counsel"); *Williams,* 430 U.S. at 399, 97 S.Ct. 1232 (finding that the Sixth Amendment was violated under the standards stated in *Massiah* where a known government agent "purposely sought during [the defendant's] isolation from his lawyers to obtain as much incriminating information as possible"), and "knowing exploitation" of such a situation. Because the Court held that the Maine police "knowingly circumvented Moulton's right to have counsel present at a confrontation between Moulton and a police agent," the Court affirmed the State court's order for a new trial. *Id.* at 180, 106 S.Ct. 477.

### 5. Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986)

The latest, but by no means recent, consideration by the Supreme Court of a *"Massiah* issue" arising from use of a confidential informant was in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).[15] In *Kuhlmann,* the Court considered a case in which the "jailhouse informant" was purportedly placed in close proximity to the defendant, but made no effort to stimulate conversations involving the crimes charged against the defendant. Thus, *Kuhlmann* addressed the situation the Court had expressly found was *not* presented in *Henry, see Henry,* 447 U.S. at 271 n. 9, 100 S.Ct. 2183 ("[W]e are [not] called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversation about the crime charged."), but which the government contends *is* presented in Angela Johnson's case.

### a. Facts of the case

The *Kuhlmann* decision arose from a robbery by three men of a taxicab garage during which a night dispatcher was fatally shot. *Kuhlmann,* 477 U.S. at 438–39, 106 S.Ct. 2616. Wilson, a former employee, had been seen on the premises conversing with two other men, and had been seen fleeing after the robbery, carrying loose money in his arms. *Id.* at 439, 106 S.Ct. 2616. Wilson turned himself in, and admitted that he had been present at the time of the robbery, but claimed that he had not participated in it and had only fled because he was in fear that he would be blamed for the crimes. *Id.* He was confined in a cell with a prisoner named Benny Lee, who, unbeknownst to Wilson, had agreed to act as a police informant. *Id.* Wilson made incriminating statements to Lee, which Lee reported to the police. *Id.* The trial court made the following findings of fact on Wilson's motion to suppress:

> Before respondent arrived in the jail, Lee had entered into an arrangement with Detective Cullen, according to which Lee agreed to listen to respondent's conversations and report his remarks to Cullen. Since the police had positive evidence of respondent's participation, the purpose of placing Lee in the cell was to determine the identities of respondent's confederates. *Cullen instructed Lee not to ask respondent any questions, but simply to "keep his ears open" for the names of the other perpetrators. Respondent first spoke to Lee about the crimes after he looked out*

---

**15.** Perpetuating the strange coalitions among the justices in such cases, the majority decision on the Sixth Amendment issue was by Justice Powell, with a concurring opinion by Chief Justice Burger, while Justice Brennan dissented in an opinion joined by Justice Marshall, and Justice Stevens filed a separate dissent. Thus, Justice Rehnquist, who had dissented in *Williams, Henry,* and *Moulton,* at last joined the majority in a post-*Massiah* decision.

*the cellblock window at the Star Taxicab Garage, where the crimes had occurred. Respondent said, "someone's messing with me," and began talking to Lee about the robbery, narrating the same story that he had given the police at the time of his arrest. Lee advised respondent that this explanation "didn't sound too good,"* but respondent did not alter his story. Over the next few days, however, respondent changed details of his original account. Respondent then received a visit from his brother, who mentioned that members of his family were upset because they believed that respondent had murdered the dispatcher. *After the visit, respondent again described the crimes to Lee. Respondent now admitted that he and two other men, whom he never identified, had planned and carried out the robbery, and had murdered the dispatcher. Lee informed Cullen of respondent's statements and furnished Cullen with notes that he had written surreptitiously while sharing the cell with respondent.*

*Kuhlmann*, 477 U.S. at 439–40, 106 S.Ct. 2616 (footnote omitted; emphasis added).

The trial court concluded that Wilson's incriminating statements to Lee were "spontaneous" and "unsolicited," and allowed the jury to hear evidence of those statements. *Id.* at 440, 106 S.Ct. 2616. Wilson was convicted of "common-law murder" and felonious possession of a weapon, the state appellate court affirmed, and the state high court denied leave for further appeal. *Id.* at 441, 106 S.Ct. 2616. Wilson's first federal *habeas* action failed, but he commenced a second *habeas* action after the Supreme Court handed down its decision in *Henry. Id.* at 441–42, 106 S.Ct. 2616. On Wilson's second petition, the federal district court denied relief, but a divided panel of the Second Circuit Court of Appeals reversed, finding the circumstances indistinguishable from the facts in *Henry.* The Supreme Court, how-ever, again reversed, denying Wilson any relief.

### b. The Supreme Court's analysis

After a lengthy discussion of the question of whether it was proper for the federal courts to entertain Wilson's "successive *habeas corpus* petition," *see id.* at 444–55, 106 S.Ct. 2616, which is not of interest here, the Supreme Court turned, in the alternative, to the merits of Wilson's argument that *Henry* entitled him to relief. The Court forecast its holding on this issue as follows:

Even if the Court of Appeals had correctly decided to entertain this successive habeas petition, we conclude that it erred in holding that respondent was entitled to relief under *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). As the District Court observed, *Henry* left open the question whether the Sixth Amendment forbids admission in evidence of an accused's statements to a jailhouse informant who was "placed in close proximity but [made] no effort to stimulate conversations about the crime charged." *Id.*, at 271, n. 9, 100 S.Ct., at 2187, n. 9. Our review of the line of cases beginning with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), shows that this question must, as the District Court properly decided, be answered negatively.

*Kuhlmann*, 477 U.S. at 456, 106 S.Ct. 2616 (footnote omitted).

The Court then embarked on a survey of its decisions in *Spano, Massiah, Henry,* and *Moulton. Kuhlmann*, 477 U.S. at 456–59, 106 S.Ct. 2616. The Court summarized the import of this line of cases, and in particular, the *Moulton* decision, as follows:

As our recent examination of this Sixth Amendment issue in *Moulton*

makes clear, *the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.* Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," 474 U.S., at 176, 106 S.Ct., at 487, citing *United States v. Henry, supra,* at 276, 100 S.Ct., at 2189 (POWELL, J., concurring), *a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.*

*Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616 (emphasis added).[16] Thus, in *Kuhlmann,* by reference to its prior decisions, the Court attempted to make a clear distinction between "deliberate elicitation" and "mere listening." *Id.*

In just two paragraphs, the shortest substantive application of the "*Massiah* standard" yet, the Court rejected the ruling of the Second Circuit Court of Appeals, which had found a Sixth Amendment violation:

It is thus apparent that the Court of Appeals erred in concluding that respondent's right to counsel was violated under the circumstances of this case. *Its error did not stem from any disagreement with the District Court over appropriate resolution of the question re-*

served *in Henry, but rather from its implicit conclusion that this case did not present that open question.* That conclusion was based on a fundamental mistake, namely, the Court of Appeals' failure to accord to the state trial court's factual findings the presumption of correctness expressly required by 28 U.S.C. § 2254(d). *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

*The state court found that Officer Cullen had instructed Lee only to listen to respondent for the purpose of determining the identities of the other participants in the robbery and murder.* The police already had solid evidence of respondent's participation. *The court further found that Lee followed those instructions, that he "at no time asked any questions" of respondent concerning the pending charges, and that he "only listened" to respondent's "spontaneous" and "unsolicited" statements.* The only remark made by Lee that has any support in this record was his comment that respondent's initial version of his participation in the crimes "didn't sound too good." *Without holding that any of the state court's findings were not entitled to the presumption of correctness under § 2254(d), the Court of Appeals focused on that one remark and gave a description of Lee's interaction with respondent that is completely at odds with the facts found by the trial court.* In the Court of Appeals' view, "[s]ubtly and slowly, but surely, Lee's ongoing verbal intercourse with [respondent] served to exacerbate [respondent's] already troubled state of mind."

---

**16.** Contrary to the government's assertions that *Moulton* may be of doubtful continued viability or correctness, the Court in *Kuhlmann* specifically recognized the *Moulton* decision as controlling authority, at least on the

"primary concern of the *Massiah* line of decisions," see *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616, and nothing in the *Kuhlmann* decision expressly overrules or casts doubt on the decision in *Moulton.*

742 F.2d, at 745. *After thus revising some of the trial court's findings, and ignoring other more relevant findings, the Court of Appeals concluded that the police "deliberately elicited" respondent's incriminating statements. Ibid. This conclusion conflicts with the decision of every other state and federal judge who reviewed this record, and is clear error in light of the provisions and intent of § 2254(d).*

*Kuhlmann,* 477 U.S. at 459–61, 106 S.Ct. 2616 (footnotes omitted; emphasis added). On these grounds, the Supreme Court reversed the decision of the Second Circuit Court of Appeals and remanded the case for "further proceedings consistent with this opinion," *i.e.,* denial of relief to Wilson. *Id.* at 461, 106 S.Ct. 2616.

Thus, *Kuhlmann* is the only decision in which the Supreme Court has *denied* relief on a *"Massiah* claim." It is readily apparent that, in denying relief, the key factor was the finding of the trial court on the motion to suppress concerning what, exactly, the informant did or did not do to obtain the challenged evidence from the defendant. While this was so in *Kuhlmann,* because of the *effect* that the Court was required to give those findings under 28 U.S.C. § 2254(d) on a petition for federal *habeas corpus* relief, it does not change what *findings* were critical to determination of the Sixth Amendment issue. Here, of course, the undersigned is the trier of fact on Johnson's motion to suppress.

### B. Application Of The Rule

Guided by these Supreme Court precedents and their progeny in the Circuit Courts of Appeals, this court turns to the question of whether or not incriminating statements were obtained from Johnson by Robert McNeese, the jailhouse informant in this case, in violation of Johnson's Sixth Amendment right to counsel. The stakes

are high: "Any statement about the charged crime[s] that government agents deliberately elicit from a defendant without counsel present after the defendant has been indicted must be suppressed under the Sixth Amendment exclusionary rule" developed in the Supreme Court's *Massiah* line of cases. *See United States v. Red Bird,* 287 F.3d 709, —— (8th Cir. 2002).

### 1. Preliminary considerations

To resolve Johnson's claim, the court must first address two preliminary matters. First, the court must determine who bears the burden of proof on a *Massiah* claim raised in a pre-trial motion to suppress. Second, the court must determine what are the elements of such a claim.

### a. Burden of proof

In *Moore v. United States,* 178 F.3d 994 (8th Cir.), *cert. denied,* 528 U.S. 943, 120 S.Ct. 356, 145 L.Ed.2d 278 (1999), the Eighth Circuit Court of Appeals considered on direct appeal a similar *"Massiah* claim" involving the defendant's contention that the trial court had erred by admitting evidence from a jailhouse informant in violation of his Sixth Amendment right to counsel. *Moore,* 178 F.3d at 999.[17] In *Moore,* the court plainly placed the burden of proof *on appeal* on the *defendant* to establish that evidence had been admitted in violation of *Massiah. Id.* ("[I]n order for Moore to prevail on this claim, he would need to show....."). Similarly, in *Kuhlmann,* the Supreme Court appeared to place the burden on the defendant to prove a *"Massiah* violation." *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616 ("[A] defendant does not make out a violation of [the *Massiah* rule] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incrimi-

---

**17.** The undersigned was the trial judge in *Moore.*

nating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."). However, *Kuhlmann* considered the claim of a "*Massiah* violation" in the context of a state prisoner's petition for *habeas corpus* relief. *Id.* Unlike *Moore* and *Kuhlmann*, however, the present action involves a pre-trial motion to suppress evidence on the basis of a "*Massiah* violation."

In a case reviewing denial of a motion to suppress, the Fifth Circuit Court of Appeals made the following observations concerning the burden of proof:

> Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights. *See United States v. Roch*, 5 F.3d 894, 897 (5th Cir.1993); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977). There are situations, however, where the burden shifts to the government. *See id.*

*United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 919, 151 L.Ed.2d 884 (2002). The court in *Guerrero–Barajas* found that the case then before it was one of those exceptions in which the government bore the burden of proof, because it involved an investigatory stop without a warrant. *Id.* ("When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional. *See* [*Roch*, 5 F.3d at 897.] Therefore, in the instant case, since the Agents conducted an investigatory stop without a warrant, the government bears the burden of proving, by a prepon-

derance of the evidence, that the investigatory stop was constitutional."). In a recent case specifically considering a pretrial motion to suppress evidence based on a "*Massiah* violation," the district court appeared to place the burden on defendants to establish the violation of their constitutional rights, *see United States v. Fernandez*, 172 F.Supp.2d 1252 (C.D.Cal. 2001) (citing *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616), suggesting that a claim of a "*Massiah* violation" is subject to the general rule on the burden of proof identified by the Fifth Circuit Court of Appeals in *Guerrero–Barajas*. Thus, it appears that it would also be appropriate to place on Angela Johnson the burden of proving her claim of a "*Massiah* violation" on her motion to suppress evidence.

However, this court need not decide the question of whether an alleged "*Massiah* violation" presents one of those "situations . . . where the burden shifts to the government" on a motion to suppress evidence. *See Guerrero–Barajas*, 240 F.3d at 432. At the oral arguments on January 16, 2002, Angela Johnson's counsel expressly conceded that Johnson bears the burden of proof to establish a "*Massiah* violation," and that she must carry that burden by the preponderance of the evidence. The government did not contest either this allocation or quantification of the burden of proof in this case. Thus, the court will proceed on the assumption that, on a pretrial motion to suppress evidence, Johnson bears the burden of proving her claim of a "*Massiah* violation" by the preponderance of the evidence.

#### b. *"Elements" of the claim*

The decision of the Eighth Circuit Court of Appeals in *Moore* also identifies the "elements" of a "*Massiah* violation," whichever party bears the burden of proof on such a claim at this stage of the proceedings. *Moore*, 178 F.3d at 999. In

*Moore,* the court explained that, "in order for Moore to prevail on this claim, he would need to show [ (1) ] that his right to counsel had attached, [ (2) ] that [the informant] was a government agent, and [ (3) ] that [the informant] deliberately elicited incriminating statements from him." *Id.* (citing *Massiah,* 377 U.S. at 206, 84 S.Ct. 1199). These "elements" might be described as (1) "attachment of the right," (2) "agency of the informant," and (3) "deliberate elicitation" of the incriminating statements, respectively.

In *Massiah,* these three factors were embodied in the Supreme Court's holding that Massiah's Sixth Amendment right to counsel was violated "when there was used against him at his trial evidence of his own incriminating words, which [ (1) ] federal agents [*i.e.,* 'agency'] [ (2) ] had deliberately elicited from him [*i.e.,* 'deliberate elicitation'] [ (3) ] after he had been indicted and in the absence of his counsel [*i.e.,* 'attachment of the right']." *Massiah,* 377 U.S. at 206, 84 S.Ct. 1199. These three factors are also in accord with the Supreme Court's conclusion in *Henry,* that "[t]hree factors are important" to determining whether "a Government agent 'deliberately elicited' incriminating statements from [a defendant] within the meaning of *Massiah,*" which the Court identified as "First, [the informant] was acting under instructions as a paid informant for the Government [*i.e.,* 'agency']; second, [the informant] was ostensibly no more than a fellow inmate of [the defendant] [*i.e.,* 'deliberate elicitation']; and third, [the defendant] was in custody and under indictment at the time he was engaged in conversation by [the informant] [*i.e.,* 'attachment of the right']." *See Henry,* 447 U.S. at 270, 100 S.Ct. 2183.[18]

This court believes, however, that a fourth element—or at least, a fourth issue—follows directly from these three elements and the nature of the Sixth Amendment right as formulated by the Supreme Court in its *Massiah* cases. That issue is "the scope of the preclusion" of the evidence necessitated by a "*Massiah* violation." *See, e.g., Moulton,* 474 U.S. at 179–80 & n. 16, 106 S.Ct. 477 ("[I]ncriminating statements pertaining to pending charges are inadmissible *at the trial of those charges* . . . if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel," but "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses."); *see also McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("The Sixth Amendment right . . . is offense specific."). The government contends that, even if there has been a Sixth Amendment violation in this case, the evidence or some of the evidence is nonetheless admissible, either in its case-in-chief or for impeachment purposes.

The court will consider the present case in light of each of these "elements."

---

**18.** In a recent *en banc* decision, the Third Circuit Court of Appeals identified the pertinent factors in much the same way as the Eighth Circuit Court of Appeals in *Moore. See, e.g., Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 892 (3d Cir.) (*en banc*) (concluding that there were three basic requirements for finding a Sixth Amendment violation in so-called "secret interrogations": "(1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a 'government agent'; and (3) the informant must have engaged in 'deliberate elicitation' of incriminating information from the defendant"), *cert. denied,* 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999).

### 2. Attachment of the right to counsel

### a. Attachment of the right

■ In none of the Supreme Court's decisions addressing a *"Massiah* violation," was there any serious question as to attachment of the defendant's right to counsel at the time that the purported "deliberate elicitation" of incriminating statements occurred. *See Kuhlmann*, 477 U.S. at 438, 106 S.Ct. 2616 (the jailhouse informant obtained incriminating statements after the defendant had been arraigned and confined in the cell with the informant); *Moulton*, 474 U.S. at 162, 106 S.Ct. 477 (the co-defendant obtained the incriminating statements from the defendant after they had both been indicted, but while they were released on bail pending trial); *Henry*, 447 U.S. at 266–67, 100 S.Ct. 2183 (the jailhouse informant obtained incriminating statements from the defendant after the defendant was arrested, indicted, and counsel was appointed for him); *Williams*, 430 U.S. at 391–93, 97 S.Ct. 1232 (the "Christian burial speech" was given to the defendant on the trip back to Des Moines after his initial appearance, with counsel, in Davenport); *Massiah*, 377 U.S. at 201, 84 S.Ct. 1199 (the defendant was free on bail following charges of violating federal narcotics laws). Likewise, in the case before the Eighth Circuit Court of Appeals in *Moore*, the government conceded that the defendant's Sixth Amendment right to counsel had attached at the time he made incriminating statements to the informant. *See Moore*, 178 F.3d at 999.

The Third Circuit Court of Appeals, in a recent *en banc* decision addressing a claim of a *"Massiah* violation," considered the question of whether or not the defendant's right to counsel had attached in somewhat more detail:

We hold that Matteo's right to counsel had attached at the time of the telephone conversations. By this time Matteo had undergone preliminary arraignment. Additionally, he "was in custody as a result of an arrest warrant charging him with the murder, and he was, in fact, represented by counsel from the day he surrendered." [Quoting the record below] Moreover, both before and after the telephone calls, Matteo was confronted with the organized resources of an ongoing police investigation by agents who were well aware of his legal representation. Under these circumstances, we believe Matteo's right to counsel had attached and he was entitled to the full protection of the Sixth Amendment.

*Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999).

In a very recent decision, the Eighth Circuit Court of Appeals explained somewhat more succinctly the significance and timing of the attachment of the right to counsel for *Massiah* purposes, as follows:

"Whatever else it may mean, the right to counsel ... means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). The Sixth Amendment guarantees the accused the right to rely on counsel as a medium between him and the authorities. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

*United States v. Red Bird*, 287 F.3d 709, ——–——— (8th Cir.2002).

Here, there does not appear to be any serious question that Angela Johnson's right to counsel had attached when she first made incriminating statements to Robert McNeese at the Benton County Jail. Johnson was indicted on July 26, 2000, and a warrant issued for her arrest that day. She was arrested on July 30, 2000, and taken to the Benton County Jail. She was arraigned on July 31, 2000, and entered a not guilty plea while represented by one attorney, and another attorney was appointed to represent her on August 1, 2000. *See Red Bird,* at —————— (noting that the right to counsel attaches at the initiation of judicial proceedings, and holding that the defendant's Sixth Amendment right had attached, for *Massiah* purposes, once he had been indicted and had been appointed an attorney). Although Johnson was in the cell next to McNeese from the time of her arrest, the record is clear that she had no contact with McNeese until after her arraignment and appointment of counsel: McNeese testified that it was about a week after Johnson arrived at the Benton County Jail that he first had contact with her by shouting through the cell wall, and the testimony of Sara Bramow, Johnson's cellmate, corroborates the timing of "first contact" between McNeese and Johnson as occurring shortly after August 6, 2000. Certainly, at the time Johnson had first contact with McNeese, she "was confronted with the organized resources of an ongoing police investigation by agents who were well aware of [her] legal representation." *Matteo,* 171 F.3d at 893. Thus, the first element of a *"Massiah* violation," as identified in *Moore,* 178 F.3d at 999, is established here.

### b. To what charges the right had attached

The more important question for purposes of the "attachment of rights" prong of the analysis, at least in this case, ap-

pears to be, to what charges had Johnson's right to counsel attached? In a recent decision, a panel of the Tenth Circuit Court of Appeals seemed to suggest that the right recognized in *Massiah* attaches even to "uncharged crimes," that is, crimes to which the Sixth Amendment right had not yet attached:

> Where government officials must have known that a defendant will make incriminating statements about a charged crime, their interrogation on *uncharged crimes* without counsel present clearly violates the Sixth Amendment. *See Maine v. Moulton,* 474 U.S. 159, 176–77 & n. 12, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (government's arrangement to record post-arraignment conversations between defendant and co-defendant violated defendant's Sixth Amendment right to counsel because the government "must have known that its agent was likely to obtain incriminating statements from the accused").....

*Valdez v. Ward,* 219 F.3d 1222, 1235–36 (10th Cir.2000) (emphasis in the original), *cert. denied sub nom. Valdez v. Gibson,* 532 U.S. 979, 121 S.Ct. 1618, 149 L.Ed.2d 481 (2001). To the extent that the *Valdez* court's characterization of the rule can be read to suggest that "interrogation *on uncharged crimes* without counsel present clearly violates the Sixth Amendment" *as to the uncharged crimes, see id.* at 1235 (emphasis added), that characterization would be misleading or overbroad.

Rather, as the Supreme Court made clear in *Moulton,* when it considered the question of whether other, legitimate reasons for listening to the defendant's conversations prevented suppression of the defendant's incriminating statements on *charged* crimes, the Sixth Amendment violation only requires suppression of evidence *in the trial of the charged crimes. See Moulton,* 474 U.S. at 178–80, 106 S.Ct.

477. In *Moulton*, the Court reaffirmed its holding in *Massiah* " 'that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.' " *Moulton*, 474 U.S. at 179, 106 S.Ct. 477 (quoting *Massiah*, 377 U.S. at 207, 84 S.Ct. 1199). The Court expressly distinguished between "allow[ing] the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance," on the one hand—because to do so "invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah"—and "exclud[ing] evidence pertaining to charges *as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained*, simply because other charges were pending at the time," on the other—because to do so "would unnecessarily frustrate the public's interest in the inves-

tigation of criminal activities." *Id.* at 179–80, 106 S.Ct. 477 (emphasis added). Thus, the specific holding on this point in *Moulton* was as follows: "[I]ncriminating statements pertaining to *pending charges* are *inadmissible at the trial of those charges*, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." *Id.* at 180, 106 S.Ct. 477 (emphasis added). The Court then added, in a footnote, "Incriminating statements *pertaining to other crimes*, as to which the Sixth Amendment right has not yet attached, are, of course, admissible *at a trial of those offenses*." *Id.* at 180 n. 16, 106 S.Ct. 477 (emphasis added); *see also United States v. Ford*, 176 F.3d 376, 380 (6th Cir.1999).[19]

Because the government contends here that it initiated surveillance of Johnson through McNeese, at least in part, to investigate possible, as yet uncharged—and even inchoate—crimes, such as an attempt to escape, it may be important to deter-

---

**19.** In *Ford*, the Sixth Circuit Court of Appeals accurately explained the impact of attachment of the Sixth Amendment right to counsel as to *charged offenses* upon an alleged *"Massiah* violation":

[T]he Supreme Court has clearly established that law enforcement officials may question an indicted defendant who has invoked his right to counsel if the questioning relates to offenses other than those that form the basis for his/her indictment. *See McNeil v. Wisconsin*, 501 U.S. 171, 175–76, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Maine v. Moulton*, 474 U.S. at 179–80, 106 S.Ct. 477, 478, 88 L.Ed.2d 481 (1985).

Accordingly, the fact that law enforcement officials arranged for an informant to converse with an indicted defendant about offenses other than those for which the defendant had been indicted is not unlawful. *See Terzado–Madruga*, 897 F.2d at 1111–12. Thus, *if an informant "deliberately elicits"*

*incriminating statements relating to the charged offense, the defendant is entitled to suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or to the use of any statements that incriminate the defendant on uncharged offenses. See Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2629, 91 L.Ed.2d 364 (1986); *see also Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

*Ford*, 176 F.3d at 379–80 (emphasis added). In *Ford*, the court affirmed a magistrate judge's conclusion that the government had placed an informant in the defendant's cell based on a reasonable, good faith belief that the defendant had made threats of a significant nature to law enforcement officials and witnesses, but that the defendant was then charged only with other offenses, so that there was no Sixth Amendment violation. *Id.* at 380.

mine the charges to which any Sixth Amendment violation under *Massiah* may apply. *See Moulton*, 474 U.S. at 189 & n. 16, 106 S.Ct. 477. In other words, it is necessary to determine to what charges the Sixth Amendment right to counsel had attached at the time the jailhouse informant obtained incriminating statements from Johnson.

At the time that McNeese obtained purportedly incriminating statements from Johnson, she had been charged with the following offenses in the indictment filed July 26, 2000: Five counts of killing witnesses in violation of 18 U.S.C. §§ 1512(a)(1)(A) and/or (C), 1512(a)(2)(A), 1111, and 2; one count of soliciting a violent felony (the murder of witnesses to prevent them from testifying in federal proceedings), in violation of 18 U.S.C. §§ 373(a)(1) and 2; and one count of conspiring to commit the substantive offenses charged, in violation of 18 U.S.C. § 371.[20] It is these offenses as to which Johnson's Sixth Amendment right to counsel had attached at the time she had any contact with Robert McNeese, as required for proof of the first prong of her alleged "*Massiah* violation."

On the other hand, at the time she had contact with Robert McNeese, Johnson's Sixth Amendment right to counsel had not attached as to the ten counts of the indictment filed almost a year later in Case No. CR 01–3046–MWB on August 30, 2001. As explained in more detail *supra*, beginning at page 827, the second indictment charges five counts of killing witnesses while engaging in a drug-trafficking conspiracy, and five counts of killing witnesses in furtherance of a continuing criminal enterprise.

### 3. Agency of the informant

As explained above, under *Moore*, the second element of a "*Massiah* violation" is

"that [the informant] was a government agent." *Moore*, 178 F.3d at 999. The government repeatedly conceded, in briefs and oral arguments, that McNeese was a government agent as of September 11, 2000, when he signed instructions explaining his role as a "listening post" to acquire information from Angela Johnson. However, those concessions hardly obviate the need for the court to consider the "agency" element further, because Johnson argues that McNeese was a government agent well before September 11, 2000. While the government contends that at least some of the information McNeese obtained from Johnson was obtained by McNeese acting as an "entrepreneur," and thus does not implicate the right to counsel as identified in *Massiah*, Johnson contends that her Sixth Amendment right to counsel was violated as to all of the information that McNeese obtained from her, as it relates to the first seven charges against her, because *all* of the information was "deliberately elicited" while McNeese was a "government agent."

#### a. "Luck," "happenstance," "entrepreneurs," and "volunteers"

■ After its decision in *Massiah*, the Supreme Court made clear that the "agency" element of a "*Massiah* violation" is not established where the government's acquisition of incriminating statements through an informant is a matter of "luck or happenstance." *See Moulton*, 474 U.S. at 176, 106 S.Ct. 477 ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. *See Henry*, 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring)."). Similarly, the Supreme Court and various Circuit Courts of Appeals appear to agree that, in general,

---

**20.** These offenses are described in more detail *supra* n. 1.

an informant who acts as an "entrepreneur" or "volunteer" in providing unsolicited information to the government also is not an "agent" for *Massiah* purposes. *See, e.g., Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616 ("[A] defendant does not make out a violation of [the Sixth Amendment right identified in *Massiah*] simply by showing that an informant ... voluntarily reported his incriminating statements to the police."); *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir.) ("The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant."), *cert. denied,* 522 U.S. 976, 118 S.Ct. 433, 139 L.Ed.2d 333 (1997); *United States v. Brink,* 39 F.3d 419, 423 (3d Cir.1994) ("An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past. *See United States v. Van Scoy,* 654 F.2d 257, 260 (3d Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981)."); *United States v. York,* 933 F.2d 1343, 1356 (7th Cir.) (finding that certain facts suggested that the informant was an "entrepreneur" who hoped to sell information to the government, not a government agent) (citing *United States v. Watson,* 894 F.2d 1345, 1348 (D.C.Cir.1990)), *cert. denied,* 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991). The question, of course, is when *is* the "agency" element established?

### b. Indicia of agency

Unfortunately, "[t]he Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 893 (3d Cir.) (*en banc*) (citing *Depree v. Thomas,* 946 F.2d 784, 793–94 (11th Cir.1991)), *cert. denied,* 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62

(1999). Thus, the lower courts have combed the Supreme Court's decisions and other sources for indicia of agency for *Massiah* purposes.

**i. The Moore decision.** In *Depree v. Thomas,* 946 F.2d 784 (11th Cir.1991), the Eleventh Circuit Court of Appeals concluded, "There is, by necessity, no brightline rule for determining whether an individual is a government agent for purposes of the Sixth Amendment right to counsel." *Depree,* 946 F.2d at 793–94. On the other hand, in *Moore,* a case in which the undersigned was the trial judge, the Eighth Circuit Court of Appeals analyzed the "agency" element of a "*Massiah* violation" in such a way as to suggest that there is such a "bright line rule," at least in this circuit:

> "[A]n informant becomes a government agent for purposes of [Massiah] only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir.1997) (collecting cases). To the extent there was agreement between Hartwig and the government, there is no evidence to suggest it had anything to do with Moore. The proffer agreement simply evidenced Hartwig's willingness to disclose his knowledge of drug activity in hopes of receiving a more favorable plea agreement. Even if we were to accept Hartwig's view that the proffer applied to his knowledge of any illegal activity, *there is still no evidence that Hartwig was directed to procure additional information from Moore, or anybody else. As the District Court correctly pointed out, the fact that Hartwig had recently signed a proffer agreement with the government seems to be an unrelated and fortuitous event. We find that the link between Hartwig's relationship with the government and his conduct at issue here is insufficient for his actions*

*to be attributable to the government for purposes of a Massiah violation.*

*Moore,* 178 F.3d at 999–1000 (emphasis added). Thus, in *Moore,* the Eighth Circuit Court of Appeals appeared to rely on a sort of "bright line rule" for determination of the agency of an informant, based on whether or not " 'the informant has been instructed by the police to get information about the particular defendant.' " *Id.* at 999 (quoting *Birbal,* 113 F.3d at 346).

In *United States v. Birbal,* 113 F.3d 342 (2d Cir.), *cert. denied,* 522 U.S. 976, 118 S.Ct. 433, 139 L.Ed.2d 333 (1997), the decision from which the Eighth Circuit Court of Appeals in *Moore* extracted what appears to be its "bright line rule," the Second Circuit Court of Appeals observed,

> *Other circuits agree that an informant becomes a government agent for purposes of Kuhlmann only when the informant has been instructed by the police to get information about the particular defendant.* See, e.g., United States v. D.F., 63 F.3d 671, 682 n. 16 (7th Cir.1995) (key inquiry is whether "the government directed the interrogator toward the defendant in order to obtain incriminating information"); Stano [v. Butterworth], 51 F.3d [942,] 977 [(11th Cir.1995)] (no evidence to support prearrangement between informant and government regarding defendant), [cert. denied, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996) ]; Robinson v. Clarke, 939 F.2d 573, 576 (8th Cir.1991) (where government had not asked informant to solicit information while in prison, no Sixth Amendment violation); United States v. Watson, 894 F.2d 1345, 1347–48 (D.C.Cir.1990) (government informant was not instructed to obtain information from defendant; entrepreneurial acts did not violate defendant's Sixth Amendment rights); Brooks v. Kincheloe, 848 F.2d 940, 945 (9th Cir. 1988) (even though informant solicited

information from defendant before going to the police, informant had not been asked to obtain information from defendant). *But see United States v. Brink,* 39 F.3d 419, 424 (3d Cir.1994).

*Birbal,* 113 F.3d at 346 (emphasis added). The apparent rationale for such a rule was that "[t]he 'primary concern' of the government informant rule is to avoid 'secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.' " *Id.* (quoting *Stano v. Butterworth,* 51 F.3d 942, 977 (11th Cir.1995), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996), which in turn cites *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616). Presumably, in the absence of direction to obtain information from a particular defendant, there is nothing equivalent to direct police interrogation of that defendant.

In the case then before it, the court in *Birbal* found no such express "instruct[ion] by the police" to the informant, Gabaree, "to get information about the particular defendant," Birbal. The court explained that, in July 1992, "Gabaree had ... entered into an agreement with the government to provide 'any and all information in his possession relating directly or indirectly to any and all criminal activities or other matters of which he had knowledge.' " *Id.* at 344. However, this agreement did not satisfy what appeared to be the court's "bright line rule" for agency:

> *Gabaree's July 1992 agreement with the government did not require him to elicit information from Birbal (or anyone else).* There is no evidence that Gabaree was aware of Birbal's existence before September 18. The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question

that defendant. No doubt, Gabaree engaged Birbal in conversation in the hopes that he would get something valuable to take to the police, but Gabaree's agreement did not render him a roving agent. *See generally United States v. York*, 933 F.2d 1343, 1357 (7th Cir.1991) (discussing incentives of prisoners to seek information to better their own lot). *Birbal*, 113 F.3d at 346 (emphasis added).

Thus, *Moore* and *Birbal* seem to recognize a "bright line rule" that " '[a]n informant becomes a government agent for purposes of [*Massiah* ] only when the informant has been instructed by the police to get information about the particular defendant.' " *Moore*, 178 F.3d at 999 (quoting *Birbal*, 113 F.3d at 346), reasoning that, in the absence of such instructions, "[t]he 'primary concern' of the government informant rule"—which "is to avoid 'secret interrogation by investigatory techniques that are the equivalent of direct police interrogation' "—has not been implicated. *See Birbal*, 113 F.3d at 346 (quoting *Stano*, 51 F.3d at 977, which in turn cites *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616). However, if *Moore* and *Birbal* stand for such a "bright line rule," those two decisions represent only one side of an apparent split in the circuits over the extent to which instructions must be "defendant-specific" to create the required "agency" for purposes of a *Massiah* claim.

*ii. "Control," "roving agency," and "symbiotic relationships."* Other Circuit Courts of Appeals recognize that a *"Massiah* violation" can be premised on the "roving agency" of the informant or the "symbiotic relationship" of the informant with the government, even in the absence of instructions to the informant to get information about a specific defendant. The court, therefore, turns to a consideration of such decisions to explore the bases for a difference of opinion on what can establish "agency" for *Massiah* purposes.

In *United States v. Brink*, 39 F.3d 419 (3d Cir.1994), the Third Circuit Court of Appeals found that a fact issue on the "agency" of the informant, for *Massiah* purposes, had been presented, requiring an evidentiary hearing, notwithstanding that the informant "maintain[ed] he was not instructed to question [the defendant] about the robbery," which was the offense as to which his Sixth Amendment rights had attached. *Brink*, 39 F.3d at 423. The court explained the need for an evidentiary hearing on the question, as follows:

On this record, however, it is unclear whether Scott was acting as a government agent while sharing Brink's cell. An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past. *See United States v. Van Scoy*, 654 F.2d 257, 260 (3d Cir.), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981). Because Scott admitted acting as a government agent in other cases, but denied receiving any promises or rewards for informing on Brink, he may fall within this category.

*But the record also contains evidence suggesting that Scott may have had a tacit agreement with the government.* Scott testified that he began informing in the hopes of having his sentence reduced. *The government trained him as an informant and at one point a government agent told Scott that his cooperation would be reported to the United States Attorney and the Attorney General. Therefore, Scott may have informed on Brink on the reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently, with a recommendation for a reduction in his sentence.*

*Brink*, 39 F.3d at 423–24 (footnotes omitted; emphasis added). Thus, in *Brink* the government's conduct in training an informant and suggesting benefits· he might receive from informing on other inmates— even in the absence of instructions to inform on a particular defendant—was sufficient to raise a fact question as to whether or not the informant had a "tacit agreement" establishing his "agency" for purposes of the *Massiah* claim of a defendant on whom he actually informed.

Even clearer recognition of the principle that an informant can be a "roving agent" or involved in a "symbiotic relationship" with the government—such that the informant's conduct can be attributed to the government for *Massiah* purposes, even in the absence of specific instructions to get information from a specific defendant— appears in two decisions of the Seventh Circuit Court of Appeals. In the first of these cases, *United States v. York*, 933 F.2d 1343 (7th Cir.), *cert. denied*, 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991), the Seventh Circuit Court of Appeals found that "[b]oth *Henry* and *Kuhlmann* focused more directly on whether the challenged statements had been deliberately elicited rather than the question of whether the informants were acting as government agents when the statements were made," and "[i]n both cases, the Court concluded without discussion that the informants were agents." *York*, 933 F.2d at 1356. The court in *York* found an explanation for such abbreviated treatment of the agency issue in those cases:

> It is not hard to see why [the Court found the informants were agents]: in each case the government officials identified specific prisoners from whom they wanted information and found informants to retrieve it. *See also Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 1250, 113 L.Ed.2d 302 (1991). Nichols was told to pay attention to the handful of federal prisoners in a county

jail; Lee was told to pay attention to his cellmate. *Recognizing this fact, we have in the past "refuse[d] to extend the rule of Massiah and Henry to situations where an individual, acting on his own initiative, deliberately elicits incriminating information." United States v. Malik,* 680 F.2d 1162, 1165 (7th Cir.1982); *see also United States v. Metcalfe*, 698 F.2d 877, 882 (7th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983). In *Malik*, the government jailed an informant wanted by British authorities for bank robbery. In hope of avoiding extradition, the informant turned over statements made by the defendants. There was no evidence that the government intended or knew that the jailed informant would continue to gather information, and the natural inference would have been otherwise; the informant had every reason not to continue working for the government after it had abandoned him. In *Metcalfe*, there was simply no evidence that the informant had ever had any contact with the FBI before he turned over the defendant's statements to the authorities.

*York*, 933 F.2d at 1356. In short, the court in *York* might be described as reiterating, in the first instance, the rule that there is no "*Massiah* violation" where the informant is a "mere entrepreneur."

However, *York* goes further than that, probing what circumstances, besides express instructions, do establish "agency" for *Massiah* purposes. In the context of the decisions discussed in its analysis, the court in *York* considered the following circumstances involving an informant named Beaman:

> *No one directed Carl Beaman to cozy up to Tom York.* When Beaman arrived at the Terre Haute penitentiary in May 1987, York was already there. Beaman was serving a forty-year sentence for

two bank robbery convictions and had been acting as a prison informant for the FBI since 1983. Beaman was transferred to Terre Haute from Talledega, Alabama, after testifying against an accomplice in the bank robbery for which he had been convicted. There is no evidence that Beaman was placed in Terre Haute to meet York or to obtain information from him; the Bureau of Alcohol, Tobacco, and Firearms ("ATF") had investigated York's crimes, not the FBI. The FBI learned of York only when Beaman came to them with York's confessions. John Stoll, the FBI agent to whom Beaman reported when he had information, did tell Beaman that he only wanted information about certain crimes—murder, official corruption, and drug offenses—but that direction hardly narrowed the field of opportunity for Beaman. *Beaman's situation was thus in many respects the same as that of the informant in United States v. Watson, 894 F.2d 1345 (D.C.Cir.1990). Like Beaman, the informant in that case had been a government informant for some time when he came into contact with the defendant. Like Beaman, the informant had some expectation that he would benefit from providing information to the government agent with whom he maintained contact. The court held, however, that the informant was not a government agent, noting that there was no evidence that the government had directed or steered the informant toward the defendant. The informant was not so much a government agent, the court held, as he was an entrepreneur who hoped to sell information to the government. Id. at 1348.*

*York,* 933 F.2d at 1356 (emphasis added).

Although these facts suggested that the informant was merely an "entrepreneur," the court in *York* also considered whether "the government can send an informant on a reconnaissance patrol through the prison population to gather evidence as long as it does not target specific individuals for the informant's attentions," and concluded that the answer to the question was "No." *Id.*

The government tried that tactic in *United States v. Sampol,* 636 F.2d 621, 638 (D.C.Cir.1980), to no avail. *In that case the court held that where there is a prearrangement between the government and an informant, the informant is a government agent. Id. There is a distinct difference between passively receiving information provided by enterprising inmates and striking deals with inmates—whether based on coercion or enticement—to gather as much information as possible from other inmates, as did the trial court and the prosecution in Sampol.* "An element of the agency relationship is the understanding of the parties that the principal is to be in control of the undertaking and that the agent shall serve ... subject to the directions of the principal." *Federal Pants, Inc. v. Stocking,* 762 F.2d 561, 564 (7th Cir.1985). *Whether the principal exercises its control strictly, by targeting specific individuals, or casually, by loosing an informant on the prison population at large, is irrelevant.* "It is the ability to control, whether exercised or unexercised, that indicates agency relationship." *American Broadcasting Cos. v. Climate Control Corp.,* 524 F.Supp. 1014, 1018 (N.D.Ill.1981).

*York,* 933 F.2d at 1357 (emphasis added).

Having established that the important principle in the determination of "agency" for *Massiah* purposes was the government's "control" of the agent, not the specific instructions to the informant, the court in *York* reexamined whether or not there was an agreement to provide information that would establish the informant's agency. The court cautioned that "[u]ndoubtedly, most inmates who provide

information to law enforcement officials harbor the hope that their service will not go unrewarded," but that "'[w]e must not confuse speculation about [an informant's] motives for assisting the police for evidence that the police promised [the informant] consideration for his help or, otherwise, bargained for his active assistance.'" *Id.* (quoting *Lightbourne v. Dugger,* 829 F.2d 1012, 1021 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988)). The court, therefore, examined what establishes an agreement, and whether such an agreement had been established in the case before it:

> *Agreements, of course, don't have to be explicit or formal, and are often inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct over a sustained period of time. What of symbiotic relationships between informants and government law enforcement officials that evolve from an initial exercise of initiative by the informant? Such cases present sticky questions, and York's is an example.* York contends that there was an implicit agreement between Beaman and Agent Stoll since Beaman had worked for Stoll for a number of years and was reporting to Stoll on a weekly basis during the period when York was confiding to Beaman. Among the favors he performed for the FBI, Beaman made consensually monitored phone calls to persons he knew outside the prison who were dealing drugs, an activity he could not have pursued while in prison without government forbearance. Agent Stoll also testified that the government had an agreement with Beaman that it would inform his parole board of the extent of his cooperation when he became eligible for parole. Beaman, however, had never been paid for, or received any benefit from, the information he gave to the FBI before he related York's statements to Agent Stoll. In fact, Beaman maintained that the government had welched on the only promise it had ever made to him in connection with his cooperation. According to Beaman, an Assistant United States Attorney had promised, but failed, to write a letter to his parole board on his behalf in 1986 when Beaman testified in a trial as a government witness. The government also agreed to support Beaman's application for parole in exchange for his testimony against York at trial, but that promise bears only on Beaman's credibility as a government witness, not on his status as a government agent at the time he maintains York confided in him. Beaman did receive $5,000 and another promise that the prosecutors would support his application for parole after he related York's statements to Agent Stoll. Payment after providing information may, as York maintains, be probative of a prior agreement between the informant and the government (though the cases cited for this proposition in his brief do not stand for that proposition at all). Beaman testified, and the government corroborated his testimony, that the bulk of the money he received was to reimburse him for long distance phone calls and lost prison wages stemming from his past cooperation with the government. Agent Stoll testified that about a third of the money was a reward for information and testimony Beaman provided to the FBI in 1986. He maintained that the money had nothing to do with the information Beaman provided concerning York, as York's was an ATF, not an FBI, case. Agent Stoll did not, however, explain the curious timing of the payment.

*York,* 933 F.2d at 1357–58 (emphasis added).

In *York,* the court noted that, following an evidentiary hearing, the district court

had concluded that Beaman was not a government agent when he spoke to York, "because, in the court's words, 'he was under no general direction by any special agent during that period of time as to how to proceed.'" *Id.* at 1358. The Seventh Circuit Court of Appeals "agree[d] with that view of the facts, but ... respectfully disagree[d] as to their legal significance." *Id.* Instead, the appellate court reasoned as follows:

> *There is no question that the FBI was not closely managing Beaman's actions in prison; the relevant question, however, is whether the FBI told Beaman to collect information, not whether it told him exactly **how** or **when** to collect it, or from **whom**. We conclude that, as a matter of law, Beaman was acting on behalf of the government while incarcerated at Terre Haute.* Agent Stoll conceded that there was an informal agreement with Beaman to assist his parole application by detailing the extent of his cooperation with the government; that fact distinguishes Beaman from Young, the informant in *Watson, supra.* Beaman, unlike Young, had been promised a reward for suitable information obtained from any source; the structure of the deal also maximized Beaman's incentive to cooperate since the strength of the government's support would be a direct function of the assistance he provided. *Moreover, Stoll told Beaman the type of information he was interested in receiving; that statement was tantamount to an invitation to Beaman to go out and look for that type of information.*

*York,* 933 F.2d at 1358 (emphasis in bold in the original; emphasis in italics added). Thus, the court concluded that the informant was an agent of the government on the basis of "an invitation to Beaman to go out and look for that type of information," even though there was no instruction to obtain information from the particular defendant in question.

In a subsequent decision, *United States v. Li,* 55 F.3d 325 (7th Cir.1995), the Seventh Circuit Court of Appeals distinguished, but did not retreat from, its decision in *York.* In *Li,* the pertinent facts were the following:

> The first argument raised on appeal relates to incriminating statements Li made to his former partner Clayton Hayes, who testified for the government. Li and Hayes were partners in another dental care provider similar to HA named Illinois Pacific Dental. Hayes had provided the federal government information in three or four other investigations prior to the Li/HA affair. When Hayes heard that Li might be indicted, he arranged a meeting with Li to discuss the situation. He also called Hahne, an agent he knew in the Labor Department, to find out if Li had been indicted. Hahne confirmed that Li had been indicted; that Hayes would meet with Li and that they would discuss the indictment.
>
> At the meeting, Li made certain admissions to Hayes. After the meeting, Hahne arranged a meeting between Hayes and the Assistant U.S. Attorney prosecuting this case. Hayes testified for the government at the grand jury and at trial. Li sought to suppress these admissions at trial on the grounds that the government effectively used Hayes as a quasi informant, post indictment, to gather damaging testimony in the absence of Li's named counsel. The district court denied Li's motion to suppress. On appeal, Li argues this denial violated the Sixth Amendment.

*Li,* 55 F.3d at 327–28.

The court rejected Li's Sixth Amendment argument, relying on *York* as emphasizing the issue of "control" of the purported agent/informant, in the context of deciding whether the evidence established

that the statements in question had been "(1) deliberately elicited (2) by a government agent." *Li,* 55 F.3d at 328 (citing *York,* 933 F.2d at 1344).

In this case, there is no question that Hayes deliberately elicited the information from Li. Hayes testified that he arranged a meeting with Li in order to protect his investment in Pacific Union Dental, his partnership with Dr. Li. In other words, Hayes deliberately elicited the information from Li in order to be fully informed about any potentially harmful effect on their joint venture. *Here we focus on the second prong; whether Hayes was a government agent.* We have previously refused to extend this concept to "an individual, acting on his own initiative, [who] deliberately elicits incriminating information." *United States v. Malik,* 680 F.2d 1162, 1165 (7th Cir.1982). Traditional principles of agency help determine government agent status. *United States v. York,* 933 F.2d 1343, 1357 (7th Cir.1991). Control is an essential element of these principles; there must be an understanding between the parties that the principal is in control while the agent serves subject to that control. *Id.,* (quoting *Federal Pants, Inc. v. Stocking,* 762 F.2d 561, 564 (7th Cir.1985)). Hayes was a business owner acting on his own initiative. Though he contacted the government, it was in an attempt to receive information rather than relay it. The evidence demonstrated no government control over Hayes' actions; most importantly, there was no control over Hayes' decision to arrange a meeting with Li. Hayes was not a government agent, thus there was no violation of the Sixth Amendment.

*Li,* 55 F.3d at 328 (emphasis added).

The court then rejected Li's reliance on *Moulton:*

Li relies heavily upon *Maine v. Moulton,* 474 U.S. 159, 171, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985), to argue that the government had an affirmative obligation to preserve his right to counsel. *Moulton,* however, did not abandon the second prong necessary for a *Massiah* violation, *i.e.* government agent status. In fact, the informant in *Moulton,* at the request of the police, wore a concealed wire transmitter to record conversations with the accused. Clearly, this undercover informant satisfied the elements discussed above for classification as government agent. Li's affirmative obligation argument does not, in this case, satisfy his burden of meeting the second prong of the test.

*Li,* 55 F.3d at 328.

***iii. Other indicia of agency.*** Notwithstanding that there appears to be a "bright line rule" on what establishes "agency" of a jailhouse informant in this circuit, it may be helpful to examine what other indicia of agency have been identified by other courts. In a recent *en banc* decision, *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877 (3d Cir.) (*en banc*), *cert. denied,* 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999), the Third Circuit Court of Appeals also attempted to identify indicia of agency for purposes of a *Massiah* claim, and its conclusions may be instructive here.

In *Matteo,* the court's analysis began with the Supreme Court's decision in *Henry,* which it described as the Supreme Court's "sole case focusing on a determination of government agency" *Matteo,* 171 F.3d at 893. The court in *Matteo* read *Henry* as holding that the informant in that case was an agent, "because he was paid and 'acting under instructions' from the government," *id.* (citing *Henry,* 447 U.S. at 270, 100 S.Ct. 2183), which, indeed, matches what this court identifies below as the "agency" factor among the three "important factors" in *Henry. See Henry,*

447 U.S. at 270, 100 S.Ct. 2183 ("Three factors are important [to the determination of a *Massiah* violation in that case]. First, Nichols was acting under instructions as a paid informant for the Government...."). The court in *Matteo* may have gone too far, however, when, in its list of factors going to "agency" in *Henry*, it included "facts that the informant was ostensibly a mere fellow inmate rather than a trusted friend of the defendant and that the defendant was in custody and under indictment at the time of the alleged elicitation." *Matteo*, 171 F.3d at 893.[21] In this court's view, as explained more fully below, these facts were identified in *Henry* as "important," because they demonstrated "deliberate elicitation" and "attachment of rights," respectively, rather than "agency."

This court nevertheless agrees with the conclusion of the Third Circuit Court of Appeals in *Matteo* that, whatever factors in *Henry* may have gone into the determination of "agency," "[t]he Court [in *Henry*] did not attempt to generalize these factors into a rule defining government agency for future cases, nor has it revisited them in subsequent cases." *Id.* Nevertheless, the court in *Matteo* was able to identify some further indicia of "agency" for purposes of a *Massiah* claim by looking beyond *Henry:*

> The lower federal courts have explicated the holding of *Henry* in some detail: in particular, several have held that the existence of *an express or implied agreement between the state and the informant is an additional factor supporting a finding of agency:* "At a minimum ... there must be some evidence that an agreement, *express or implied,* between the individual and a government official existed at the time the elicitation takes place."

*Matteo*, 171 F.3d at 893 (citations omitted; emphasis added). Thus, under *Matteo*, an agreement to get information from the defendant may be either "express or implied." *Accord York*, 933 F.2d at 1357 ("Agreements, of course, don't have to be explicit or formal, and are often inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct over a sustained period of time"). Acknowledgment that agency can arise from an "implied" agreement to obtain information from fellow inmates would be consistent with *Brink,* also a decision of the Third Circuit Court of Appeals, and the decisions of the Seventh Circuit Court

**21.** The court in *Matteo* later relied on these facts as indicia of agency when it concluded that, notwithstanding its ultimate agreement with the state court's determination that the informant was not a government agent, there was "some evidence of an agency relationship in this case":

> Lubking was not a jailhouse acquaintance, but a trusted friend of Matteo's. *See [Henry],* 447 U.S. at 270, 100 S.Ct. 2183, 65 L.Ed.2d 115. The police therefore knew that Matteo would be relatively more likely to make incriminating statements to Lubking. In addition, Matteo was in custody at the time of the elicitation. *See id.* (examining whether defendant was in custody with formal charges pending when the incriminating statements were elicited). As the

Supreme Court has held, "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.* at 274, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115. The use of an informant in these circumstances "intentionally creat[es] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel," and therefore is significant to a finding of agency. *Id.* At the time of his conversations with Lubking, Matteo had been arrested for murder, preliminarily arraigned, and incarcerated. Certainly, the "special pressures" of custody were present.

*Matteo*, 171 F.3d at 894–95.

of Appeals in *York* and *Li. See Brink,* 39 F.3d at 423–24 (suggesting that a "tacit agreement" may be sufficient to establish "agency" for *Massiah* purposes); *Li,* 55 F.3d at 328 ("control" of the agent, rather than explicit instructions, is the key to agency); *York,* 933 F.2d at 1357–58 ("control" of the informant is the essence of agency, observing that "the relevant question ... is whether the FBI told [the informant] to collect information, not whether it told him exactly *how* or *when* to collect it, or from *whom*," and holding that, where the government investigator told the informant the type of information he was interested in receiving, that statement was "tantamount to an invitation to [the informant] to go out and look for that type of information," which established the informant's "agency") (emphasis in the original). The court in *Matteo* also accepted that "payment" is not required, but that some other sort of "quid pro quo—in which the informant receives some type of benefit, even if nonpecuniary, in exchange for assisting the authorities—may constitute evidence of an agency relationship," although no "deal was struck" in the case then before it. *Id.* at 894 (citing *United States v. Brink,* 39 F.3d 419, 423 n. 5 (3d Cir.1994)).

On the other hand, in *Matteo,* the court rejected an overinclusive definition of the kind of "instructions" from the government that can establish that an informant is a "government agent" for purposes of a *Massiah* claim. In *Matteo,* the defendant argued that the informant was still an "agent," because he was acting on instructions from the police, which the court acknowledged was a factor identified in *Henry,* but one that had not been considered by the state court that first rejected the defendant's claim of a *Massiah* violation. *Matteo,* 171 F.3d at 894. In rejecting this argument, the Third Circuit Court of Appeals focused on *the kind of instructions* the police gave the informant:

Matteo cites the fact that authorities showed Lubking how to use the recording equipment on the phone and directed him not to ask questions or otherwise elicit information from Matteo. We do not believe these instructions are the kind contemplated by *Henry. The instruction on how to operate the recording device was trivial and does not pose a problem of constitutional dimension. As for the instruction not to elicit information from Matteo, it would be perverse to hold that police informants may not deliberately elicit information and yet to forbid police from notifying potential informants of this fact.* In many circumstances, such a holding would preclude police from using informants at all, a result we find untenable. Consequently, we are not convinced by Matteo's argument that Lubking was acting under police instructions.

*Matteo,* 171 F.3d at 894 (emphasis added).

*iv. The Moore decision revisited.* In short, contrary to what appears to be a "bright line rule" of agency in the decisions of the Eighth Circuit Court of Appeals in *Moore* and the Second Circuit Court of Appeals in *Birbal,* the decisions in *Brink, York,* and *Li* recognize that an informant may be a government "agent" for purposes of *Massiah,* notwithstanding that there were no instructions to the informants in those cases to get information about a *particular* defendant. Moreover, the *en banc* decision of the Third Circuit Court of Appeals in *Matteo* and the decision of the Seventh Circuit Court of Appeals in *York* recognize that an agreement establishing the agency of the informant may be either "express or implied." The question then becomes this: Is this court truly presented with binding circuit precedent, in the form of the decision in *Moore,* establishing a "bright line rule" that " '[a]n informant becomes a government agent for purposes of [*Massiah* ] only when the

informant has been instructed by the police to get information about the particular defendant,' " *Moore*, 178 F.3d at 999 (quoting *Birbal*, 113 F.3d at 346), or is this court instead presented with a question of first impression, namely, can "agency" for *Massiah* purposes be established in the absence of express instructions from the government to get information about a particular defendant by proof of an implicit agreement arising from a longstanding informant's "roving agency" or "symbiotic relationship" with the government?

This court acknowledges that, in *Moore*, the Eighth Circuit Court of Appeals appeared to be stating a general rule that " '[a]n informant becomes a government agent for purposes of [*Massiah*] *only* when the informant has been instructed by the police to get information about the particular defendant.' " *Id.* (quoting *Birbal*, 113 F.3d at 346) (emphasis added). Nevertheless, the court concludes that *Moore* is not controlling for two principal reasons: (1) *Moore* did not involve any circumstances giving rise to the question of whether, in the absence of express instructions from the government to get information about a particular defendant, "agency" for *Massiah* purposes can be established by proof of government "control" of a longstanding informant, or such a longstanding informant's "roving agency" or "symbiotic relationship" with the government; and (2) if government "control" of a longstanding informant, or a longstanding informant's "roving agency" or "symbiotic relationship" with the government, does not present an exception to *Moore*'s supposed "bright line rule," then the principles articulated in the Supreme Court's *Massiah* line of cases have no real meaning or appear to be seriously undermined.

Considering, first, the circumstances presented in *Moore*, the question before the court in that case was whether the Sixth Amendment rights of a defendant, who was incarcerated awaiting trial on bank robbery charges, had been violated by the government's actions in leaving a government informant in his cellblock to elicit incriminating statements and accepting the informant's assistance. *Moore*, 178 F.3d at 998–99. The Eighth Circuit Court of Appeals identified the pertinent circumstances as the following:

After being arrested on February 20, 1998, Moore was taken to the Linn County Jail, where he was housed on the same cellblock with Hartwig. Hartwig was already incarcerated awaiting trial on drug charges. Sometime between February 17 and February 25, 1998, Hartwig received and signed a letter from the United States Attorney's Office agreeing to participate in a meeting with agents in order to provide an informal proffer of information concerning his knowledge of drug-related criminal activity. The stated purpose of the meeting was to assist the government "in determining what, if any, consideration should be afforded [Hartwig] in exchange for [his] agreement to provide information or other cooperation 'on the record' so to speak" (Appellant's App. at 8.) Hartwig testified that at the time he signed the agreement he considered himself a government informant (Tr. 328), but only as to information he had at that time (Tr. 388.) He also stated that he thought that he might benefit from providing information about any criminal activity, not just drug-related activity, but that he did not recall who told him this, and that it might have been his attorney (Tr. 325–26.) Hartwig testified that over the course of the next four or five weeks he overheard Moore conversing with Fisher about some of the details of the car theft and bank robbery (Tr. 310–14.) Hartwig further testified that at no time did anyone ask

him to listen in on or solicit any comments from Moore (Tr. 384), and that at the time he overheard these conversations, he had no intention of reporting them to the authorities or any notion that this information might be useful to him (Tr. 383.) Hartwig did not reveal this information to law enforcement until around March 17, 1998, when he was providing his statement for the proffer agreement (Tr. 315.)

*Moore,* 178 F.3d at 999. On this record, the Eighth Circuit Court of Appeals, not surprisingly, concluded that the agreement Hartwig made to provide information to the government had nothing to do with Moore; that the proffer agreement evidenced Hartwig's willingness to disclose his existing knowledge of drug activity, not Moore's bank robbery; that even if the agreement applied to Hartwig's knowledge of *any* illegal activity, there was still no evidence that Hartwig was directed to *procure* additional information from Moore, or anyone else; and that the agreement, therefore, was an "unrelated and fortuitous event" not linked to Hartwig's actions in obtaining information from Moore. *Id.* at 999–1000.

Thus, in *Moore,* the Eighth Circuit Court of Appeals did not have before it any evidence that the informant was a longstanding cooperator who had previously obtained information from a long list of targets of criminal investigations and had obtained or been promised benefits in return by government agents, suggesting to him that similar benefits would be available if he obtained additional incriminating information from any available target. Rather, the extent of the contact between the government and the informant in *Moore* was a proffer agreement concerning information that the informant had *at the time* about *drug-related criminal activity,* not procurement of information about *any* criminal activity or the defendant's specific crime of bank robbery.

The informant's impression that he might benefit from providing information about *any* criminal activity, not just drug-related activity, did not necessarily come from government agents, but instead might have come from his own attorney, and still did not involve an understanding that the informant might benefit by *procuring* additional incriminating information. Rather, at the time that the informant overheard Moore's incriminating statements, he claimed to have no intention of reporting Moore's statements to authorities, nor any notion that such information might be useful to him. *Id.* Plainly, then, in *Moore,* the Eighth Circuit Court of Appeals did not consider, and had no reason to consider, whether the "agency" element of an alleged *"Massiah* violation" can be established in the absence of an express instruction to the informant to get information about a particular defendant by evidence of a "symbiotic relationship," "roving agency," or "implied agreement" involving benefits in return for obtaining incriminating statements, as contemplated, for example, by other Circuit Courts of Appeals in *Brink, York, Li,* and *Matteo.*

On the other hand, in *Birbal,* from which the Eighth Circuit Court of Appeals derived what appears to be its "bright line rule," the Second Circuit Court of Appeals at least acknowledged the possibility that an informant can be rendered a "roving agent" for *Massiah* purposes. *See Birbal,* 113 F.3d at 346 (citing *York,* 933 F.2d at 1357). However, the Second Circuit Court of Appeals rejected such a "roving agency" argument in the case before it, because the informant's "agreement with the government"—which required him "to provide 'any and all information in his possession relating directly or indirectly to any and all criminal activities or other matters of which he had knowledge,' " *see id.* at 344— "did not require him to elicit information from [the defendant] (or anyone else)."

*Id.* at 346. Thus, no circumstances actually suggesting a "roving agency" were presented in *Birbal,* either.

Except, perhaps, in *Henry,* it does not appear that the Supreme Court has considered whether "agency" can be established for *Massiah* purposes by anything like circumstances involving a longstanding jailhouse informant who has been conditioned to believe that benefits will flow from obtaining incriminating statements from fellow inmates. *See Massiah,* 377 U.S. at 201–03, 84 S.Ct. 1199 (the informant was a co-defendant with no indication that he had previously been a government agent or informant); *Williams,* 430 U.S. at 390–93, 97 S.Ct. 1232 (the "informant" was, and was known by the defendant to be, a law enforcement officer); *Moulton,* 474 U.S. at 161–68, 106 S.Ct. 477 (the informant was a co-defendant with no indication that he had previously been a government agent or informant); *Kuhlmann,* 477 U.S. at 439–40 & 460–61, 106 S.Ct. 2616 (although the informant had agreed to act as a police informant to obtain information from the defendant about his confederates, there was no indication that the informant had previously been a government agent or informant). As the Third Circuit Court of Appeals observed in *Matteo, Henry* is the Supreme Court's only decision specifically considering how agency is established for *Massiah* purposes. *See Matteo,* 171 F.3d at 893 (describing *Henry* as the Supreme Court's "sole case focusing on a determination of government agency" for purposes of a *"Massiah* violation"). This court also finds that, as among precedents that are "binding" on this court, it is *Henry,* not *Moore,* that considered the question of whether the "agency" element of an alleged *"Massiah* violation" can be established in the absence of an express instruction to the informant to get information about a particular defendant by something like evidence of a "symbiotic relationship," "roving agency," or "implied agreement"

involving benefits in return for obtaining incriminating statements, and it is also *Henry,* not *Moore,* that provides the nearest factual similarity to the circumstances presented here.

More specifically, in *Henry,* the Supreme Court explained the circumstances under which evidence from a jailhouse informant came to light as follows:

On November 21, 1972, shortly after Henry was incarcerated, Government agents working on the Janaf robbery contacted one Nichols, an inmate at the Norfolk city jail, who for some time prior to this meeting had been engaged to provide confidential information to the Federal Bureau of Investigation as a paid informant. Nichols was then serving a sentence on local forgery charges. *The record does not disclose whether the agent contacted Nichols specifically to acquire information about Henry or the Janaf robbery.*

Nichols informed the agent that he was housed in the same cellblock with several federal prisoners awaiting trial, including Henry. *The agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery. In early December, after Nichols had been released from jail, the agent again contacted Nichols, who reported that he and Henry had engaged in conversation and that Henry had told him about the robbery of the Janaf bank. Nichols was paid for furnishing the information.*

*Henry,* U.S. at 266 (footnotes omitted; emphasis added). Thus, in *Henry,* the informant had previously been acting as a paid informant for the FBI, although "[t]he record d[id] not disclose whether the [government] agent contacted Nichols specifically to acquire information about Hen-

ry or the Janaf robbery" with which Henry was charged. *Id.*

In the course of subsequent proceedings to vacate Henry's sentence pursuant to 28 U.S.C. § 2255, the relationship between the government agent and Nichols became a central issue, leading to submission of an affidavit from the government agent explaining that he had told the informant "to be alert to any statements made by these individuals [the federal prisoners, not Henry specifically] regarding the charges against them"; that he instructed the informant "not to question Henry or these individuals about the charges against them, however, if they engaged him in conversation or talked in front of him, he was requested to pay attention to their statements"; that he told the informant "not to initiate any conversations with Henry regarding the bank robbery charges against Henry"; but that, if the defendant initiated conversations with the informant, the informant was "to pay attention to the information furnished by Henry." *Henry,* 447 U.S. at 268, 100 S.Ct. 2183. Thus, even if there may have been specific instructions to the informant to get information about the particular defendant in *Henry,* such instructions were incidental to broader instructions to get information about *all* of the federal prisoners in the jail. *Id.; see also York,* 933 F.2d at 1356 (observing that, in *Henry,* "Nichols was told to pay attention to the handful of federal prisoners in a county jail," not specifically to the defendant). These circumstances would seem to suggest a sort of "roving agency" of the informant to acquire information from a broadly defined group of fellow prisoners, not a particular defendant.

It is unclear precisely what factors in *Henry* went to the informant's "agency" and which went to "deliberate elicitation" by the agent, because the Court simultaneously considered the "agency" and "deliberate elicitation" elements in its analysis: The Court framed the question for a *Massiah* claim as "whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah,*" *Henry,* 447 U.S. at 270, 100 S.Ct. 2183, that is, in terms of agency plus deliberate elicitation. The Court did not hold that an informant is a government agent for *Massiah* purposes only if he has been instructed by the police to get information about a particular defendant. Rather, the Court concluded that the "combination of circumstances" presented was "sufficient to support the Court of Appeals' determination" that the informant acted as a "government agent" who "deliberately elicited" information from the defendant. *Id.*

Only one of the three factors that the Court in *Henry* identified as "important" to its determination of agency plus deliberate elicitation goes to "agency"—whether the informant "was acting under instructions as a paid informant of the Government"—while the other two "important" factors—the fact that the informant "was ostensibly no more than a fellow inmate of Henry" and that "Henry was in custody and under indictment at the time he was engaged in conversation by [the informant]"—go to "deliberate elicitation" and "attachment of the right," respectively. *Id.* Again, the statement of that one "important" factor going to agency in *Henry* does *not* say that the informant "was acting under instructions to get information from the particular defendant," although it does point out that the informant was getting paid.

Nor can a requirement that the "instructions" be to get information from "the particular defendant" necessarily be gleaned from that part of the *Henry* decision upholding, again in compound form, the appellate court's conclusions that the informant "deliberately used his position to se-

cure incriminating information from Henry when counsel was not present *and ... that conduct [was] attributable to the Government.*" *Henry,* 447 U.S. at 270, 100 S.Ct. 2183 (emphasis added). The Supreme Court explained its reasons for affirming the appellate court on these determinations as follows:

> *Nichols had been a paid Government informant for more than a year;* moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. *The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information. This combination of circumstances is sufficient to support the Court of Appeals' determination.* Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity [between the defendant and the informant] likely would lead to that result.

*Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183 (footnote omitted; emphasis added). In this court's view, only the italicized portions of this quotation can reasonably be read as going to the determination of the informant's "agency." Again, those portions indicate that the determinative evidence was the *general status* of the informant as a longstanding paid informant, in combination with other circumstances, not specific instructions to the informant from the government to obtain information from "the particular defendant." Thus, *Henry* considered circumstances not presented in *Moore,* which involved an informant's longstanding cooperation with the government as a paid informant, and the Court concluded that such evidence established the "agency" of the informant for *Massiah* purposes, undermining any conclusion that *Moore* states a "bright line rule" that is controlling in circumstances like those presented in *Henry.*

Moreover, if evidence that the informant was a longstanding cooperator who had been conditioned to expect benefits in return for providing incriminating statements of fellow inmates does not establish, or at least suggest, the "agency" of the informant for *Massiah* purposes, then the Sixth Amendment principles established in the Supreme Court's *Massiah* line of cases have little real meaning, because they can be too easily circumvented. As long as the government withholds specific instructions to an informant to obtain information from a particular defendant, even where the informant is obviously highly motivated to obtain incriminating information from fellow inmates, or is, in fact, obviously obtaining such information, and has been led to believe that he will obtain benefits by disclosing such information to government agents, then there is little force to the government's "affirmative obligation to respect and preserve the accused's choice to seek [counsel's] assistance." *See Moulton,* 474 U.S. at 171, 106 S.Ct. 477. This court cannot see how a defendant's Sixth Amendment rights are any less "seriously imposed upon" or how a defendant is any less "subjected to indirect and surreptitious interrogations," in the absence of counsel, *see Massiah,* 377 U.S. at 205–06, 84 S.Ct. 1199 when federal agents *know* that an informant, whom they have encouraged by past association to obtain incriminating information and expect benefits in return, is deliberately eliciting incriminating statements from the defendant, but the federal agents simply stand back and let the information flow as long as possible before providing defendant-specific instructions that would indubitably establish "agency" for *Massiah* purposes. Rather, the government's conduct in such a case would be no less "tantamount to interrogation," making the circumstances of the

case "constitutionally indistinguishable from those presented in *Massiah.*" *Cf. Williams,* 430 U.S. at 400, 97 S.Ct. 1232. Again, this court believes that the Supreme Court's decision in *Henry* makes clear that the question is not whether some "bright line" has been crossed, but whether the "combination of circumstances is sufficient to support the [court's] determination" that the informant acted as the government's agent. *Henry,* 447 U.S. at 271, 100 S.Ct. 2183.

■ *v. The governing rule.* This court finds that *Brink, York, Li,* and *Matteo* not only considered circumstances, not presented in *Moore,* that reasonably presented the question of whether an informant can be an "agent" for *Massiah* purposes even in the absence of defendant-specific instructions, but that the resolution of the question of agency in such circumstances in those decisions is consistent with traditional principles of agency, *see, e.g., Li,* 55 F.3d at 328 ("Traditional principles of agency help determine government agent status.") (citing *York,* 933 F.2d at 1357), consistent with the limited Supreme Court precedent on "agency" for *Massiah* purposes, which also considered and found agency in the absence of defendant-specific instructions, *see Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183, and simply more consonant with both the principles established in the Supreme Court's *Massiah* cases and the realities of the relationships among government officials, informants, and pretrial detainees, *see, e.g., Moulton,* 474 U.S. at 171, 106 S.Ct. 477; *Henry,* 447 U.S. at 271, 100 S.Ct. 2183; *Massiah,* 377 U.S. at 205–06, 84 S.Ct. 1199, than the "bright line rule" suggested in cases such as *Moore,* in which the court was *not* presented with circumstances that would give rise to consideration of the possibility of agency in the absence of defendant-specific instructions, and *Birbal,* which considered the possibility, but found no such circumstances presented in the

case then before the court. Therefore, this court concludes that, while specific instructions to an informant to get information about a *particular* defendant will certainly suffice to establish the informant's "agency" for *Massiah* purposes, and the absence of any other evidence of agency would be fatal to a *Massiah* claim, *see Moore,* 178 F.3d at 999–1000, such defendant-specific instructions are not *necessarily* required to establish "agency" for *Massiah* purposes. *See, e.g., Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183. Rather, this court concludes that the question of the informant's "agency" is not subject to any "bright line rule," *see, e.g., Depree v. Thomas,* 946 F.2d 784, 793–94 (11th Cir. 1991) ("There is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the Sixth Amendment right to counsel."), but must instead be determined in light of all of the circumstances, *see Henry,* 447 U.S. at 271, 100 S.Ct. 2183 (finding that "[t]he combination of circumstances is sufficient to support" a finding of "agency"), including whether the government has expressly, implicitly, or tacitly, directed the informant to obtain incriminating information from other inmates, for example, by creating a reasonable expectation on the part of the informant that providing such information will be rewarded with payment or other benefits. *See, e.g., Matteo,* 171 F.3d at 893–94; *Li,* 55 F.3d at 327–28; *Brink,* 39 F.3d at 423–24; *York,* 933 F.2d at 1356–58. The court concludes, further, that *Moore* is not to the contrary, because the facts in that case did not reasonably give rise to consideration of the question of "agency" in circumstances suggesting such an implicit agreement.

This is not to say that this court disagrees with the proposition that an inmate who voluntarily furnishes information without instruction from the government is *not* a government agent, even if the infor-

mant had been an agent in the past. *See Brink,* 39 F.3d at 423 (citing *United States v. Van Scoy,* 654 F.2d 257, 260 (3d Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981)). In other words, what establishes, or raises an inference of, "agency" for *Massiah* purposes is not *just* that the informant had been an agent in the past. Rather, as suggested in *Brink,* what raises a fact question about the "agency" of an informant who had been a government agent in the past is evidence suggesting that the informant may have had a tacit agreement with the government to continue to provide incriminating information in the hope of obtaining some benefit, such as a sentence reduction. *See id.* at 424. Thus, "agency" may be established, for example, by evidence that the informant provided incriminating statements of the defendant "on the reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently," with a benefit, such as a reduction in his sentence. *Id.*

This court believes that it is also significant to the question of the informant's "agency," not just to the issue of "deliberate elicitation," whether the government exercised its "control" of a known informant, *see York,* 933 F.2d at 1357 ("control" of the informant is the key to the agency relationship), to place the informant in "propinquity" with the defendant, knowing of the informant's "propensity to inform on his cellmates." *Cf. Brink,* 39 F.3d at 424 (concluding that such evidence "could represent a deliberate effort to obtain incriminating information from a prisoner in violation of his Sixth Amendment right to counsel"); *cf. also Henry,* 447 U.S. at 271, 100 S.Ct. 2183 ("Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity [between the informant and the defendant as cellmates] likely would lead to that result."). This is so, because the tacit message to the informant, conveyed by the manner in which the government exercises its "control," is that the informant should attempt to obtain information from other inmates when the opportunity is presented. Nor can the government "send an informant on a reconnaissance patrol through the prison population to gather evidence as long as it does not target specific individuals for the informant's attentions," because an express or implicit "prearrangement between the government and an informant" to gather information in return for a benefit establishes the informant's "agency," whether the government exercises its control over the informant "strictly, by targeting specific individuals, or casually, by loosing an informant on the prison population at large." *York,* 933 F.2d at 1357.

### c. When was McNeese a government agent?

■ The government expressly concedes that Robert McNeese was a "government agent" as of September 11, 2000, when he signed "listening post" instructions relating to Angela Johnson. The government makes this concession notwithstanding an express statement in the "listening post instructions" that, "[a]lthough in the past you have acted as an informant and have actively cooperated, you are *not* a government agent." Government's Exhibit 4 at 1 (underlining in the original). The court agrees that this disclaimer cannot defeat overwhelming evidence to the contrary concerning the conduct of the government, which demonstrated that McNeese *was* a government agent for *Massiah* purposes, at the very latest, as of the time he signed the "listening post instructions." In other words, even supposing that *Moore* establishes a "bright line rule" of agency, a rule that " '[a]n

informant becomes a government agent for purposes of [*Massiah*] only when the informant has been instructed by the police to get information about the particular defendant,' "*Moore*, 178 F.3d at 999 (quoting *Birbal*, 113 F.3d at 346), the government's "listening post instructions" are the point at which that "bright line" was undisputedly crossed in this case and McNeese became the government's "agent" for *Massiah* purposes. In light of the government's concession, the question about "agency" in this case is not whether McNeese was a government agent, but whether he was a government agent *prior to September 11, 2000.*

█ As to McNeese's "agency" prior to September 11, 2000, the court finds that what is involved here is not just "luck," "happenstance," or "voluntary" or "entrepreneurial" conduct by McNeese. *See Kuhlmann*, 477 U.S. at 459, 106 S.Ct. 2616 ("[A] defendant does not make out a violation of [the Sixth Amendment right identified in *Massiah*] simply by showing that an informant ... voluntarily reported his incriminating statements to the police."); *Moulton*, 474 U.S. at 176, 106 S.Ct. 477 ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. *See Henry*, 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring)."); *Birbal*, 113 F.3d at 346 ("The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant."); *Brink*, 39 F.3d at 423 ("An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past. *See United States v. Van Scoy*, 654 F.2d 257, 260 (3d Cir.), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d

114 (1981).")"; *York*, 933 F.2d at 1356 (finding that certain facts suggested that the informant was an "entrepreneur" who hoped to sell information to the government, not a government agent) (citing *Watson*, 894 F.2d at 1348). Rather, in McNeese's career as an informant in numerous investigations, beginning well before McNeese had any contact with Angela Johnson, the government had created a reasonable expectation on McNeese's part that providing incriminating information on other inmates would be rewarded with, or would at least secure promises of, support for his efforts to get his life sentence reduced to a term of years, and to get himself and his brother into the witness security program. *Cf. Henry*, 447 U.S. at 270–71, 100 S.Ct. 2183; *Matteo*, 171 F.3d at 893–94; *Li*, 55 F.3d at 327–28; *Brink*, 39 F.3d at 423–24; *York*, 933 F.2d at 1356–58. The government knew that McNeese was a highly-motivated informant likely to seek incriminating statements from other inmates, where, in the past, he had brought to the attention of law enforcement officers information about persons and incidents of criminal conduct of which they were otherwise ignorant. Indeed, McNeese had been providing information to the government for a longer period than the paid informant in *Henry*, 447 U.S. at 270, 100 S.Ct. 2183 ("Nichols had been a paid Government informant for more than a year"), and perhaps as long as the informant in *York*, 933 F.2d at 1357 ("Beaman [the informant] had worked for Stoll [a government agent] for a number of years and was reporting to Stoll on a weekly basis during the period when York [the defendant] was confiding to Beaman."). The fact that McNeese may have come to government officials with information about Johnson first does not mean he was not a government agent in light of the other circumstances of his long term relationship with the government as an informant. *See, e.g., York*, 933 F.2d at 1356–58

(although the FBI learned of the defendant only when the informant came to them with the defendant's confessions did not mean that the informant was not an "agent" for *Massiah* purposes in acquiring those confessions, where the "symbiotic relationship" between the government and the informant had established an agency relationship for the purpose of acquiring incriminating statements from other inmates).

From his long association with the government as an informant, McNeese had learned to be alert to statements of other prisoners, even if he had not been specifically instructed to acquire information about Johnson or her involvement in the crimes with which she was charged. *Cf. Henry*, 447 U.S. at 266, 100 S.Ct. 2183 ("The record does not disclose whether the agent contacted Nichols specifically to acquire information about Henry or the Janaf robbery.... The agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery."). Through McNeese's involvement as an informant in numerous investigations, and prior "listening post instructions" in the Dr. Shultice investigation, the court can fairly find that the government "trained" McNeese as an informant, and it is undisputed that the government specifically informed McNeese that his cooperation would be reported to the United States Attorney for the Middle District of Florida to assist McNeese with his efforts to get a reduction in his life sentence. *See Brink*, 39 F.3d at 423–24 ("The government trained [the informant] as an informant and at one point the government agent told [the informant] that

his cooperation would be reported to the United States Attorney and Attorney General. Therefore, [the informant] may have informed on [the defendant] on the reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently, with a recommendation for a reduction in his sentence."); [22] *York*, 933 F.2d at 1357–58 (finding that a government official paid the informant for providing useful information and there was an informal agreement to assist the informant with his parole application by detailing the extent of his cooperation with the government). At a minimum, there was a tacit or implicit "prearrangement" between the government and McNeese to provide McNeese with benefits in return for obtaining incriminating evidence about other prisoners. *York*, 933 F.2d at 1357.

This court need not simply speculate about McNeese's motives for assisting government officials, because the court finds, based on substantial evidence, "that the [government officials] promised [McNeese] consideration for his help or, otherwise, bargained for his active assistance." *Id.* Here, the government "bargained for [McNeese's] active assistance" by offering assistance in his attempts to reduce his life sentence and to get him into the witness security program, even though there was no explicit or formal agreement to obtain information from Johnson, because McNeese and the government had followed a particular course of conduct over a sustained period of time creating the sort of "symbiotic relationship" envisioned in *York. See id.* at 1357–58. McNeese had received what was "tantamount to an invitation ... to go out and look for [incrimi-

---

**22.** In *Brink*, the court found that such evidence required an evidentiary hearing to determine the informant's "agency." *See Brink*, 39 F.3d at 423–24. Here, of course, this court has held such an evidentiary hearing,

and has moved beyond the inferences suggested by such evidence to a finding based on the evidence that McNeese was acting as a government agent.

nating] information" on federal prisoners, even though there were no explicit instructions to obtain information from Johnson. *See id.* at 1358. Payment was not required, because there was a sort of "quid pro quo—in which [McNeese] receive[d] [or was promised] some type of benefit, even if nonpecuniary, in exchange for assisting the authorities," which, in this case, established an "agency relationship," even though no *overt* "deal was struck." *See Matteo,* 171 F.3d at 894.

Moreover, it appears to this court that, as among precedents that are "binding" on this court, it is *Henry,* not *Moore,* that provides the nearest factual similarity to the circumstances presented here, because this case, like *Henry,* involves a longstanding cooperator conditioned to expect benefits in return for providing incriminating information about other prisoners, even if there is some uncertainty about precisely when, if ever, prior to September 11, 2000, McNeese received specific instructions to get information from the defendant about charged crimes. *See Henry,* 447 U.S. at 266 & 270–71, 100 S.Ct. 2183. Here, as in *Henry* and *York,* any suggestion that government officials did not know that McNeese would try to get incriminating information, and were not exercising their "control" in such a way as to permit McNeese to do so, is simply not credible, where the government was well aware of McNeese's past behavior in bringing incriminating statements of other inmates to the attention of law enforcement officers. Although the government may not have been "closely managing [McNeese's] actions in [the Benton County Jail]," that is not the question, because "the relevant question ... is whether the [government officials] told [the informant] to collect information, not whether it told him exactly *how* or *when* to collect it, or from *whom.*" *York,* 933 F.2d at 1358 (emphasis in the original). Thus, the court finds that McNeese's "agency" for *Massiah* purposes ran from the time Johnson was placed in "propinquity" to him in the Benton County Jail, *see Henry,* 447 U.S. at 271, 100 S.Ct. 2183 ("Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity [between the informant and the defendant as cellmates] likely would lead to that result."), not just from the date McNeese received specific "listening post instructions" regarding Johnson.

Moreover, in making its assessment of McNeese's "agency," the court has found very instructive the following table summarizing McNeese's contacts with government agents *about Angela Johnson,* what information McNeese disclosed to them, and what instructions McNeese received from them *about communications with Angela Johnson* while he and Johnson were both incarcerated in the Benton County Jail.

| CONTACT | GOV'T AGENT(S) PRESENT | MCNEESE'S DISCLOSURES OF CONTACTS WITH JOHNSON AND INSTRUCTIONS HE RECEIVED |
|---|---|---|
| 7/30/00 | | *Johnson arrives at the Benton County Jail.* |
| approx. 8/7/00 | | *McNeese has first contact with Johnson.* |
| approx. 8/7/00 | Officer Rich | McNeese sent Johnson a note, either concealed in a crossword puzzle book or simply in an envelope, which Rich delivered, and Rich thereafter passed notes, some allegedly just in envelopes, almost daily. Rich denies actual knowledge that he delivered any notes between McNeese and Johnson, although he admits that notes may have been hidden in newspapers, etc., that he passed between McNeese and Johnson. |
| 8/13/00 | Jailer Merino<br><br>Dispatcher, Jailer Reese | (1) McNeese informed Jailer Merino that Johnson was talking to him. There is no evidence that Jailer Merino told McNeese to stop the contacts.<br>(2) A dispatcher reported a note was passed between McNeese and Johnson. Jailer Reese refused to do anything about the note-passing, so the dispatcher reported it to Detective Wright. |
| 8/14/00 | Detective Wright, Jailer Les Wood | McNeese admitted receiving a note from Johnson. Wright told McNeese to stop talking to the women in cell #2. |
| 8/14/00 | Jailer Merino | McNeese gave Merino copies of 5 notes from Johnson, who turned them over to Wright, who in turn gave them to Agent Basler. *See* Government's Exhibit 10. McNeese also requested another meeting with Wright, explaining that he had not mentioned the notes before, because he did not trust Wood. |

| CONTACT | GOV'T AGENT(S) PRESENT | MCNEESE'S DISCLOSURES OF CONTACTS WITH JOHNSON AND INSTRUCTIONS HE RECEIVED |
|---------|------------------------|------------------------------------------------------------------------------|
| 8/14/00 | Detective Wright | In a second meeting, McNeese clarified that the dispatcher had seen a note passing from McNeese to Johnson, and said he had asked Johnson about her murder charges and the absence of bodies. Wright told McNeese not to speak to Johnson any more until the matter was resolved. Johnson was moved to a cell across the hall from, instead of adjacent to, McNeese's cell. |
| 8/30/00 | Detective Wright | McNeese told Wright that Johnson was trying to learn the name of a dispatcher with whom she had had a verbal confrontation and that Johnson was planning an escape. The record does not reveal what instructions Wright gave McNeese at this time, but McNeese agreed to a meeting with Agent Basler. |
| 9/3/00 | Jailer Rich | Rich confiscated a note from McNeese to Johnson, which a dispatcher had seen McNeese pass to Johnson through his cell door. *See* Government's Exhibit 8. Johnson was locked down, but McNeese was not. |
| Prior to 9/11/00 | Detective Fischer | McNeese testified that he thought that, prior to 9/11/00, Detective Fischer had told him to remember the "listening post instructions" regarding Dr. Shultice, and that he had been "going to inform" prior to the September 11, 2000, meeting. Fischer testified that, at some uncertain date, McNeese contacted him by phone and told him about a developing relationship with Johnson, but Fischer doesn't recall that he "did anything" with that information. |
| 9/6/00 | Agent Basler | McNeese turned over to Basler letters he had received from Johnson between August 12 and September 6. *See* Government's Exhibit 11. McNeese revealed Johnson's statement that the missing witnesses were dead, details of the murders she had given him, her plans with McNeese to find a person to confess to the murders, Johnson's plan to kill another person, and her plans to escape. McNeese indicated that he had learned the information about the witnesses being shot "a couple of weeks ago." Agent Basler instructed McNeese not to do anything until he heard from an investigator as to how to proceed. *See* Defendant's Exhibit F; Transcript, Vol. III, p. 684. |

| CONTACT | GOV'T AGENT(S) PRESENT | MCNEESE'S DISCLOSURES OF CONTACTS WITH JOHNSON AND INSTRUCTIONS HE RECEIVED |
|---|---|---|
| 9/11/00 | Detective Wright, Agent Basler, AUSA Reinert | McNeese was presented with, read, discussed, and signed "listening post" instructions regarding further contacts with Angela Johnson. *See* Government's Exhibit 4. McNeese also turned over letters and notes received from Johnson prior to that time. *See* Government's Exhibit 12. After the meeting, jailers were instructed that if further communications between McNeese and Johnson occurred, they should "let them pass." The government established a "taint team." |
| 9/12/00 | AUSA Reinert | McNeese signed a plea agreement concerning his involvement in the Scotter Clark drug-trafficking crimes, which provided for further "cooperation" beyond the Scotter Clark investigation. *See* Government's Exhibit 14. |
| 9/18/00 | Jailer Merino | McNeese told Merino that he had information from Johnson, including a map of the location of the bodies of the murdered witnesses. |
| 9/18, 9/19, 9/20, 9/22, 9/25/00 | Detective Basler | McNeese made several telephone reports to Basler which the latter logged with notes. *See* Defendant's Exhibit J. Basler sought guidance on how to respond to McNeese's questions, eventually informing him on how to respond to Johnson's comments about her original charges. Basler's notes indicate he reiterated "listening post" instructions on 9/18 and 9/19 (3 times). |
| 9/26/00 | Jailer Merino | McNeese reiterated to Merino that he had a map showing the locations of the bodies of murdered witnesses. |
| 9/26/00 | Detective Wright, Jailer Merino, two AUSAs from the "taint team" | In a face-to-face meeting, McNeese denied that he had a map from Johnson and refused to let officers search his cell. A first search of McNeese's cell revealed nothing, but his legal mail was not searched. McNeese was later extracted from his cell by a cell extraction team and taken to an isolation cell. Jailer Merino was instructed not to permit any more contacts between McNeese and Johnson. |

| CONTACT | GOV'T AGENT(S) PRESENT | MCNEESE'S DISCLOSURES OF CONTACTS WITH JOHNSON AND INSTRUCTIONS HE RECEIVED |
|---|---|---|
| 10/2/00 | Detective Fischer | McNeese contacted Fischer in response to a request from Fischer through Wright that McNeese contact him. McNeese offered to turn over the maps. Eventually, the government obtained notes and other materials that McNeese had received or written from 9/11/00 to 9/25/00. *See* Government's Exhibit 13. |
| 10/2/00 | Detective Fischer, Detective Wright | In a face-to-face meeting, McNeese turned over the maps and explained various things to the detectives. A search warrant was obtained for McNeese's cell, which was executed on 10/3/00, producing additional documents. |
| 10/23/2000 | Agent Basler | McNeese called Agent Basler from the Scott County Jail to disclose further information that Johnson and another had shot someone in April 2000 and buried the body in the same area the other five murder victims had been found. Agent Basler directed McNeese to contact AUSA Murphy. |

This table of contacts demonstrates several salient points. Even discounting Officer Rich's actual or constructive knowledge that McNeese and Johnson were communicating right at the time of "first contact" between them, on or about August 6 or 7, 2000, government officials waited from August 13, 2000, when McNeese reported his contacts with Johnson to Officer Merino, until September 11, 2000, to give McNeese formal "listening post instructions." Although government officials gave McNeese instructions to have no contact with Johnson during the interim, they either knew or should have known from McNeese's record that the propinquity of McNeese and Johnson, in a jail like the Benton County Jail, where communication among inmates appears to have been largely unchecked, would likely—even inevitably—lead to continued contacts and the acquisition of further incriminating information. *See Henry*, 447 U.S. at 271, 100 S.Ct. 2183 ("Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result."). For the entire time between August 13, 2000, and September 11, 2000, jailers were facilitating contacts between Johnson and McNeese by passing materials between them that the jailers knew or should have known—indeed, the court finds almost certainly did know—contained notes.

Nor did federal officials remove either Johnson or McNeese from the Benton County Jail, something they could have done, had they been serious about their "affirmative obligation to respect and preserve [Johnson's] choice to seek [counsel's] assistance." *See Moulton*, 474 U.S. at 171, 106 S.Ct. 477. McNeese could easily have been removed, ostensibly for court appearances, until government officials had thoroughly instructed him on the rules of permissible contacts or until they had been authorized by their superiors to let McNeese wear a wire, so that they could monitor the next set of disclosures. At best, officials made only a "cosmetic" effort to separate Johnson and McNeese by moving Johnson from a cell adjacent to McNeese to a cell across the hall. However, that move did not stop either the passing of notes or yelling, and government officials knew or should have known that it

would not, based on the nature of the jail and past experience of jailers. The move also made it possible for McNeese and Johnson to exploit new and more direct methods of communication, such as oral communication through the cell window to the exercise yard, which government officials knew or should have known was possible, even likely, but did nothing to hinder. Agent Basler also knew from McNeese's interview statement on September 6, 2000, that a jailer had permitted a face-to-face contact with Johnson, but there is no evidence that jailers were subsequently instructed not to let such things happen or that there was any other real effort to discover, punish, or prevent facilitation by jailers of communications between prisoners. The record is simply devoid of any evidence of any investigation of lax jail procedures or misfeasance of jailers. The evidence strongly suggests, and the court finds, that government officials delayed, consciously or unconsciously, but certainly knowingly and negligently, giving McNeese "listening post instructions" while knowing perfectly well that, in the interim, McNeese was getting, and was going to get, incriminating information from Johnson, notwithstanding any "no contact" instructions. This evidence convincingly establishes that the "real message" to McNeese that was implicit in the government's conduct, *i.e.*, it's "control" of its agent, *see, e.g., Li*, 55 F.3d at 328 ("control" of the agent, rather than explicit instructions, is the key to agency); *York*, 933 F.2d at 1357–58 (same), was that McNeese should continue to get information from Johnson in the expectation pursuing such contacts and that turning over to the government any incriminating information obtained certainly would *not* result in any punishment, and would instead result in possible benefits to his pursuit of his personal agenda.

Therefore, the court finds that McNeese was an "agent" for *Massiah* purposes, with

reference to Johnson, during the entire period he was in contact with Johnson at the Benton County Jail. In the alternative, the government concedes, and the court also finds, that McNeese was an "agent" for *Massiah* purposes, with reference to Johnson, within the meaning of any "bright line rule" of agency established in *Moore*, 178 F.3d at 999, from September 11, 2000, the date on which McNeese actually received "listening post instructions" pertaining to Johnson, during the remainder of his stay at the Benton County Jail.

### 4. "Deliberate elicitation"

Because McNeese was an "agent" of the government for *Massiah* purposes, either from the beginning of Johnson's stay at the Benton County Jail or from September 11, 2000, until McNeese's removal from the Benton County Jail, two of the key questions remaining in the analysis of Johnson's claim of a "*Massiah* violation" are *whether* and *when* incriminating statements were "deliberately elicited" from Johnson. *See Moore*, 178 F.3d at 999 (the third element of a *Massiah* claim is "deliberate elicitation" of incriminating statements). This court finds that, in the decisions of the Supreme Court and the Eighth Circuit Court of Appeals, the determination on the "deliberate elicitation" element involves consideration of the conduct of both the government and the informant, although courts do not always make clear distinctions between the two.

These twin concerns are suggested in the decision of the Eighth Circuit Court of Appeals in *Moore*, which in this respect is both instructive and controlling:

> In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the Supreme Court made clear that the "primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the

equivalent of direct police interrogation ... 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements.'" *Id.* at 459, 106 S.Ct. 2616, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (citing *United States v. Henry*, 447 U.S. 264, 276, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)) (Powell, J., concurring). *"[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."* *Id.* at 459, 106 S.Ct. 2616, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364.

*Moore*, 178 F.3d at 999–1000 (emphasis added). Indeed, in *Moore*, the defendant put at issue both the conduct of the government and the informant, framing the alleged *Massiah* violation as arising from the *government's* conduct in "leaving Hartwig [the informant] in Moore's cellblock to elicit incriminating statements, and accepting his assistance," *Moore*, 178 F.3d at 998–99, although, as discussed below, the court rejected the defendant's claim on the ground that the *informant* had done nothing improper under *Massiah*. *See id.* at 1000.

The Supreme Court's *Massiah* decisions also suggest that—where any distinction can be made between the two—both the conduct of the government and the conduct of the informant are at issue in determining whether there has been "deliberate elicitation" of incriminating statements from a defendant.[23] In *Henry*, where the informant was a prisoner housed in the same cellblock as the defendant, the Court examined both the conduct of the government agent who instructed the informant

and the informant himself. As to government conduct, the Court held, "Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity [of the informant and the defendant] likely would lead to [securing incriminating information]." *See Henry*, 447 U.S. at 271, 100 S.Ct. 2183. The Court elsewhere described in detail the effect of such "propinquity" between a defendant and an informant who was a fellow inmate on a defendant's willingness to make incriminating disclosures. *Id.* at 272–74, 100 S.Ct. 2183. As to the informant's conduct, the Court concluded that, "according to his own testimony, [the informant] was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" *Id.* at 271, 100 S.Ct. 2183.

Similarly, the conduct of the government and the agent both figured in the Court's assessment of the "deliberate elicitation" element in *Moulton*. In *Moulton*, it was patently obvious that the informant had "deliberately elicited" incriminating statements, where he had obtained several such statements from Moulton by professing to have a poor memory and asking Moulton to remind him of the circumstances of the crimes and by "reminiscing" about events surrounding the various thefts. *Moulton*, 474 U.S. at 165–66, 106 S.Ct. 477. Moreover, because of the relationship between the defendant and the informant, when the informant engaged the defendant "in active conversation about their upcoming trial," that conduct "was certain to elicit" incriminating statements from the defen-

**23.** In *Williams,* where no such distinction could be made, because the informant was a police officer, and thus his conduct was the government's conduct, the Court found a *Massiah* violation, because the officer "purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." *Williams,* 430 U.S. at 399, 97 S.Ct. 1232.

dant, such that the informant's participation "in this conversation was 'the functional equivalent of interrogation.'" *Id.* at 177 n. 13, 106 S.Ct. 477 (quoting *Henry,* 447 U.S. at 277, 100 S.Ct. 2183 (Powell, J., concurring)); *see also Kuhlmann,* 477 U.S. at 458–59, 106 S.Ct. 2616 (explaining significant conclusions in *Moulton* ). The conduct of the government that resulted in a Sixth Amendment violation in *Moulton* was "obtain[ing] incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent," which the State of Maine had done in that case by suggesting that the informant record telephone conversations with the defendant, and by asking him to wear a wire transmitter during a subsequent meeting with the defendant at which the police "knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel." *Id.* at 176–77, 106 S.Ct. 477.

Finally, in *Kuhlmann,* where the government had placed the defendant in a cell with an inmate who had agreed to act as an informant—which would probably constitute "knowing exploitation" of a situation in which the defendant might make incriminating statements in the absence of counsel under *Moulton*—the Court nevertheless found no "deliberate elicitation," and hence no *Massiah* violation, based on the conduct of the informant. In that case, the informant had received *and followed* directions only to listen to the defendant—that is, the informant " 'at no time asked any question' of respondent concerning the pending charges, and ... 'only listened' to respondent's 'spontaneous' and 'unsolicited' statements." *Kuhlmann,* 477 U.S. at 460, 106 S.Ct. 2616. Thus, *Kuhlmann* suggests that, even if the government intentionally creates or knowingly exploits a situation in which incriminating statements might be made to an informant

in the absence of counsel within the meaning of *Moulton,* there is nevertheless no violation of the Sixth Amendment within the meaning of *Massiah* unless the informant *also* engages in conduct that is the equivalent of an interrogation.

Therefore, the court must consider both the conduct of the government and the conduct of the informant in this case to determine whether incriminating statements were "deliberately elicited" from Angela Johnson in violation of her Sixth Amendment rights.

### a. Conduct of the government

■ As indicated in the precedents discussed briefly above, and as explained more fully below, consideration of the conduct of the government in relation to the "deliberate elicitation" element examines such matters as the government's conduct in creating or exploiting an opportunity for an informant to obtain information from the defendant. It also involves consideration of the effect, if any, of the government's legitimate reasons for surveillance of the defendant independent of a purpose to obtain incriminating evidence relating to charged offenses.

In *Henry,* the instructions that the government agent gave Nichols, the informant, became a central issue:

> [T]he District Court requested affidavits from the Government agents. An affidavit was submitted describing the agent's relationship with Nichols and relating the following conversation:
>
> > "I recall telling Nichols at this time to be alert to any statements made by these individuals [the federal prisoners] regarding the charges against them. I specifically recall telling Nichols that he was not to question Henry or these individuals about the charges against them, however, if they engaged him in conversation or talked

in front of him, he was requested to pay attention to their statements. I recall telling Nichols not to initiate any conversations with Henry regarding the bank robbery charges against Henry, but that if Henry initiated the conversations with Nichols, I requested Nichols to pay attention to the information furnished by Henry."

The agent's affidavit also stated that he never requested anyone affiliated with the Norfolk city jail to place Nichols in the same cell with Henry.

*Henry,* 447 U.S. at 268, 100 S.Ct. 2183. Moreover, the government agent asserted that he "had not intended that Nichols take affirmative steps to obtain incriminating statements." *Id.* at 271, 100 S.Ct. 2183. However, the Supreme Court's decision in *Henry* established that the government does not have to have such intent. Rather, the standard is whether the government *"must have known* that such propinquity [of the informant and the defendant]," which the government had created, "likely would lead to [securing incriminating information]." *Id.* (emphasis added). Thus, in *Henry,* the Court held that a defendant's Sixth Amendment rights were violated if the government had *"intentionally creat[ed]* a situation *likely to* induce [the defendant] to make incriminating statements without the assistance of counsel." *Henry,* 447 U.S. at 274, 100 S.Ct. 2183 (emphasis added).

In *Moulton,* the Court confirmed that the standard is that the government " 'must have known' that [the informant] would take affirmative steps to secure incriminating information." *Moulton,* 474 U.S. at 174, 106 S.Ct. 477 (quoting *Henry,* 447 U.S. at 271, 100 S.Ct. 2183); *see also Valdez v. Ward,* 219 F.3d 1222, 1235–36 (10th Cir.2000) (citing cases applying this "must have known" standard), *cert. denied sub nom. Valdez v. Gibson,* 532 U.S. 979, 121 S.Ct. 1618, 149 L.Ed.2d 481 (2001). Noting that, in *Henry,* the Court had

found a Sixth Amendment violation where the government had " '*intentionally creat[ed]* a situation *likely to* induce [the informant] to make incriminating statements without the assistance of counsel,' " *id.* (again quoting *Henry,* 447 U.S. at 274, 100 S.Ct. 2183) (emphasis added), the Court went one step further. In *Moulton,* the Court expanded the scope of government conduct that runs afoul of *Massiah* by concluding that *"knowing exploitation* by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the *intentional creation* of such an opportunity." *Id.* at 176, 106 S.Ct. 477 (emphasis added). "Accordingly," the Court wrote, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.*

■ Thus, this court must decide whether the government either "intentionally created" a situation in which McNeese was able to obtain incriminating statements from Angela Johnson, or "knowingly exploited" such a situation. If the government did neither, then there was no Sixth Amendment violation within the meaning of *Massiah* and its progeny. *See Henry,* 447 U.S. at 274, 100 S.Ct. 2183; *Moulton,* 474 U.S. at 176, 106 S.Ct. 477. On the other hand, even if the government "intentionally created" or "knowingly exploited" a situation in which incriminating statements were likely to be elicited from the defendant in the absence of counsel, there is no Sixth Amendment violation unless the informant *also* "deliberately elicited" such statements instead of acting merely as a "listening post." *See Kuhlmann,* 477 U.S. at 459–60, 106 S.Ct. 2616.

*i. "Intentional creation" of the opportunity.* In considering whether the government "intentionally created" a situation in which Johnson was likely to make incriminating statements, *see Henry,* 447 U.S. at 271, 100 S.Ct. 2183 (recognizing that the government "deliberately elicits" incriminating statements if it "intentionally creates" a situation in which such disclosures were likely to be made); *see also Moulton,* 474 U.S. at 174, 106 S.Ct. 477 (reiterating that "intentional creation" is one way in which the government may be guilty of "deliberate elicitation"), the fact that Johnson and McNeese were both incarcerated must be kept in mind. Indeed, in *Henry,* the Court focused on the fact that Henry was not aware of a fellow inmate's role as a government informant, observing that "[a]n accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then 'arms' length' adversaries." *Henry,* 447 U.S. at 272–73, 100 S.Ct. 2183. On the other hand, "[w]hen the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents." *Id.* at 273, 100 S.Ct. 2183. The Court concluded that "Henry's incarceration at the time he was engaged in conversation by Nichols is also a relevant factor," because "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.* at 273–74, 100 S.Ct. 2183.

Here, the government, in the person of AUSA Reinert, intervened to place Johnson in the Benton County Jail where a well-known informant was also known to be incarcerated, instead of in the Linn County Jail, where Johnson would ordinarily have been placed upon her arrest. Again, government officials cannot feign ignorance of McNeese's propensity to acquire incriminating information from other inmates, in light of his long history of cooperation, including revelation of several persons or incidents of criminal conduct of which law enforcement officers were unaware, such as situations involving Dice, Stefani, and Shultice. Government officials knew or should have known that McNeese would pursue any available opportunity to acquire incriminating statements. Moreover, the Benton County Jail was a facility in which male and female inmates were not segregated in separate units or on separate floors, but could be placed in the same cellblock or even in adjacent cells, while the Linn County Jail was a much larger jail in which it was unlikely that male and female prisoners would have any contact. Again, although the court finds that the placement of Johnson and McNeese in adjacent cells is "suspicious," the court agrees with the government's contention that the government just isn't good enough to pull off a conspiracy to achieve that end. Nevertheless, the Benton County Jail was small enough that there was only one cellblock used by all of the inmates, except those placed in a temporary "holding cell," so that it was likely that inmates of both sexes would be able to communicate with each other, and indeed, inevitably would be able to and would do so. Thus, this court finds both that the government "intentionally created" the opportunity to circumvent Johnson's right to counsel, by placing Johnson in a jail like the Benton County Jail with McNeese, and that the government "must have known that [the] propinquity [of McNeese and Johnson in that jail] likely would lead to [securing incriminating information]," owing to what government officials knew or

should have known about the nature of that jail. *Id.* at 271, 100 S.Ct. 2183; *see also Moulton*, 474 U.S. at 174, 106 S.Ct. 477 (confirming that the standard is that the government " 'must have known' that [the informant] would take affirmative steps to secure incriminating information' ") (quoting *Henry*, 447 U.S. at 271, 100 S.Ct. 2183). In other words, the government *"intentionally creat[ed]* a situation *likely to induce* [the defendant] to make incriminating statements without the assistance of counsel." *Id.* at 274, 100 S.Ct. 2183 (emphasis added). Indeed, the details of the instructions that were given to the informant and the government's protestations that no one requested that the informant be placed in proximity to the defendant in this case are almost eerie echoes of the circumstances presented in *Henry*, and the Court in that case readily concluded that the government had "deliberately elicited" incriminating statements from the defendant. *See id.* at 268, 100 S.Ct. 2183 (the government's agent asserted that he had instructed the informant not to initiate conversations with the defendant and that he had never requested that anyone affiliated with the jail in which the defendant and informant were incarcerated place the informant in the same cell with the defendant). The same conclusion is appropriate here.

Also, in this case, as in *Henry*, it is appropriate to focus on the fact that Johnson was not aware of McNeese's role as a government informant, and so "[c]onversation stimulated in such circumstances [might] elicit information that [Johnson] would not intentionally reveal to persons known to be Government agents." *Id.* at 273, 100 S.Ct. 2183. This case demonstrates quite plainly why the Court in *Henry* noted that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make [a defendant] particularly susceptible to the ploys of under-

cover Government agents." *Id.* at 273–74, 100 S.Ct. 2183. Here, the fact that Johnson and McNeese were incarcerated together made Johnson particularly susceptible to McNeese's ploy in fabricating a plan to suborn a perjured confession to the murders with which Johnson was charged as a means of obtaining exceptionally detailed incriminating statements about the manner of, and Johnson's participation in, the witnesses' murders and disposal of their bodies. Johnson fell for this ploy, notwithstanding that her attorney—who had also represented Dr. Shultice, one of McNeese's prior targets—had specifically warned her not to trust McNeese, because he might be an informant. The fact that Johnson confided in McNeese notwithstanding such a warning is certainly a tribute, in the first instance, to McNeese's persuasiveness; however, the court also finds that at least some of McNeese's success in overcoming the warning from Johnson's attorney is attributable to the "subtle influences" that confinement may bring into play. Several of the notes exchanged between McNeese and Johnson, for example, show that McNeese relied on their common plight and his purported concern for a fellow inmate as the justification for his interest in Johnson's situation. It is inconceivable that Johnson would have made the disclosures that she did to someone she knew to be a government informant. Moreover, the government was well aware of McNeese's ability to use such "ploys," to marvelous effect, in light of his prior cooperation with the government, making it even plainer that the government "must have known that [the] propinquity [of McNeese and Johnson in the Benton County Jail] likely would lead to [securing incriminating information]." *Id.* at 271, 100 S.Ct. 2183.

***ii. "Knowing exploitation" of the opportunity.*** In the alternative, or in addi-

tion, the court finds that, even if the government did not "intentionally create" the opportunity to obtain incriminating statements from Johnson in the absence of counsel, the government certainly "knowingly exploited" such an opportunity when it presented itself. In *Moulton*, in which the Supreme Court inaugurated this alternative standard, the Court held that the State of Maine had "knowingly exploited" the opportunity to obtain incriminating statements by suggesting that the informant record telephone conversations with the defendant and by asking him to wear a wire transmitter during a subsequent meeting with the defendant at which the police "knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel." *Moulton*, 474 U.S. at 176–77, 106 S.Ct. 477. Here, the record presents at least as substantial and convincing evidence that the government "knowingly exploited" the situation.

That evidence includes McNeese's many notices to the government that he was having contact with Johnson, summarized in the table above, and the government's utter failure to take reasonably available steps to stop the contacts or otherwise to act upon its "affirmative obligation to respect and preserve [Johnson's] choice to seek [counsel's] assistance." *See Moulton*, 474 U.S. at 171, 106 S.Ct. 477. As the court found above, in reference to conduct of the government demonstrating McNeese's "agency," McNeese could easily have been removed from the Benton County Jail, ostensibly for court appearances, until government officials had thoroughly instructed him on the rules of permissible contacts or until they had been authorized by their superiors to let McNeese wear a wire, so that they could monitor the next set of disclosures. However, government officials instead pursued only "cosmetic" efforts to separate Johnson and McNeese by moving Johnson from a cell adjacent to McNeese's to a cell across the hall, which government officials knew or should have known would not stop contacts between Johnson and McNeese, and instead, created new opportunities for direct communication between them, and by failing to "stop the holes" in jail security that permitted such communications. Again, the evidence strongly suggests, and the court finds, that government officials delayed, consciously or unconsciously, but certainly knowingly and negligently, giving McNeese "listening post instructions" or taking any other steps to protect Johnson's Sixth Amendment rights while knowing perfectly well that, in the interim, McNeese was getting, and was going to get, incriminating information from Johnson, notwithstanding any "no contact" instructions. Thus, in the alternative, the court finds that the government "knowingly exploited" an opportunity to obtain incriminating statements from Johnson in the absence of counsel.

*iii. "Legitimate purposes" of the surveillance.* The government contends that the "legitimate purposes" of its surveillance of Johnson prevent the exclusion of the evidence obtained on Sixth Amendment grounds. Specifically, the government contends that Johnson's Sixth Amendment right to counsel did not exist, because the surveillance involved uncharged criminal activity, including potential "new crimes" of obstruction of justice, suborning perjury, escaping from custody, and possibly assault or murder of jail personnel. Because no Sixth Amendment right had attached as to these "new crimes," the government contends that evidence of statements obtained in pursuit of information about "new crimes" and any evidence flowing from those statements should be admissible.

The government admits, as it must, that its argument that legitimate purposes of

surveillance excuse any Sixth Amendment violation as to charged offenses is plainly contrary to existing law, prompting the government to argue that the primary decision rejecting this argument, *Moulton,* was wrongly decided. *See* Government's Memorandum in Support of the Government's Notice of Intent to Use Evidence at 13–15 & n. 2; *see also* Government's Supplemental Memorandum in Response to Defendant's Motion to Dismiss at 5 ("As argued in the government's opening Memorandum, the holding in *Moulton* is wrong."). However, even before *Moulton,* the Supreme Court had made clear that legitimate reasons for continuing investigation of *charged offenses* could not excuse or cure a Sixth Amendment violation. In *Massiah,* the Court confronted that issue as follows:

> The Solicitor General, in his brief and oral argument, has strenuously contended that the federal law enforcement agents had the right, if not indeed the duty, to continue their investigation of the petitioner and his alleged criminal associates even though the petitioner had been indicted. He points out that the Government was continuing its investigation in order to uncover not only the source of narcotics found on the S.S. Santa Maria, but also their intended buyer. He says that the quantity of narcotics involved was such as to suggest that the petitioner was part of a large and well-organized ring, and indeed that the continuing investigation confirmed this suspicion, since it resulted in criminal charges against many defendants. Under these circumstances the Solicitor General concludes that the Government agents were completely 'justified in making use of Colson's cooperation by having Colson continue his normal associations and by surveilling them.'
>
> We may accept and, at least for present purposes, completely approve all

that this argument implies, Fourth Amendment problems to one side. *We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.*

*Massiah,* 377 U.S. at 206–07, 84 S.Ct. 1199 (emphasis added).

In *Moulton,* the Court expressly considered the government's contention that there was no Sixth Amendment violation, because it had monitored the defendant by means of an undercover informant for the legitimate purpose of investigating crimes *other than the ones charged,* an argument much like the one the government asserts in this case. In other words, *Moulton* considered the question of whether a companion, legitimate interest in investigating other criminal activity by an incarcerated defendant could excuse infringement of the defendant's Sixth Amendment right to counsel as to charges already filed. In *Moulton,* the Court rejected the government's argument:

> *The Solicitor General argues that the incriminating statements obtained by the Maine police nevertheless should not be suppressed because the police had other, legitimate reasons for listening to Moulton's conversations with Colson,* namely, to investigate Moulton's alleged plan to kill Gary Elwell and to insure Colson's safety. In *Massiah,* the Government also contended that incriminating statements obtained as a result of its deliberate efforts should not be ex-

cluded because law enforcement agents had "the right, if not indeed the duty, to continue their investigation of [Massiah] and his alleged criminal associates...." 377 U.S., at 206, 84 S.Ct., at 1203. There, as here, the Government argued that this circumstance justified its surveillance and cured any improper acts or purposes. We rejected this argument, and held:

> "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." · *Id.*, at 207, 84 S.Ct., at 1203 (emphasis omitted).

*We reaffirm this holding, which states a sensible solution to a difficult problem.* The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. *In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason*

*for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in Massiah.* On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. *.Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.*

*Moulton*, 474 U.S. at 178–80, 106 S.Ct. 477 (footnotes omitted; emphasis added).

On the authority of *Moulton*, the First Circuit Court of Appeals in *United States v. Bender*, 221 F.3d 265 (1st Cir.2000), rejected arguments similar to those asserted by the government here. In *Bender*, the court set the scene and framed the grounds for appeal as follows:

> While in prison awaiting trial on charges of being a felon-in-possession of a firearm, Jeremy Bender conversed with an undercover government agent concerning his plot to falsify an alibi and possibly kidnap and murder government witnesses. Bender's attorney was not present during the conversation nor notified that it would take place. After the government informed Bender that it would seek to introduce his statements in the pending criminal case, he moved to have them suppressed. Applying *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the

district court found that the statements were incriminating and obtained in violation of the Sixth Amendment. As a consequence, the court suppressed them. The government appeals and argues that the admission of these statements would not violate the Sixth Amendment because: 1) the statements concerned future crimes unrelated to the pending charges; 2) the statements, insofar as they concerned subornation of perjury, were unprotected by the Sixth Amendment; 3) the government did nothing wrong in obtaining the statements; and 4) suppression of the statements would encourage the obstruction of justice.

*Bender*, 221 F.3d at 267. The court rejected all of the government's arguments and affirmed the suppression of the evidence.

In the heart of its analysis in *Bender*, the First Circuit Court of Appeals noted that the government "does not ask us to rethink the rule in *Moulton* "—something the government *does* as this court to do here—"nor does it argue that the incriminating statements were obtained by luck or happenstance." *Id.* at 269.

Instead, the government contends, primarily, that, since the incriminating statements concerned different and future crimes, unrelated, it says, to the pending charges, the Sixth Amendment does not apply. We disagree. *The statements were incriminating not only as to future crimes (perjury, conspiracy to kidnap and murder) but also as to the pending charges. So long as the statements were incriminating as to the pending charges and were deliberately elicited by government agents, they cannot constitutionally be admitted in the trial of those charges. Cf. [Moulton, 474 U.S.]* at 180, 106 S.Ct. 477, 88 L.Ed.2d 481 (holding that the Sixth Amendment does not permit the introduction of directly incriminating statements obtained during the investigation of other crimes).

At bottom, the government's position is that *Moulton* is limited to direct statements by the defendant about the crime with which he has been charged. Nothing in *Moulton* supports that limitation, and Sixth Amendment jurisprudence is to the contrary. *See Massiah,* 377 U.S. at 207, 84 S.Ct. 1199, 12 L.Ed.2d 246. All that matters is that the statements were incriminating as to the pending charges; it does not matter how. So while Bender's statements suborning perjury did not provide direct evidence in the pending case (e.g., underlying facts, details, and strategy) or amount to an explicit confession, they "strongly tended to show that a guilty mind was at work." *United States v. Lozada–Rivera,* 177 F.3d 98, 107 (1st Cir.1999) (suppressing similar jailhouse statements because of Sixth Amendment violation). It was obvious that questioning Bender about a false alibi for the underlying charges would result in his making incriminating statements as to those charges. The same was true of a plot to do away with government witnesses. Bender's statements, therefore, were likely to be incriminating as to the pending charges, were deliberately elicited post-indictment, and were obtained in the absence of counsel. Thus, they were obtained in violation of the Sixth Amendment and were rightly suppressed by the district court. *Cf. id.* (finding that the admission of statements concerning subornation of perjury was not harmless error and required reversal and a new trial). Our conclusion is in accord with the Second Circuit's pre-*Moulton* decision in *Mealer v. Jones,* 741 F.2d 1451, 1453–55 (2d Cir. 1984).

*Bender*, 221 F.3d at 269 (footnote omitted). Similarly, here, much of the evidence that relates to the government's potential "new crimes" also relates to the charges that

were already pending against Johnson, including, for example, evidence of the location of the bodies of the murder victims, which related to both charged crimes and the inchoate crime of suborning a perjured confession to the murders. This relationship is not lost on the government, of course, or the government would not be attempting to obtain prior authorization to admit the evidence in Johnson's trial on the first seven charges brought against her.

The court in *Bender* also rejected other contentions by the government that have echoes here. The government argued that the statements pertaining to subornation of perjury were not protected by the Sixth Amendment, in particular, because the defendant's trial attorney would have had to report his client's subornation of perjury had he known about it. *Id.* The court rejected this argument for the following reasons:

> The argument confuses two different concepts: the doctrine of right to counsel under the Sixth Amendment and the doctrine of attorney-client privilege (and exceptions to that doctrine for crime or fraud). These are two distinct doctrines serving different purposes. The right to counsel is not defeated if a particular communication is not privileged. Many activities of counsel are not privileged, as in examining witnesses at trial; others are privileged, as in giving confidential advice. The logic of the government's argument is that because an activity is not privileged, there is no right to counsel. To articulate that logic is to show its weakness. The right to counsel applies in both privileged and non-privileged situations. This is so regardless of whether a communication falls within the exception to a privilege. Indeed, the privilege doctrine, and so the exceptions to it, assume there is an attorney-client relationship.... The Sixth Amendment

prohibits the government from eliciting incriminating statements no matter their content. That defense counsel might be under an obligation not to participate in a client's subornation of perjury does not excuse the government from its obligation to interact with the accused through the medium of counsel. Indeed, the government's argument can be stood on its head: given counsel's ethical obligation to advise a client not to commit perjury, the client's Sixth Amendment right to counsel is particularly important in situations like the one this case presents.

*Bender,* 221 F.3d at 269–70. Similarly here, the fact that the right to counsel had not attached to an attempt to suborn perjury does not mean that there was no Sixth Amendment right as to the information about charged crimes garnered from Johnson's attempt to suborn perjury through McNeese.

In *Bender,* the government then argued that suppression of the evidence was illogical, because the district court had found that the government did "nothing wrong." *Id.* at 270. The First Circuit Court of Appeals found this argument equally unpersuasive:

> The same argument was presented and rejected in both *Massiah* and *Moulton. See Massiah,* 377 U.S. at 207, 84 S.Ct. 1199, 12 L.Ed.2d 246; *Moulton,* 474 U.S. at 179, 106 S.Ct. 477, 88 L.Ed.2d 481. Though the government might be investigating entirely separate crimes, "dual purposes may exist whenever police have more than one reason to investigate someone." *Moulton,* 474 U.S. at 179 n. 15, 106 S.Ct. 477, 88 L.Ed.2d 481. That the government might have other legitimate reasons for confronting a person who is accused does not eliminate the violation of the right as it pertains to the pending charges. *See id.* at 179–80,

474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481; *see also id.* at 180, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 ("To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.*").

*Bender,* 221 F.3d at 270. For the same reasons, even if the court were convinced that monitoring of Johnson was for a "dual purpose," not simply to obtain incriminating information about charged crimes, such an argument would be to no avail as to evidence of the charged crimes.

In *Bender,* the court also rejected the government's "variant of this same argument," a contention that "the purpose of suppression is to deter law enforcement officers from violating constitutional rights by imposing the penalty of suppression when they do." *Id.* The government argued that, if the incriminating statements only violate the defendant's constitutional rights if introduced in the trial of pending charges, then the agents in that case had not violated any constitutional rights in procuring the statements, so there was no reason to suppress them. *Id.* The court, again, was not persuaded:

> There are at least two different responses. First, even if the focus were on the agent and not the government as prosecutor, we do not live in a perfectly logical world but rather live in one that is built on experience and accommodation of differing interests. The tension the government identifies is inherent in what *Moulton* calls "a sensible solution to a difficult problem." *Id.* at 179, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481. Second, as one commentary has noted, "[i]n answer to such criticisms, it might be observed that *Massiah,* after all, is

grounded in the Sixth Amendment right to counsel and thus should be assessed in terms of its protection of that right instead of as some sort of alternative to or extension of either *Miranda* or the voluntariness test." 2 Wayne R. La-Fave et al., *Criminal Procedure* 504 (2d ed.1999).

*Bender,* 221 F.3d at 270 (footnote omitted). The *Bender* court's further comment, in a footnote, on a related argument is also instructive:

> The government says that if it is "free to use the statements at a future prosecution, there must be no Sixth Amendment violation in the very acquisition of the statements." Thus, "there should be no Sixth Amendment violation in obtaining and using the statements at a trial on pending charges." We have no occasion to rule on the premise; the conclusion, however, does not follow. The Sixth Amendment does not fasten itself irremovably from an incriminating statement, making that statement either admissible or inadmissible for all time. Instead, the Amendment, in this context, governs the interactions between the government and the accused once the adversarial process has begun in a particular case. In other words, "[t]he Sixth Amendment right ... is offense specific." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). *Consequently, the same statements can be given differing constitutional status depending on their relationship to a particular case.*

*Bender,* 221 F.3d at 270 n. 4 (emphasis added). These conclusions are instructive here, because the incriminating statements purportedly obtained from Johnson plainly relate to charges in two different cases, and *Bender* supports the conclusion that the statements may have to be treated differently in those two cases. Similarly,

this court agrees that the question of a Sixth Amendment violation under *Massiah* does not make evidence "constitutionally tainted" in the same way a Fourth Amendment violation might, because the Sixth Amendment violation is *offense specific,* making it possible for the evidence to be unuseable in the prosecution of some offenses, but useable in the prosecution of others.

All other arguments having failed, the government argued in *Bender* that suppression was just "poor policy," because it " 'encourages defendants to suborn perjury, tamper with witnesses, obstruct justice, and otherwise interfere with the truth-finding function of the courts.' " *Id.* at 271 (quoting the government's brief). The court, however, found that these policy concerns were adequately addressed, not only by the unlikelihood that such conduct would occur when counsel is present, but because of the uses that *could* be made of the incriminating statements obtained in violation of the defendant's Sixth Amendment rights:

> As observed, the presence of counsel may lessen instances of such conduct. And we doubt that defendants will be more likely to suborn perjury or obstruct justice because of our decision. Nothing prevents the government from prosecuting Bender in a separate proceeding for subornation of perjury and the like. *See Moulton,* 474 U.S. at 180 n. 16, 106 S.Ct. 477, 88 L.Ed.2d 481; *United States v. Walker,* 148 F.3d 518, 528–30 (5th Cir.1998). Nothing prevents the government from using Bender's statements, if knowing and voluntary, for the purpose of impeachment, if he testifies. *See Michigan v. Harvey,* 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). And nothing prevents the government from using these statements at sentencing if Bender is tried and convicted. *See* U.S.S.G. § 3C1.1. The government might be re-

luctant to prosecute Bender for these new alleged crimes because of scarce resources or because such a prosecution would depend on the statements of inmate witnesses, who might lack credibility. But these considerations do not outweigh the significant countervailing constitutional values.

*Bender,* 221 F.3d at 271. For these reasons, the court in *Bender* affirmed suppression of the evidence.

■ This court can add little to the reasoning of *Moulton* and *Bender,* which plainly remove any doubt that the evidence must be suppressed in this case, if the elements of Johnson's *Massiah* claim are otherwise established, notwithstanding the government's purported "legitimate reasons" for attempting to obtain evidence from Johnson through a jailhouse informant. This court would point out, however, that there are clear "policy reasons" for *suppressing* the evidence, which include not allowing the government to assert "legitimate reasons" for use of a jailhouse informant as a pretext for intentional or knowing violation of a defendant's Sixth Amendment right to counsel as to pending charges. Indeed, the Supreme Court alluded to this rationale in *Moulton* when the Court observed, "To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.*" *Moulton,* 474 U.S. at 180, 106 S.Ct. 477.

Unfortunately, in this case, there are disturbing inferences that the government's "legitimate reasons" for monitoring Johnson are little more than *post hoc* justifications or a pretext for obtaining incriminating information from Johnson in the

absence of counsel. As pointed out above, in the court's findings concerning Johnson's placement in the Benton County Jail rather than the Linn County Jail, although several witnesses testified that it was their understanding that AUSA Reinert wanted Johnson placed in the Benton County Jail out of concern that Johnson might attempt to escape, that was not the reason AUSA Reinert himself first gave at the suppression hearing. Instead, on direct examination, AUSA Reinert first stated that his *only* concern when he discussed Johnson's initial placement with Chief Deputy Marshal Arechiga was possible attempts by Johnson to engage in "witness tampering," with suggestions of some concern about an escape attempt only appearing on cross-examination by the government, with a final metamorphosis of the rationale for the placement, under questioning by the court, into concerns about *both* witness tampering and escape.

Furthermore, the "listening post instructions" given to McNeese on September 11, 2000, do not suggest that inchoate crimes, such as escape or witness tampering, were the government's first concern in engaging McNeese as an informant. The first part of the "listening post instructions" to mention the kind of information that McNeese might acquire instead focused upon acquisition of evidence of *charged* crimes, with only a passing reference to *uncharged* crimes, and no reference whatsoever to *inchoate* crimes, as follows:

> You are not to initiate conversations with any individual regarding that individual's *past criminal conduct* in an attempt to elicit or obtain information about that *past criminal conduct.* If someone comes to you and begins a conversation regarding their conduct, *whether charged or uncharged,* you may listen and respond to the statements but you should not begin to question that individual or elicit further information.

Government's Exhibit 4 at 1 (emphasis added). As to *inchoate* crimes, the "listening post instructions" state only the following:

> Exceptions to this memorandum may be made by the United States Attorney's Office in the event we initiate an investigation of an inmate *for crimes not yet committed.* In the event such an investigation is initiated by the United States Attorney's Office, your role and activities in that investigation may differ from the guidance in this memorandum. If such an investigation is initiated, you will be given additional guidance.

*Id.* at 2 (emphasis added). There are no further written instructions to McNeese in the record concerning any investigation initiated by the United States Attorney's Office regarding any escape or witness tampering crimes "not yet committed." Moreover, on the occasions when Agent Basler's notes regarding contacts with McNeese indicate that he reiterated "listening post instructions" or sought further guidance from federal authorities on how McNeese should proceed, his actions were apparently prompted by McNeese's revelations of facts concerning the murders of the witnesses, not by the inchoate crime of finding someone to make a perjured confession to those murders. *See* Defendant's Exhibit J. Similarly, while McNeese's plea agreement plainly provides for cooperation ranging well beyond the immediate Scotter Clark investigation, it is not clear that the cooperation required encompassed the investigation of Angela Johnson's charged, uncharged, or inchoate crimes as part of any "related investigation" to the Scotter Clark investigation, *see* Government's Exhibit 14 at 2–3, because the only apparent nexus between the Scotter Cark investigation and the Angela Johnson investigation was the prosecutor and the informant. While the court stops short of specifically finding that the government's "legitimate

reasons" are simply pretextual, the record in this case is sufficiently disturbing to demonstrate why "legitimate reasons" for surveillance cannot be accepted as a justification or excuse for a *Massiah* violation.

Finally, if "legitimate reasons" could be used to override violation of Sixth Amendment rights, the exception would soon swallow the rule embodied in the Supreme Court's *Massiah* cases, not only making a meaningless travesty of the Sixth Amendment right to counsel, *see, e.g., Moulton*, 474 U.S. at 180, 106 S.Ct. 477 ("To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*."), but opening the door to acceptance of other "legitimate reasons" for violating other constitutional rights of criminal defendants. That is not a result that can be tolerated in a civilized society founded on the rule of law. It is precisely when the lowest or most despised members of society are subjected to the investigatory and penal power of the State, when the charged crimes are most heinous—as the crimes charged against Angela Johnson certainly are—or the defendant's guilt supposedly most obvious, that courts must be most vigilant to protect defendants' constitutional rights for the sake of *all* members of society, the favored as well as the despised. History shows that the tables can turn with shocking rapidity, such that everyone has a vested interest in protection of constitutional rights from erosion, even if that erosion seems justified in a particular case by "legitimate reasons."

In short, a "*Massiah* violation" of Johnson's Sixth Amendment right to counsel, cannot be justified, excused, or cured by assertions (or even proof) that the government had "legitimate reasons" for using an undercover jailhouse informant to obtain incriminating statements from Johnson that relate to pending charges.

***iv. Did the constable just blunder?***
As in *Henry*, "[b]y intentionally creating a situation likely to induce [Johnson] to make incriminating statements without the assistance of counsel," *Henry*, 447 U.S. at 274, 100 S.Ct. 2183, and/or by "knowingly exploiting" the "opportunity to confront [Johnson] without counsel being present," as in *Moulton*, 474 U.S. at 176–77, 106 S.Ct. 477, the government violated Johnson's Sixth Amendment right to counsel. As the Supreme Court observed in *Henry*, "This is not a case where, in Justice Cardozo's words, 'the constable . . . blundered'; rather, it is one where the 'constable' planned [or exploited, *see Moulton*, 474 U.S. at 176, 106 S.Ct. 477] an impermissible interference with the right to the assistance of counsel." *Henry*, 447 U.S. at 275, 100 S.Ct. 2183 (internal citation omitted). Thus, the court finds that the government "deliberately elicited" incriminating statements from Johnson in the absence of counsel.

***b. Conduct of the informant***
█ In contrast to the consideration of the government's conduct, in relation to the "deliberate elicitation" element of a "*Massiah* violation," which focuses primarily on what the government did to "set the stage" for the acquisition of incriminating statements from the defendant, the court finds that consideration of the informant's conduct examines primarily the way in which the informant actually obtained incriminating statements from the defendant. Into this inquiry go consideration, first, of the informant's conduct either as a "listener" or "active participant" in incriminating conversations; the extent to which the agent's conduct exceeded the scope of, or was contrary to, the government's in-

structions, including consideration of whether such "ultra vires" conduct of the agent is nonetheless attributable to the government; and consideration of whether or not conduct *of the defendant* has an impact on whether incriminating statements were "deliberately elicited" from her.

***i. "Passive listening" vs. "deliberate elicitation."*** The Supreme Court's *Massiah* cases make clear that the central inquiry regarding the informant's conduct is whether the informant "deliberately elicited" incriminating statements, or "merely listened" to them. The distinction between "passive listening" and "deliberate elicitation" was first forecast in *Henry.* In that case, the Court found that, "according to his own testimony, [the informant] was not a passive listener; rather he had 'some conversations with [the defendant]' while he was in jail and [the defendant's] incriminating statements were 'the product of this conversation.'" *Henry,* 447 U.S. at 271, 100 S.Ct. 2183. In the face of this

evidence, the Court noted that "we [are not] called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversation about the crime charged." *Id.* at 271 n. 9, 100 S.Ct. 2183.

When that issue was squarely presented to the Supreme Court in *Kuhlmann,* the Court concluded that, even if the government had intentionally created or knowingly exploited a situation that was likely to lead the defendant to make incriminating statements in the absence of counsel, if the informant did no more than listen—which is all the informant did in *Kuhlmann*—there was still no *Massiah* violation. *See Kuhlmann,* 477 U.S. at 460, 106 S.Ct. 2616 (there was no *Massiah* violation, based on the conduct of the informant, where the informant had received and followed directions only to listen to the defendant, "'at no time asked any question' of respondent concerning the pending charges, and ... 'only listened' to respondent's 'spontaneous' and 'unsolicited' statements").[24]

---

**24.** The Third Circuit Court of Appeals reached a similar conclusion on the import of *Kuhlmann* and the Supreme Court's line of *Massiah* cases in *Bey v. Morton,* 124 F.3d 524 (3d Cir.1997):

In each case [in which the Supreme Court considered a *Massiah* issue], those charged with Sixth Amendment violations were conducting, or working with others who were conducting, an investigation of crimes the defendant had been charged with committing. They were thus deliberately seeking to elicit information to be used in connection with the charges pending against the accused, the subject matter of the defendant's attorney-client relationship. *In this line of cases, the Court struggled with the issue of whether there are any circumstances under which the state can deliberately undertake to secure incriminating information from a represented defendant in the absence of counsel and can thereafter use in court the incriminating information it obtains. The answer that has evolved is that it can, only if there is not "elicitation"—only if the government does*

*no more than listen. See Kuhlmann,* 477 U.S. at 459, 106 S.Ct. at 2629–30. *It cannot if the police or their informants question or otherwise encourage or facilitate the defendant's discussion of the crime, and this is true even if the defendant initiates the discussion of the criminal conduct. See Henry,* 447 U.S. at 271–72, 100 S.Ct. at 2187–88.

These strict rules are necessary in *Massiah*-type situations because the state has deliberately set out to secure information for use in a pending prosecution and because the accused, thinking he is communicating with a fellow inmate rather than a state investigator, is exercising no judgment as to whether counsel's advice should be sought. Under these circumstances, the risk of "dilut[ing] the protection afforded by the right to counsel" is great. *Moulton,* 474 U.S. at 171, 106 S.Ct. at 484; *see Henry,* 447 U.S. at 273, 100 S.Ct. at 2188 ("Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents.").

*Bey,* 124 F.3d at 530 (emphasis added).

Similarly, in *Moore*, a decision of the Eighth Circuit Courts of Appeals, the court's analysis of the "deliberate elicitation" element focused on the following matters:

> There is . . . no evidence that Hartwig did anything but act as a passive listening post in gathering this information. . . . In this case, Moore has not alleged anything to suggest he was subject to any improper or surreptitious interrogation.

*Moore*, 178 F.3d at 999–1000. Thus, the Eighth Circuit Court of Appeals found that, in *Moore*, the circumstances established "merely listening" by the agent, within the meaning of *Kuhlmann*, not "deliberate elicitation" within the meaning of *Massiah*. Indeed, all other factors aside, *Moore* involved no evidence that the informant ever had any conversation at all with the defendant; rather, the only evidence was that Hartwig "overheard" Moore's incriminating statements. *Moore*, 178 F.3d at 999.

In its *en banc* decision in *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999), the Third Circuit Court of Appeals also focused on the conduct of the informant in its consideration of whether incriminating statements had been "deliberately elicited" from the defendant. The court agreed with, and deferred to, the state court's determination that the informant had not deliberately elicited the incriminating statements from the defendant:

> In contrast [to the circumstances in *Moulton* and *Henry* ], Lubking's conduct did not approach this level of deliberate elicitation in either phone call. Lubking did not prompt Matteo to disclose the gun's location; rather, Matteo voluntarily called Lubking on January 27 and asked Lubking to retrieve the gun for him, obviously in an attempt to prevent the police from finding the murder weapon. Plainly, it was necessary for Matteo to tell Lubking where the gun was hidden. In fact, the entire purpose of Matteo's calls to Lubking was to enlist his help in locating the rifle, a task that necessarily required Matteo to furnish Lubking with details of the gun's location. Although we recognize that it is unimportant whether Matteo initiated the contact with Lubking, *see Moulton*, 474 U.S. at 174, 106 S.Ct. 477, 88 L.Ed.2d 481, we believe the voluntariness of Matteo's disclosure is relevant to the issue of elicitation. Furthermore, we note that after being notified of Matteo's initial request, the police merely "listened in" as Matteo provided the information that was essential for Lubking to carry out the task. In the first conversation, Lubking said virtually nothing at all, causing Matteo to grow suspicious and question whether he was "getting set up." This pattern was repeated in the second phone call, as Matteo willingly provided a detailed description of the gun's location and Lubking responded almost exclusively with monosyllabic rejoinders such as "okay," "yeah," "uh-huh," and the like. The fact that near the end of the second call Lubking asked a few clarifying questions, which were directly responsive to statements Matteo had just made, does not alter the fundamental nature of the exchange between the two men: namely, Matteo enlisted Lubking's help to track down the murder weapon and voluntarily provided him with the information necessary to do so.
>
> We are also not convinced by Matteo's argument that deliberate elicitation is proved by Lubking's statements in the first conversation that he was not acting at the behest of police. Although the statements were false, we are aware of no rule suggesting that deliberate elici-

tation occurs whenever an informant misrepresents that he is not cooperating with authorities. Matteo claims such a principle is established by the following statement in *Moulton:* "By concealing the fact that [the informant] was an agent of the State, the police denied [defendant] the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." *Id.* at 177, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481. But we do not interpret this language to mean that police informants must disclose, if asked, that they are cooperating with the authorities, or else any incriminating statements made to them are excluded by the Sixth Amendment. If that were the case, criminal suspects could easily circumvent all undercover investigative techniques. Rather, "[w]hen an accused voluntarily chooses to make an incriminatory remark in these circumstances, he knowingly assumes the risk that his confidant may be untrustworthy." *Henry*, 447 U.S. at 297–98, 100 S.Ct. 2183, 65 L.Ed.2d 115 (Rehnquist, J., dissenting).

*Matteo*, 171 F.3d at 896–97 (footnotes omitted).

In short, *Kuhlmann, Moore*, and *Matteo* were all "pure" "listening post" cases, in which the informant did nothing but listen to the incriminating statements made by the defendant. The question here, of course, is whether this case, too, is only a "pure" "listening post" case.

***ii. Was McNeese only a "passive listener"?*** Here, the court finds, without hesitation, that McNeese was not just a "passive listener." McNeese himself admits that he initiated first contact with Angela Johnson, and Sara Bramow's credible testimony supports a finding that it was McNeese who was interested in pursuing the contacts and was angry when Johnson would not come to the cell window

to talk to him when he was in the exercise yard. Objective evidence also shows that notes were passing *both ways* between McNeese and Johnson, and the content of some of those notes shows that Johnson was frequently responding to inquiries by McNeese about the specifics of her case and the evidence known to the government.

Any suggestions by McNeese in his testimony at the suppression hearing that he "just listened" to comments offered by Johnson simply cannot stand, for example, in the face of other testimony concerning the manner in which McNeese testified that he learned that Johnson knew the witnesses she had allegedly murdered were dead:

> I believe she said that—I think I said something like, "if they don't have any bodies, you're not going to get found guilty" or—and said something about if they were alive or something, and she said that they were dead, and I told [Agent Basler] that.

Transcript, Vol. II, p. 434, *ll.* 11–15. Thus, McNeese's own characterization of the conversation is that he was involved in and forwarded a conversation about Johnson's crimes by commenting on the effect of the absence of the alleged murder victims' bodies. To put it another way, here as in *Henry*, "according to his own testimony, [the informant] was not a passive listener; rather he had 'some conversations with [the defendant]' while he was in jail and [the defendant's] incriminating statements were 'the product of this conversation.'" *Henry*, 447 U.S. at 271, 100 S.Ct. 2183. McNeese was not simply "listening."

Moreover, any "mere listener" characterization fails in the face of McNeese's contemporary statements, as recorded by Agent Basler, on September 6, 2000, about the way in which he had obtained information from Johnson, substantial portions of

which are quoted *supra,* beginning on page ——. Even assuming that McNeese "just listened" to Johnson's revelations of a desire or inchoate plan to kill a woman named "Christi," an uncharged matter, in light of the interview notes, any suggestion that McNeese was "just listening" to Johnson's incriminating statements about charged crimes is untenable. Rather, McNeese initiated conversations about charged offenses and admitted that he had fabricated a plan to have someone else confess to the murders with which Johnson was charged, preempting a similar plan first suggested by Dustin Honken. By suggesting such an alternative plan, McNeese put himself in a position to get more information about Johnson's crimes, under the guise of needing information to make a perjured confession credible. It was pursuant to McNeese's plan to suborn a perjured confession that McNeese stated in his interview with Agent Basler that he had learned several details of the murders, including information that the people had been shot, which McNeese indicated Johnson had shared with him "a couple weeks ago," *i.e.,* sometime after mid-August, *see* Defendant's Exhibit F at 5; *and compare* Suppression Hearing Transcript, Vol. III, (Testimony of Agent Basler) at pp. 683–84 (indicating that McNeese told Agent Basler that he had had this conversation with Johnson about August 21, 2000), which means that the information was revealed after government officials were aware of McNeese's contacts with Johnson, but were doing nothing to prevent such contacts, government conduct this court found established McNeese's agency at that time. Also, McNeese specifically told Agent Basler "that he had told Johnson that in order for Greg Long to admit to these crimes, Long would need all of the details of the crimes, so that Long could make a full admission." *Id.* at 6. Thus, McNeese undoubtedly directly questioned Johnson about the circumstances of her charged crimes, or engaged in conduct plainly intended to elicit more details about the crimes than Johnson might otherwise have let drop voluntarily, if unprompted by McNeese's surreptitious interrogation. *Compare Moulton,* 474 U.S. at 165–66, 106 S.Ct. 477 (the informant, a codefendant, "deliberately elicited" incriminating statements from the defendant where he obtained several such statements from the defendant by professing to have a poor memory and asking the defendant to remind him of the circumstances of the crimes and by "reminiscing" about events surrounding the various thefts). The circumstances in this case are, therefore, plainly distinguishable from the circumstances in *Moore,* where the informant only "overheard" incriminating conversations, but did not join in them or participate in any questioning, *see Moore,* 178 F.3d at 999, and *Kuhlmann,* where the informant had received *and followed* directions only to listen to the defendant, "'at no time asked any question' of respondent concerning the pending charges, and ... 'only listened' to respondent's 'spontaneous' and 'unsolicited' statements." *Kuhlmann,* 477 U.S. at 460, 106 S.Ct. 2616.

Furthermore, it is not even clear that affirmative questioning of the defendant by the informant is required to constitute "deliberate elicitation." In *Henry,* the Court observed that "[i]n *Massiah,* no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Henry,* 447 U.S. at 271–72, 100 S.Ct. 2183. Rather, the Court observed that "[i]n both *Massiah* and this case, the informant was charged with the task of obtaining information from an accused." *Id.* at 272 n. 10, 100 S.Ct. 2183. Under those circumstances, "[w]hether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it

was a matter of no concern to the *Massiah* Court." *Id.* Thus, "general conversation" about the defendant's crime may be all that is required to constitute "deliberate elicitation" of incriminating statements, at least where the informant "was charged with the task of obtaining information from an accused," as the court finds that McNeese was here, both before and after the government concedes that McNeese was its agent. Evidence here that McNeese engaged in "general conversation" about Johnson's crimes is abundant, where Johnson herself may have "raised the subject of the crimes under investigation." *See id.* at 271–72, 100 S.Ct. 2183.

Nor did McNeese engage merely in "clarifying questions" or "monosyllabic rejoinders such as 'okay,' 'yeah,' 'uh-huh,' and the like," which might not suffice to cross the line between "passive listening" and "deliberate elicitation." *See Matteo,* 171 F.3d at 896–97 & n. 4. McNeese, not Johnson, fabricated the plan to have a non-existent person named "Greg Long" take credit for the murders of the witnesses, and elicited Johnson's help in making it stick by providing the necessary detail, not the other way around, as in *Matteo,* where the defendant fabricated the plan to track down the murder weapon and voluntarily provided the informant with the information necessary to do so. *See id.* at 897. Similarly, McNeese did more than merely make statements that required no answer in response to Johnson's revelations about her criminal conduct, as was the case in *York. See York,* 933 F.2d at 1359 (the informant's only response to the defendant's confession that he had killed someone was to observe that "you must have been pretty mad at the bitch," which "is not a statement that required an answer, much less a confession to murder"). Rather, McNeese plainly did "s[eek] to capitalize on his good fortune" in obtaining incriminating statements from Johnson "by quizzing [Johnson] about the details of the crimes," thus "deliberately eliciting" such further information. *Compare id.,* 933 F.2d at 1359 (the informant engaged in no such "quizzing"). Unlike the informant in *York,* McNeese's subsequent conduct in fabricating circumstances in which Johnson would reveal further details of her crimes showed that he *"was* hot on the scent of information that could have proven particularly valuable to him in light of [the government's] indication" that it was interested in information of the kind he had provided in the past. *Compare id.* at 1359–60 (emphasis added) (noting that such evidence was absent in the case before that court, so that, although the informant was a "government agent," he had not "deliberately elicited" incriminating information, so that the defendant's Sixth Amendment rights had not been violated).

Finally, just as it was appropriate to consider the effect of Johnson's ignorance of McNeese's role as a government informant and the fact that they were both incarcerated at the time that McNeese was obtaining incriminating statements from her in assessing whether the *government's* conduct showed that the government deliberately elicited those incriminating statements, the court believes that it is appropriate to consider those factors here in assessing whether or not *McNeese* deliberately elicited incriminating statements. From his extensive past experience as a jailhouse informant, McNeese was certainly aware that, when the target of his inquiries was not aware of his role as a government informant, "[c]onversation stimulated in such circumstances [might] elicit information that [the defendant] would not intentionally reveal to persons known to be Government agents." *Henry,* 447 U.S. at 273, 100 S.Ct. 2183. In part because of "pressures" imposed upon Johnson by "the mere fact of custody," and the "subtle influences" that confinement may bring into play, Johnson was "particularly sus-

ceptible" to McNeese's "ploys" to obtain incriminating information from her, *see id.* at 273–74, 100 S.Ct. 2183, and McNeese worked those "ploys," including his fabricated plan to suborn a perjured confession in order to obtain additional incriminating information, with consummate skill gained from long experience. Again, McNeese was able to work those "ploys" notwithstanding that Johnson had been warned by her attorney not to trust McNeese, because he might be an informant. McNeese's ability to overcome such a warning and to elicit incriminating statements was "facilitated by [his] conduct and apparent status as a person sharing a common plight," which allowed him to gain Johnson's confidence, despite the warning that he might be an informant, which is plainly demonstrated in McNeese's notes and communications offering sympathy, guidance, and assistance and Johnson's responses requesting his aid on various points. *See id.* (noting that the fact that the informant had gained the defendant's confidence by appearing to be a person "sharing a common plight" was confirmed by the defendant's request for the informant's assistance with his escape plans after the informant had been released from confinement).

Thus, McNeese "deliberately elicited" incriminating statements from Johnson.

 *iii. Impact of McNeese's "ultra vires" actions.* The government contends that, even assuming that McNeese was a "government agent" as to all of the information obtained from Johnson, and even assuming that he "deliberately elicited" all of that information, the evidence McNeese obtained should not be suppressed, because it was obtained in a manner contrary to the government's express instructions to McNeese to act only as a "listening post." Thus, the government contends that McNeese's conduct should not be attributed to it under *Massiah,* because

McNeese's non-passive conduct was *ultra vires.* The court concludes, however, that this argument is contrary to the holdings of the Supreme Court's decisions in *Henry* and *Moulton.*

In *Henry,* the Court expressly held that such an argument is untenable. In that case, the Court concluded that, even if it accepted the statement of the government agent who instructed the informant to gather information "that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity [of the informant and the defendant] would lead to that result." *Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183. Consequently, the Court found a *Massiah* violation notwithstanding the government's argument "that the federal agents instructed [the informant] not to question [the defendant] about the robbery," because "according to his own testimony, [the informant] was not a passive listener; rather he had 'some conversations with [the defendant]' while he was in jail and [the defendant's] incriminating statements were 'the product of this conversation.'" *Id.* at 271, 100 S.Ct. 2183.

These principles were reaffirmed in *Moulton,* where the informant, like the informant in *Henry,* had received a "no questions" instruction. In *Moulton,* the informant—a codefendant who had agreed to let authorities record his conversation with the defendant—"was instructed 'not to attempt to question [the defendant], just be himself in his conversation....'" *Moulton,* 474 U.S. at 165, 106 S.Ct. 477. Notwithstanding that instruction, the informant, "[a]pologizing for his poor memory, ... repeatedly asked [the defendant] to remind him about the details of what had happened, and this technique caused [the defendant] to make numerous incrimina-

ting statements." *Id.* at 166, 106 S.Ct. 477. The Court noted,

> [In *Henry,*] [t]he Government argued that it should not be held responsible for [the informant's] conduct because its agent had instructed [the informant] not to question [the defendant] and had not intended that [the informant] take affirmative steps to obtain incriminating statements. *We rejected this argument, finding that, under the circumstances, the agent "must have known" that Nichols would take affirmative steps to secure incriminating information. [Henry],* [447 U.S.] at 271, 100 S.Ct., at 2187. *Consequently, the Court held, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel."* *Id.,* at 274, 100 S.Ct., at 2189.

*Moulton,* 474 U.S. at 173–74, 106 S.Ct. 477 (emphasis added). In *Moulton,* the Court went one step further, holding that "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id.* at 176, 106 S.Ct. 477.

Thus, in neither *Henry* nor *Moulton* could the government escape responsibility for an informant's deliberate elicitation of incriminating statements from the defendant, on the ground that the informant had acted contrary to "no questions" instructions, where the government had itself either "intentionally created" or "knowingly exploited" a situation in which the informant was likely to do that very thing. In other words, the government cannot simply rely on a "listening post" instruction as a prophylactic for a Sixth Amendment violation, then close its eyes to the possibility that the informant will disregard such instructions. This case does not present the

circumstance in which the government has neither "intentionally created" nor "knowingly exploited" the opportunity to obtain incriminating statements from the defendant in the absence of counsel. Therefore, whatever the result might be in such a case, the government cannot escape responsibility for McNeese's questioning of Johnson on the ground that his conduct was contrary to express "listening post" instructions.

■ *iv.* **Impact of the voluntariness of Johnson's disclosures.** The government also contends that Johnson "volunteered" information to McNeese by initiating incriminating conversations. This argument fares no better.

In *Henry,* the Court found that, "[i]n *Massiah,* no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Henry,* 447 U.S. at 271–72, 100 S.Ct. 2183. The Court distinguished circumstances in which "the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed." *Id.* at 272, 100 S.Ct. 2183.

> In *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966), for example this Court held that "no interest legitimately protected by the Fourth Amendment is involved" because "the Fourth Amendment [does not protect] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *See also United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Similarly, the Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion. *See Hoffa v. United States,*

*supra*, 385 U.S., at 303–304, 87 S.Ct., at 414–415. But the Fourth and Fifth Amendment claims made in those cases are not relevant to the inquiry under the Sixth Amendment here—whether the Government has interfered with the right to counsel of the accused by "deliberately eliciting" incriminating statements. Our holding today does not modify *White* or *Hoffa.*

*Henry*, 447 U.S. at 272, 100 S.Ct. 2183. Unlike circumstances implicating only the Fourth and Fifth Amendments, the Court's analysis of the Sixth Amendment question expressly excluded the possibility of "waiver" by voluntary disclosure of incriminating statements to an undercover jailhouse informant:

> It is undisputed that Henry was unaware of Nichols' role as a Government informant. The government argues that this Court should apply a less rigorous standard under the Sixth Amendment where the accused is prompted by an undisclosed undercover informant than where the accused is speaking in the hearing of persons he knows to be Government officers. That line of argument, however, seeks to infuse Fifth Amendment concerns against compelled self-incrimination into the Sixth Amendment protection of the right to the assistance of counsel. *An accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then "arms' length" adversaries.*
>
> *When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents.* Indeed, the *Massiah* Court not-

ed that if the Sixth Amendment "is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." The Court pointedly observed that Massiah was more seriously imposed upon because he did not know that his codefendant was a Government agent. 377 U.S., at 206, 84 S.Ct., at 1203.

> *Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. See Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *In that setting, Henry, being unaware that Nichols was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.*

*Henry*, 447 U.S. at 272–73, 100 S.Ct. 2183 (emphasis added). Moreover, the Court recognized the particular impact of incarceration of the defendant with an informant who appears to be no more than a fellow inmate:

> *Finally Henry's incarceration at the time he was engaged in conversation by Nichols is also a relevant factor.* As a ground for imposing the prophylactic requirements in *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), this Court noted the powerful psychological inducements to reach for aid when a person is in confinement. *See also id.,* at 448–454, 86 S.Ct., at 1614–1617. While the concern in *Miranda* was limited to custodial police interrogation, the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover

Government agents. The Court of Appeals determined that on this record the incriminating conversations between Henry and Nichols were facilitated by Nichols' conduct and apparent status as a person sharing a common plight. That Nichols had managed to gain the confidence of Henry, as the Court of Appeals determined, is confirmed by Henry's request that Nichols assist him in his escape plans when Nichols was released from confinement.

*Henry,* 447 U.S. at 273–74, 100 S.Ct. 2183.

Similarly, in *Moulton,* the Court rejected the State of Maine's contention "that the decisive fact in *Massiah* and *Henry* was that the police set up the confrontation between the accused and a police agent at which incriminating statements were elicited." *Moulton,* 474 U.S. at 174, 106 S.Ct. 477. The Court first amplified the State's argument, then decisively rejected it:

> Supported by the United States as *amicus curiae,* the State maintains that the Sixth Amendment is violated only when police intentionally take this or some equivalent step. Because Moulton rather than Colson initiated the recorded telephone conversations and requested the December 26 meeting, the State concludes that Moulton's Sixth Amendment rights were not violated here.
>
> In the first place, the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry.* Thus, while in *Massiah* it may have been the Government agent who was responsible for setting up the meeting with the defendant, one discovers this only by looking to the opinions of the Court of Appeals. It is not mentioned in this Court's opinion since the issue of who set up the meeting with whom was not pertinent to our disposi-

tion. Moreover, four years after *Massiah,* the Court summarily reversed a conviction where the defendant requested the meeting and initiated and led the conversation in which incriminating statements were made to an undercover informant. *Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (*per curiam*). In that case, the Solicitor General made the same argument that he and the State make today, *see* Brief in Opposition, *Beatty v. United States,* O.T.1967, No. 338, pp. 5–8; we rejected this argument in an opinion that simply cited *Massiah.* Finally, in *Henry,* we deemed it "irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused." 447 U.S., at 272, n. 10, 100 S. Ct., at 2187, n. 10.

*Moulton,* 474 U.S. at 174–75, 106 S.Ct. 477 (footnotes omitted).

Thus, even if Johnson had broached the subject of her charged offenses or information related to the location of the bodies, these facts would be of no moment. The question is, did McNeese "only listen" to those incriminating statements? *See, e.g., Kuhlmann,* 477 U.S. at 460, 106 S.Ct. 2616 (there was no *Massiah* violation, based on the conduct of the informant, where the informant had received and followed directions only to listen to the defendant, " 'at no time asked any question' of respondent concerning the pending charges, and . . . 'only listened' to respondent's 'spontaneous' and 'unsolicited' statements"). Here, of course, the court finds that McNeese did much more than "listen," eliciting remarkably detailed information from Johnson concerning her charged crimes by fabricating the scheme to get someone to take credit for the murders and otherwise by engaging Johnson

in conversation and questioning to elicit such information, in violation of Johnson's Sixth Amendment rights.

### 5. Scope of the preclusion

As the court noted above, another issue following logically from the nature of a "*Massiah* violation" is the scope of the preclusion of evidence necessitated by such a violation. The government raised various "scope of preclusion" issues in its Memorandum in Support of Government's Notice of Intent to Use Evidence. Specifically, the government contends that, at the very least, evidence that the witnesses were murdered and evidence of their remains should be admissible at trial on the present charges, because that evidence does not result in the admission of any incriminating statements from Johnson obtained in the absence of counsel. On this point, the government argues further that practicality, fundamental fairness, and the pursuit of truth compel disclosure that the victims were in fact murdered, or the trial could become a "fairytale," in which the parties must pretend that whether or not the victims are dead or were murdered are facts still at issue, when everyone but the jury would know the truth. Finally, the government argues that, even if the evidence is inadmissible in its case-in-chief, it should be admissible to impeach Johnson, should she take the stand. Woven through the government's arguments on the scope of preclusion of evidence is its contention that it is unfair to suppress the evidence when government officials obtained it in a good faith belief that they were legitimately investigating uncharged or inchoate crimes.[25]

In light of the government's arguments and the precedents considered above, the court finds that the "scope of the preclusion" issue has several facets, including the following: (1) what evidence must be precluded, which in turn breaks down into questions about (a) what statements were obtained through a "*Massiah* violation," and (b) how much other evidence is "tainted" by the "*Massiah* violation"; (2) whether the government's "good faith" in acquiring the evidence removes any "taint"; (3) whether the government is only precluded from using the evidence in its case-in-chief in this case, but may still use it for impeachment purposes; and (4) whether the evidence must be precluded as to any and all charges against the defendant or only as to offenses charged at the time that the incriminating statements were elicited.

As to the last issue, in its discussion of attachment of the defendant's Sixth Amendment right, the court pointed out that Sixth Amendment rights are "offense-specific," and that Johnson's Sixth Amendment rights had attached only to the offenses charged in the first indictment at the time McNeese deliberately elicited incriminating statements from her. The specific holding on this point in *Moulton*, this court noted, was as follows: "[I]ncriminating statements pertaining to *pending*

---

**25.** The government also argues that evidence that McNeese made statements *to* Johnson, telling her that she should not trust her lawyer and containing disparaging remarks about her lawyer, should not be suppressed, because there was no showing that Johnson suffered any injury to her Sixth Amendment right to counsel as a result of McNeese's intrusion upon her relationship with her attorney. However, such evidence does not plainly relate to a *Massiah* violation, it does not appear to the court that Johnson has ever asserted any other kind of Sixth Amendment claim premised on such statements, nor does it appear that Johnson has ever asserted that such evidence should not be admissible. Moreover, at this point, the court does not see how such evidence will be relevant to proof of the crimes charged against Johnson. *See* FED. R. EVID. 401. Therefore, the court will not evaluate the admissibility of such evidence further here, leaving that question for later, when the necessity of reaching it has been shown.

*charges* are *inadmissible at the trial of those charges,* notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel," *but* "[i]ncriminating statements *pertaining to other crimes,* as to which the Sixth Amendment right has not yet attached, are, of course, admissible *at a trial of those offenses." Id.* at 180 & n. 16, 106 S.Ct. 477 (emphasis added). The parties have made at least passing arguments that the Supreme Court has recently revisited the question of the scope of preclusion of evidence as to specific kinds of charges as the result of a *"Massiah* violation" in *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). In *Cobb,* the Court held that the Sixth Amendment right to counsel attaches only to charged offenses, and does not extend to uncharged crimes that are "factually related" to charged offenses, although the right does extend to offenses that, even if not formally charged, would be considered the "same offense" under the *"Blockburger* test." Nevertheless, the court does not propose to consider the fourth "scope of preclusion" issue here. The government has only filed a Notice of Intent to Use Evidence, and the defendant has only moved to suppress McNeese's evidence of Johnson's incriminating statements, in Case No. CR 00–3034–MWB, which involves charges brought in the first indictment against Johnson. Before considering whether evidence should also be precluded in Case No. CR 01–3046–MWB, in light of the court's finding in Case No. CR 00–3034–MWB that there has been a *"Massiah* violation," the court believes that further briefing of the issue is necessary. On the other hand, the first, second, and third issues identified above as to "scope of the preclusion" do relate to Case No. CR 00–3034–MWB, and are ripe for consideration here.

#### a. *Extent of the "taint"*

As mentioned above, the issue of what evidence must be precluded as a result of the *"Massiah* violation" in this case breaks down into two separate questions. The first question is, what statements were obtained from Johnson in violation of her Sixth Amendment right to counsel? That question is primarily one of "timing," requiring determination of what statements were deliberately elicited from Johnson while McNeese was acting as an "agent" of the government. The second question is, how much *other* evidence is "tainted" by the *"Massiah* violation"? That question is primarily one of "relationship," requiring determination of whether only Johnson's own statements must be precluded, or whether other "related" evidence must also be precluded.

***i. What statements were obtained in violation of Massiah?*** The court concluded, in the first instance, that McNeese was a government agent, for *Massiah* purposes, for the entire time that both he and Johnson were incarcerated at the Benton County Jail. In the alternative, the court concluded that McNeese was a government agent, for *Massiah* purposes, only as of September 11, 2000, the date on which he signed "listening post instructions" pertaining to Johnson. Although McNeese may not have "deliberately elicited" absolutely everything that Johnson told him, the court's only concern is with what *incriminating* statements McNeese "deliberately elicited" while he was a government "agent."

The court notes that determination of what statements were "deliberately elicited" by the informant, when the informant had contact with the defendant over an extended period of time, might be significantly more complicated than the determination to be made when the informant had only one contact with the defendant.

*Compare, e.g., Moulton,* 474 U.S. at 165–66, 106 S.Ct. 477 (the informant, a co-defendant, deliberately elicited the incriminating statements during a single meeting with the defendant, which was picked up by the informant's "wire"); *Williams,* 430 U.S. at 392–93, 97 S.Ct. 1232 (the informant, a law enforcement officer, deliberately elicited the defendant's incriminating statements during a car ride from Davenport to Des Moines); *Massiah,* 377 U.S. at 203, 84 S.Ct. 1199 (the informant, a co-defendant, deliberately elicited incriminating statements from the defendant on only one occasion, while the police were monitoring their conversation with a radio transmitter placed in the co-defendant's car); *with Kuhlmann,* 477 U.S. at 439–40, 106 S.Ct. 2616 (the informant was incarcerated for some time with the defendant, although the Court found no "deliberate elicitation" by the jailhouse informant); *Henry,* 447 U.S. at 266, 100 S.Ct. 2183 (the jailhouse informant obtained incriminating statements while he was incarcerated with the defendant, although the incriminating statements that were the focus of the *Massiah* claim may have been "the product" of only a single conversation). The matter is somewhat simplified in this case, however, by the court's conclusion that *all* of Johnson's incriminating statements were, in fact, "deliberately elicited" by McNeese. More specifically, McNeese's own characterization of the conversation in which he obtained Johnson's statement that the missing witnesses were dead was that he was involved in and forwarded a conversation about Johnson's crimes by commenting on the effect of the absence of the alleged murder victims' bodies. Also, McNeese stated in his interview with Agent Basler that it was pursuant to McNeese's plan to suborn a perjured confession that he had learned several details of the murders, including information that the people had been shot, and much about Johnson's involvement in the murders.

Finally, it was pursuant to this same plan that McNeese ultimately obtained the maps showing the locations of the murder victim's bodies and Johnson's explanations of those maps.

Nevertheless, "timing" remains a critical issue where, as here, incriminating statements were deliberately elicited over an extended period of time, and the court has made alternative holdings regarding when McNeese was an "agent," that is, either the entire time he and Johnson were both incarcerated at the Benton County Jail, or only after September 11, 2000. *See, e.g., Depree v. Thomas,* 946 F.2d 784 (11th Cir.1991) (considering the timing of whether incriminating statements were obtained before or after the informant became an "agent" of the government, but finding that after the informant had become an "agent," he had not obtained any additional evidence). As to "timing," McNeese obtained Johnson's statements that the witnesses were dead and indicating what her involvement in the killings had been prior to September 6, 2000, and hence before the alternative "agency date," because McNeese disclosed those statements during his interview with Agent Basler. McNeese provided Agent Basler with a still more specific indication of the timing of these revelations and details of the murders, including information that the people had been shot, explaining during the interview that Johnson had shared that information with him "a couple weeks ago," *i.e.,* sometime after mid-August. *See* Defendant's Exhibit F at 5; *and compare* Suppression Hearing Transcript, Vol. III, (Testimony of Agent Basler) at pp. 683–84 (indicating that McNeese told Agent Basler that he had had this conversation with Johnson about August 21, 2000). Thus, this evidence was disclosed after McNeese had notified officials that he was having contact with Johnson, and hence within the period that the court finds that, at least in

the first instance, McNeese was an "agent" of the government, although it was disclosed prior to September 11, 2000, the point at which McNeese was undisputedly an "agent" as a result of the "listening post instructions" from the government. Everything else, however, was revealed to McNeese *after* he was undisputedly an "agent" of the government owing to the "listening post instructions." Thus, the court finds that all of the incriminating evidence McNeese obtained from Johnson is "tainted" by the *Massiah* violation, or, in the alternative, that all of the post-September 11, 2000, incriminating evidence is so "tainted." More specifically, the "tainted" post-September 11, 2000, incriminating evidence includes evidence revealed to Officer Merino on September 18, 2000, to the effect that Johnson had provided a map of the location of the bodies of the witnesses that Johnson is charged with having helped to kill, an explanation of how they had been killed, and an explanation of her involvement in disposing of their bodies. It also includes revelations McNeese told Agent Basler that he had obtained in their post-September 11, 2000, telephone calls, including information about the murder of Terry DeGeus and more information about how the bodies of the murdered witnesses were buried. It also includes the maps McNeese obtained after September 26, 2000, "from the books" in the jail library where he and Johnson left notes for each other, and information indicated in McNeese's contemporaneous notes of a conversation with Johnson concerning the bodies which he said took place approximately September 29 or 30, 2000.

### ii. What evidence, besides statements, is "tainted"?

Supreme Court precedents suggest, at least initially, that it may be only Johnson's own incriminating statements, not evidence flowing from those statements, that must be suppressed. *See Massiah,* 377 U.S. at 206, 84 S.Ct. 1199 ("We hold that the petitioner was denied the basic protections of that [Sixth Amendment] guarantee [of a right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."); *see also Moulton,* 474 U.S. at 178–80, 106 S.Ct. 477 (relying on *Massiah* to hold that the Sixth Amendment violation only requires suppression of evidence of the defendant's "incriminating statements" in the trial of the charged crimes). However, such a reading is too narrow.

Indeed, the Supreme Court considered precisely this question in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), a sequel to *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the case in which the defendant led police to the victim's body after being improperly subjected to interrogation, in the form of "the Christian burial speech," by a law enforcement officer who was transporting him from Davenport to Des Moines in the absence of counsel. The question in *Nix v. Williams,* a *habeas* action, was whether, at Williams's second murder trial in state court, evidence pertaining to the discovery and condition of the victim's body was properly admitted, on the ground that it would ultimately and inevitably have been discovered even if no *Massiah* violation had occurred. *Nix v. Williams,* 467 U.S. at 434, 104 S.Ct. 2501. The Court pointed out that, in *Brewer v. Williams,* it had "noted . . . that although Williams' incriminating statements could not be introduced into evidence at a second trial, evidence of the body's location and condition 'might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams.'" *Nix v. Williams,* 467 U.S. at 437, 104 S.Ct. 2501 (quoting *Brewer v. Williams,* 430 U.S. at 407 n. 12, 97 S.Ct.

1232). In *Nix v. Williams*, Williams contended that evidence of the body's location and condition was " 'fruit of the poisonous tree,' *i.e.*, the 'fruit' or product of Detective Leaming's plea to help the child's parents give her 'a Christian burial,' which th[e] Court had already held equated to interrogation," and so admitting the evidence "violated the Sixth Amendment whether it would have been inevitably discovered or not." *Id.* at 441, 104 S.Ct. 2501.

In *Nix v. Williams*, the Court traced the genesis and development of the "doctrine requiring courts to suppress evidence as the tainted 'fruit' of unlawful governmental conduct," that is, "not only [applying exclusion] to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence," from *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See Nix v. Williams*, 467 U.S. at 442. The Court noted that, "[a]lthough *Silverthorne* and *Wong Sun* involved violations of the Fourth Amendment, the 'fruit of the poisonous tree' doctrine has not been limited to cases in which there has been a Fourth Amendment violation," because the Supreme Court had also applied the rule to violations of the Fifth and Sixth amendments. *Nix v. Williams*, 467 U.S. at 442, 104 S.Ct. 2501. Thus, the Supreme Court began its analysis with the postulate that the "exclusionary rule" or "fruit of the poisonous tree" doctrine applies to evidence obtained as the result of a *"Massiah* violation."

■ The Court noted, however, that both *Silverthorne* and *Wong Sun* placed limits on the scope of preclusion, permitting admission of evidence that might otherwise be suppressed as the result of a constitutional violation where knowledge of the evidence was gained from an independent source. *Id.* The Court explained further:

The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

By contrast, the derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; Williams' statements to Leaming indeed led police to the child's body, but that is not the whole story. The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule.

*Nix v. Williams*, 467 U.S. at 442–44, 104 S.Ct. 2501 (footnote and citations omitted). Thus, a *Massiah* violation requires the court to invoke the "fruit of the poisonous tree" exclusionary rule, but subject, where warranted, to the "independent source" or "ultimate and inevitable discovery" exceptions.

Subsequent decisions of the lower courts are in accord with applicability of the "fruit of the poisonous tree" rule to *Massiah* violations. In *United States v. Kimball*, 884 F.2d 1274 (9th Cir.1989), the Ninth Circuit Court of Appeals addressed the scope of preclusion of evidence required by a *Massiah* violation as follows:

Having concluded that a constitutional violation occurred, we now turn to the more difficult question that lies at the heart of this appeal: What is the appropriate scope of the relief to be afforded Kimball? The Government argues strenuously that the only proper remedy for a *Massiah* violation is suppression of any statements that have been improperly elicited from the defendant. We agree that the Constitution requires no less. *See Massiah*, 377 U.S. at 207, 84 S.Ct. at 1203 (holding that "the defendant's own incriminating statements, obtained by federal agents under the circumstances ... disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial" (emphasis omitted)). In *Nix v.*

*Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), however, the Supreme Court concluded that more may at times be necessary to neutralize the taint produced by governmental misconduct. *Specifically, the Nix Court held that violation of Massiah requires suppression of all derivative evidence gleaned through exploitation of the Government's wrongdoing. Id.* at 441–43, 104 S.Ct. at 2507–08; *see also Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (announcing suppression rule for all "fruits of the poisonous tree"). *Thus, the appropriate remedy for a violation of Massiah includes not only suppression of all evidence directly obtained through governmental misconduct, but also suppression of all evidence that can properly be designated the fruits of that conduct.*

\* \* \* \* \* \*

When determining whether a particular piece of evidence is the fruit of police illegality, we ask "whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted). We have further held that in order for evidence to be suppressed as the fruit of a constitutional violation, the violation must at a minimum have been the "but for" cause of the discovery of the evidence. *See, e.g., United States v. Miller*, 822 F.2d 828, 830–31 (9th Cir.1987).

*Kimball*, 884 F.2d at 1278–79. Applying these standards, the court in *Kimball* held that the district court had properly suppressed not only the defendant's incriminating statements, obtained directly through a "*Massiah* violation," but had also proper-

ly suppressed subsequent statements of an alleged co-conspirator, where evidence of the co-conspirator's statements was "fruit of the poisonous tree" derived from the "*Massiah* violation." *Id.* at 1279–80. The court observed that "when the Government chooses to violate a defendant's Sixth Amendment rights in order to advance its undercover objectives, it must be prepared to live with the consequences of that decision." *Id.* at 1280; *and compare United States v. Terzado–Madruga,* 897 F.2d 1099, 1112–1114 (11th Cir.1990) (also noting that the "fruit of the poisonous tree" doctrine applies to a *Massiah* violation, pursuant to *Nix v. Williams,* but holding that exceptions applied, because the government had obtained the challenged evidence not by exploitation of the *Massiah* violation, but "by means sufficiently distinguishable to be purged of the primary taint").

■■■ The government does not even attempt to argue that the location of the bodies of the murder victims, and indeed, the bodies themselves, are not "fruit of the poisonous tree" of a *Massiah* violation or somehow fall within an exception to that exclusionary doctrine, for example, because they were also discovered via an "independent source" or would "inevitably" have been discovered, even without Johnson's incriminating statements obtained in violation of *Massiah.* Rather, the government contends that practicality, fundamental fairness, and the pursuit of truth compel disclosure that the victims were in fact murdered, or the trial could become a "fairytale," in which the parties must pretend that whether or not the victims are dead or were murdered are facts still at issue, when everyone but the jury would know the truth. However, in *Nix v. Williams,* the Supreme Court reasoned that these interests were properly balanced against the violation of the defendant's rights by a "*Massiah* violation" by application of the "exclusionary rule" and

exceptions to it, such as the "independent source" and "inevitable discovery" rules. *See Nix v. Williams,* 467 U.S. at 442–44, 104 S.Ct. 2501. Moreover, the trial will not be a "fairytale," just because the government is required to prove elements of crimes charged with *admissible* evidence that is not derivative of a "*Massiah* violation." The burdens of coming forward with such proof, the court finds, are the sort of "consequences of th[e] decision" to "violate a defendant's Sixth Amendment rights in order to advance its undercover objectives" that the government "must be prepared to live with." *Kimball,* 884 F.2d at 1280.

### b. Does the government's "good faith" remove the "taint"?

The government also argues that it is unfair to suppress evidence that was obtained through the "*Massiah* violation" or that constitutes "fruit of the poisonous tree" of that violation in this case, because government officials obtained that evidence in a good faith belief that they were legitimately investigating uncharged or inchoate crimes. First, the court has suggested that the government's "good faith" here may be questionable, in light of evidence creating at least an inference that the government's "legitimate reasons" for Johnson's placement in the Benton County Jail and supposed "legitimacy" of its investigation of "uncharged" or "inchoate" crimes are pretexts for attempting to obtain evidence of *charged* crimes in the absence of counsel. However, more completely dispositive of this argument is that it is little more than a repackaging of the "legitimate purposes" argument this court concluded above was torpedoed by *Moulton,* 474 U.S. at 178–80, 106 S.Ct. 477, and *United States v. Bender,* 221 F.3d 265, 270–71 & n. 4 (1st Cir.2000). *See supra* beginning at page 133. The court deems it

unnecessary to engage in further analysis of this contention before rejecting it.

### c. Can the evidence be used for impeachment?

■ Finally, the government contends that, if the evidence obtained in violation of *Massiah* or derivative of such a violation is inadmissible in the government's case-in-chief, it should nevertheless be admissible to impeach Johnson, should she take the stand. This argument stands on firmer ground. As the First Circuit Court of Appeals explained in *United States v. Bender*, 221 F.3d 265 (1st Cir.2000), "Nothing prevents the government from using [the defendant's] statements [obtained in violation of *Massiah* ], if knowing and voluntary, for the purpose of impeachment, if [s]he testifies. *See Michigan v. Harvey*, 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)." *Bender*, 221 F.3d at 271.[26] Thus, to this limited extent, evidence of Johnson's incriminating statements, obtained by McNeese in violation of her Sixth Amendment rights, and evidence that is otherwise "fruit of th[at] poisonous tree," may be admissible.

## V. CONCLUSION

Although the path to this conclusion has been long and arduous, the court's ultimate conclusions can be summarized relatively briefly. First, Robert McNeese was a "government agent" for *Massiah* purposes for the entire time he and defendant Johnson were both incarcerated in the Benton County Jail, even in the absence of specific instructions from government officials to get information about Johnson, because of his "symbiotic relationship" with the government as a long-standing jailhouse informant who had been led to believe that certain benefits would flow

from providing incriminating information obtained from other inmates. While specific instructions to an informant to get information about a *particular* defendant will certainly suffice to establish the informant's "agency" for *Massiah* purposes, and the absence of any other evidence of agency would be fatal to a *Massiah* claim, such defendant-specific instructions are not *necessarily* required to establish "agency" for *Massiah* purposes under *Henry*, 447 U.S. at 270–71, 100 S.Ct. 2183. Rather, this court concludes that the question of the informant's "agency" is not subject to any "bright line rule," but must be determined in light of all of the circumstances, including whether the government has expressly, implicitly, or tacitly, directed the informant to obtain incriminating information from other inmates, for example, by creating a reasonable expectation on the part of the informant that providing such information will be rewarded with payment or other benefits. Moreover, Eighth Circuit precedent apparently stating a different "bright line rule," *Moore v. United States*, 178 F.3d 994 (8th Cir.), *cert. denied*, 528 U.S. 943, 120 S.Ct. 356, 145 L.Ed.2d 278 (1999), is not to the contrary, because the facts in that case did not reasonably give rise to consideration of the question of "agency" in circumstances suggesting such an implicit agreement. In the alternative, McNeese was undisputedly a government agent for *Massiah* purposes as of September 11, 2000, when he signed "listening post instructions" regarding Johnson.

Moreover, Johnson's incriminating statements were "deliberately elicited" from her. The government "intentionally created" the opportunity to circumvent Johnson's right to counsel, by placing

---

**26.** The First Circuit Court of Appeals also observed in *Bender* that "nothing prevents the government from using these statements at sentencing if [the defendant] is tried and convicted. *See* U.S.S.G. § 3C1.1." *Bender*, 221 F.3d at 271.

Johnson in a jail like the Benton County Jail with McNeese, and also "must have known that [the] propinquity [of McNeese and Johnson in that jail] likely would lead to [securing incriminating information]," owing to what government officials knew or should have known about the nature of that jail and about McNeese. In the alternative, or in addition, the court finds that the government certainly "knowingly exploited" an opportunity to circumvent Johnson's right to counsel when, that opportunity presented itself, by the government's utter failure, for nearly a month before giving McNeese "listening post instructions," to take reasonably available steps to stop the contacts between McNeese and Johnson or otherwise to act upon its "affirmative obligation to respect and preserve [Johnson's] choice to seek [counsel's] assistance," *see Moulton,* 474 U.S. at 171, 106 S.Ct. 477, despite McNeese's many notices to government officials that he was having contact with Johnson. Furthermore, McNeese himself "deliberately elicited" each of the incriminating statements at issue here by acting as much more than a "passive listener." Rather, McNeese initiated and pursued contacts with Johnson, and not only engaged her in "general conversation" about her charges, but fabricated a plan to suborn a perjured confession to the murders with which she was charged as a means of eliciting details about the murders from her. Thus, McNeese undoubtedly directly questioned Johnson about the circumstances of her charged crimes, or engaged in conduct plainly intended to elicit more details about the crimes than Johnson might otherwise have let drop voluntarily, if unprompted by McNeese's surreptitious interrogation. Neither the supposed "legitimate purposes" of the government's surveillance of Johnson, the supposed "vol-

untariness" of her disclosures to McNeese, or the government's supposed "good faith" in obtaining information about charged offenses while pursuing an investigation of uncharged or inchoate criminal conduct can excuse or justify the "*Massiah* violation" in this case.

Finally, as to the evidence that must be precluded owing to the "*Massiah* violation," the court concludes that all of Johnson's incriminating statements, including statements that the witnesses were dead and indicating Johnson's involvement in the killings, which had been obtained prior to September 11, 2000, were "deliberately elicited" while McNeese was a government agent. In the alternative, all of the post-September 11, 2000, statements, which identified, for example, the location of the murder victims' bodies, were obtained through a "*Massiah* violation." Furthermore, the bodies themselves and other evidence of the charged crimes derived from recovery of the bodies must be suppressed as "fruit of the poisonous tree," in the absence of any attempt by the government to show that such evidence was derived from an "independent source" or would "inevitably have been discovered" by untainted means. However, nothing prevents the government from using Johnson's incriminating statements obtained in violation of *Massiah,* if knowing and voluntary, for the purpose of impeachment, if she testifies.[27]

This case is a grim illustration of the twofold cost to society of overzealous pursuit of incriminating evidence by unconstitutional means. First, the "*Massiah* violation" in this case resulted in the denial of the basic protections of the Sixth Amendment guarantee of the right to counsel to a criminal defendant. *See, e.g., Massiah,* 377 U.S. at 206, 84 S.Ct. 1199. That cost

---

**27.** The court also assumes, without deciding, that the evidence obtained from Johnson by McNeese will be admissible in the companion prosecution of Dustin Honken.

alone is distressing to the interests of a civilized society. Equally distressing is the second cost to the interests of society, which is the inability of the government to use at trial probative evidence of a very serious crime. *See, e.g., Nix v. Williams,* 467 U.S. at 442–44, 104 S.Ct. 2501 (noting that exclusionary rules are the result of balancing of these interests). Although these costs may be the "consequences of th[e] decision" to "violate a defendant's Sixth Amendment rights in order to advance its undercover objectives" that the government "must be prepared to live with," *Kimball,* 884 F.2d at 1280, they are costs *to the interests of society* that society should not have to pay. Moreover, they are costs that can best be avoided by reasonable efforts of government officials to protect the constitutional rights of the accused.

THEREFORE, in light of the foregoing,

1. The government's Notice of Intent to Use Evidence from the jailhouse informant in Case No. CR 00–3034–MWB, to the extent it seeks an order permitting use of such evidence, is **denied**, and the defendant's responsive motion to suppress such evidence is **granted**, to the extent explained herein.

2. In light of the court's finding in Case No. CR 00–3034–MWB that there has been a *"Massiah* violation," the court establishes the following briefing schedule concerning whether evidence obtained from Johnson by McNeese should also be precluded in Case No. CR 01–3046–MWB:

 a. Defendant's brief on the issue shall be filed **on or before May 14, 2002.**

 b. Plaintiff's responsive brief shall be filed **on or before June 4, 2002.**

 c. Defendant's reply brief, if any, shall be filed **on or before June 14, 2002.**

The court will set oral arguments on the issue by separate order after consultation with counsel.

**IT IS SO ORDERED.**